UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | No. 21-CR-383 (BAH) |
| v. | : | |
| | : | |
| PATRICK STEDMAN | : | |
| | : | |

---

**DEFENDANT STEDMAN'S BRIEF IN SUPPORT OF PRETRIAL MOTIONS**

---

On the Brief:

ROCCO C. CIPPARONE, JR., ESQUIRE
Law Offices of Rocco C. Cipparone, Jr.
157 Bridgeton Pike Suite 200-320
Mullica Hill, NJ 08062
(856) 547-2100
Fax: (856) 547-2225

www.CipparoneLaw.com

*Counsel for Patrick Stedman*

# TABLE OF CONTENTS

PROCEDURAL HISTORY AND RELEVANT FACTS ......................................................... 1

LEGAL ANALYSIS AND ARGUMENT ................................................................. 6

I.    Count One Charging Violation of 18 U.S.C. § 1512 (c)(2) Must be Dismissed ................. 6

A.    Congress's certification proceeding was not an "official proceeding" within the meaning of 18 U.S.C. § 1512 ............................................................................... 6

B.    Count One must be dismissed because it fails to allege Mr. Stedman took some action with respect to a document, record, or other object as required to Violate 18 U.S.C. § 1512(c)(2)..... 10

C.    If 18 U.S.C. § 1512(C)(2) is Construed to Apply to the Congressional Session on January 6th as an "Official Proceeding", it is Unconstitutional as Applied to Mr. Stedman...................... 11

1.    Due Process violation - Lack of Fair Notice.......................................................... 11

2.    Due Process and Equal Protection violation – Arbitrary Application ..................................... 13

3.    Application of § 1512(c)(2)'s "corruptly" requirement to Mr. Stedman in Count One is void for vagueness ......................................................................................... 16

4.    Given its ambiguity Count One should be dismissed pursuant to the Rule of Lenity ............. 19

5.    Count One's novel construction of 18 U.S.C. § 1512(c)(2) operates as an *ex post facto* law and thus its application to Mr. Stedman violates the Due Process Clause............................... 21

6.    Count One's application of § 1512(c)(2) is invalid under the First Amendment as applied to Mr. Stedman ............................................................................................. 22

II.   Counts Two and Three Charging Violations of 18 U.S.C. § 1752 Must be Dismissed ..... 26

1.    Counts Two and Three fail to state offenses because they do not allege – nor can the government prove – that the U.S. Secret Service designated the alleged restricted areas ................. 26

2.   Count Three must be dismissed because 18 U.S.C. § 1752(a)(2) on its face and as applied in Count Three sets forth unconstitutionally vague boundary standards............................................. 28

III.  The Government Should be Precluded from Presenting Evidence regarding any Events of January 6, 2021 for which it cannot Demonstrate Mr. Stedman was Present and Observed ....... 31

IV.  Mr. Stedman Requests Expanded Voir Dire and Additional Peremptory Challenges ....... 32

# TABLE OF AUTHORITIES

**Cases**

*Boone v. U.S.*, 483 A.2d 1135 (D.C. Cir. 1984) ....................................................... 37

*\*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ................................................. 21, 22

*Brown v. Louisiana*, 383 U.S. 131 (1966) ................................................................ 24

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................ 16

*\*Chicago v. Morales*, 527 U.S. 41 (1999) ............................................................ 29, 30

*\*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) ................................. 12, 29, 30

*\*Edwards v. Dist. of Columbia*, 755 F.3d 996 (D.C. Cir. 2014) ...................... 22, 24, 25

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982) .............. 12, 13, 30

*Johnson v. U.S.*, 576 U.S. 591 (2015) ...................................................................... 11

*\*Pointer v. U.S.*, 151 U.S. 396 (1894) ..................................................................... 37

*\*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .............................................. 11, 13, 19

*Skilling v. U.S.,* 561 U.S. 358 (2010) ...................................................................... 35

*Snyder v. Phelps*, 562 U.S. 443 (2011) ................................................................... 24

*\*Texas v. Johnson*, 491 U.S. 397 (1989) .................................................................. 23

*Tinker v. Des Moines Ind. Comm. School. Dist.*, 393 U.S. 503 (1969) ...................... 23

*U.S. v. Griffen*, 21-CR-92 (TNM) .......................................................................... 26

*\*U.S. v. Alford,* Criminal Action 21-263 (TSC)(D.D.C. April 18, 2022)(DDE46) .................... 36

*U.S. v. Bell*, 506 F.2d 207 (D.C. Cir. 1974) ............................................................ 16

*U.S. v. Bronstein*, 849 F.3d 1101 (D.C. Cir. 2017) .................................................. 11

*U.S. v. Caputo*, 201 F. Supp. 3d 65 (D.D.C. 2016) .................................................. 25

*\*U.S. v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) ..................................................... 8

*U.S. v. Gordon*, 829 F.2d 119 (D.C. Cir. 1987) ........................................................ 36

*U.S. v. Grace*, 461 U.S. 171 (1983) ........................................................................ 24

*\*U.S. v. Hairston*, 495 F.2d 1046 (D.C. Cir. 1974) ................................................. 16

*\*U.S. v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994) ...................................................... 9

*U.S. v. Lanier*, 520 U.S. 259 (1997) ...................................................................... 11

*\*U.S. v. Miller*, Criminal Action No. 1:21-cr-00119 (CJN) ..................................... 10

*\*U.S. v. O'Brien*, 391 U.S. 367 (1968) ............................................................. 24, 25

*\*U.S. v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) ........................... 12, 13, 17, 18, 19

*\*U.S. v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) ............................................... 8

*\*U.S. v. Santos*, 553 U.S. 507 (2008) ............................................................. 20, 21

*U.S. v. Sunia*, 643 F.Supp.2d 51 (D.D.C. 2009) .................................................... 6

*U.S. v. Villanueva-Sotelo*, 515 F.3d 1234 (D.C. Cir. 2008) .................................... 20

*U.S. v. Wilson*, 160 F.3d 732 (D.C. Cir. 1998) ...................................................... 32

*\*U.S. v. Granderson*, 511 U.S. 39 (1994) ........................................................ 20, 21

## Statutes

18 U.S.C. § 1501 ...................................................................................................... 8

18 U.S.C. § 1502 ...................................................................................................... 8

18 U.S.C. § 1503 ...................................................................................................... 8

18 U.S.C. § 1504 ...................................................................................................... 8

18 U.S.C. § 1505 ..................................................................... 7, 8, 9, 17, 18, 19, 24, 26

18 U.S.C. § 1506 ...................................................................................................... 8

18 U.S.C. § 1507 ...................................................................................................... 8

18 U.S.C. § 1508 ...................................................................................................... 8

18 U.S.C. § 1509 ..................................................................................................... 8

18 U.S.C. § 1510 ..................................................................................................... 8

18 U.S.C. § 1511 ..................................................................................................... 8

18 U.S.C. § 1513 ..................................................................................................... 8

18 U.S.C. § 1514 ..................................................................................................... 8

18 U.S.C. § 1514A ................................................................................................... 8

18 U.S.C. § 1515 ................................................................................... 7, 8, 18, 19

18 U.S.C. § 1516 ..................................................................................................... 8

18 U.S.C. § 1519 ..................................................................................................... 8

18 U.S.C. § 1520 ..................................................................................................... 8

18 U.S.C. § 1521 ..................................................................................................... 8

18 U.S.C. § 1752 ........................................................................................ 1, 27, 28

18 U.S.C. § 2 .................................................................................................... 1, 32

18 U.S.C. § 3056 ................................................................................................... 27

18 U.S.C. § 1512 .................. 1, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 19, 20, 21, 22, 23, 24, 25, 26

18 U.S.C.§ 1517 ..................................................................................................... 8

18 U.S.C.§ 1518 ..................................................................................................... 8

3 U.S.C. § 15 ......................................................................................................... 28

40 U.S.C. § 5104 ................................................................................................ 1, 2

False Statements Accountability Act of 1996, Pub. L. No. 104-292, §3 ...................................... 19

**Rules**

Fed. R. Crim. P. 12 ................................................................................................ 6

*FED. R. EVID. 401 ........................................................................................... 31, 32

*Fed. R. Evid. 402 ......................................................................................... 32

*Fed. R. Evid. 403 ......................................................................................... 32

**Other Authorities**

167 Cong. Rec. H79 ........................................................................................ 7

167 Cong. Rec. S16 ........................................................................................ 7

Black's Law Dictionary (11th Ed. 2019) .................................................... 28

DOJ Criminal Resource Manual, CRM 1729 ............................................. 10

https://dictionary.cambridge.org/dictionary/english/proximity ................. 30

Merriam-Webster (2021) .............................................................................. 28

## PROCEDURAL HISTORY AND RELEVANT FACTS

On January 20, 2021, a Criminal Complaint was filed against Mr. Stedman, which included an Affidavit in support thereof averring facts in support of the violations of 18 U.S.C. § 1752(a), and 40 U.S.C. § 5104(e)(2) charged therein. See DDE 1 (Criminal Complaint).[1]  On June 2, 2021, a grand jury returned an indictment charging Defendant Patrick Stedman with the following offenses based on alleged conduct occurring in the U.S. Capitol and its grounds on January 6, 2021:

- **Count One**: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2. Count One alleges that on January 6, 2021 Mr. Stedman "did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18".

- **Count Two**: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).

- **Count Three**: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 18 U.S.C. § 1752(a)(2).

- **Count Four**: Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D).

---

[1] DDE refers to "District Docket Entry". Where no docket number is provided when using "DDE" herein, the reference is to a docket entry in the instant case.

- **Count Five**: Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

DDE 14 (Indictment). Although the indictment is devoid of significant factual allegations, the Affidavit in support of the Criminal Complaint referenced above provides overview of the government's factual allegations in this case.[2] "Facts" referenced herein are drawn from the Affidavit in support of the Criminal Complaint, except as otherwise noted herein.[3]

The government contends that the U.S. Capitol building (hereinafter "Capitol") is secured 24 hours per day by Capitol Police, that restrictions around the Capitol include temporary and permanent barriers, that only authorized persons with identification are allowed access, and that the Capitol's exterior plaza was closed to the public on January 6, 2021.

As to the events of January 6, 2021, the government contends that there was a joint session of Congress convened at 1:00 pm in the Capitol to certify the Electoral College vote count of the 2020 Presidential Election, with then Vice President Pence presiding. By approximately 1:30 pm the House and Senate adjourned to separate chambers to resolve an objection, with VP Pence then presiding over the Senate breakout session. As such was occurring, a crowd gathered outside the Capitol, with Capitol Police attempting to keep the crowd away. At about 2:00 pm, some individuals (not Mr. Stedman) forced their way through or over barricades and Capitol Police, and advanced to the exterior façade of the Capitol. Shortly

---

[2] All factual allegations and discovery references are stated as background regarding the instant motions only, without prejudice to defendant's contest of all facts at trial.

[3] Facts gleaned from the discovery provided generally are cited by reference to the labelling of such by the government in discovery production. As the facts presented are mostly for background and are not necessary to the disposition of the motions, and (for purposes of the motions only) are not contested by the defense, copies are not presented as exhibits hereto.

after 2 pm, some individuals (again not Mr. Stedman) forced entry into the Capitol including by breaking windows and assaulting Capitol Police, with encouragement from the crowd. At about 2:20 pm members of the Senate and the House of Representatives, and VP Pence, evacuated the respective chambers, which according to the government "effectively suspended"[4] all proceedings of Congress until approximately 8:00 pm. At about 8:00 pm the proceedings resumed.

Mr. Stedman was present in Washington D.C. on January 6, 2021. Mr. Stedman had posted on December 30, 2020 on Twitter that he would attend, and invited others to direct message him if they were planning on coming.[5] No "tweets" or communications indicated that Mr. Stedman anticipated or planned to engage in any criminal let alone violent or destructive conduct. Mr. Stedman posted updates on January 5, 2021 that he was on his way that night to the District of Columbia.[6]

On January 6, 2021 Mr. Stedman to some extent on Twitter posts chronicled some events of the day, including a picture of himself inside the Capitol building. Mr. Stedman's posts indicated that he had not seen any violence or destructive behavior: "'I can tell you having been in the Capitol these videos the MSM (mainstream media) is showing of fights between cops and protestors are unlike any of the dynamics I saw….'"[7] Mr. Stedman was advised at some point that shots were fired, but himself did not witness such. That is also consistent with certain

---

[4] DDE 1 (Criminal Complaint/Affidavit) at 2.

[5] DDE 1 (Criminal Complaint/Affidavit) at 5.

[6] DDE 1 (Criminal Complaint/Affidavit) at 6.

[7] DDE 1 (Criminal Complaint/Affidavit) at 7.

discovery provided by the government, including video apparently from Mr. Stedman's phone in which he stated, among other things, that "they declared a recess and as I turned the corner I had guns pointed at me and some girl got shot, I didn't see her but it was apparently pretty bad, blood everywhere, they took her out."[8] In the same video, Mr. Stedman does state that he was "in pretty much the first wave of this and we got to, broke down the doors climbed at the back part of the Capitol Building and got all the way to the chambers …."[9] Mr. Stedman stated in various What's App text messages that day that he did enter Speaker Pelosi's office[10], and there is a discovery video (apparently from Mr. Stedman's cell phone) of him walking into Pelosi's office.[11]

On January 6th Mr. Stedman posted a video (made some time after he had left the Capitol building).[12] In the video, Mr. Stedman states (among other things)

> no cops were stopping us … so we go up and I get to the top and I see that a door had been broken into and there is a little bit of glass on the floor leading into the Capitol, but right next to that door **there's about 5 cops waiving us in and they let us in** … **they are actually instructing us where to go**….  I want to emphasize something … **I didn't break anything, I didn't touch a door, I just just walked in the hallways, and I didn't assault any police officers, I didn't touch any police officers, I actually had some good conversations with police officers, but I want people to understand** … the cops weren't doing anything for the most part

---

[8] All quotations from videos are the defense best attempt to quote accurately from the video without transcripts.

[9] These facts are from a discovery video labeled QPH2.2021-05-06.16-43-51/IMG_1745.mov provided in discovery.

[10] This reference is from the discovery file labelled QPH2.2021-04-23.11-16-15\Chats-Texts of Interest.

[11] This reference is from the discovery video file labelled QPH2.2021-05-20.12-21-48/IMG_1714.mov.

[12] DDE 1 (Criminal Complaint/Affidavit at 8). A copy of the video was provided in discovery under the reference PHOTOS AND VIDEOS\"Pat_Stedman-2021-01-12_15-42" (file name).

they let us run into the Speaker's Chamber…. The first act of physical destruction I saw was they were trying to get inside Congress…. …

The one point that I did see some destruction of property you could say was when people were trying to get inside the Congressional, the main Congressional Hall, **I did not participate in that**, watched it from the back, went around, went up, saw the doors were locked there … went downstairs and there were 3 men who are not in the Capitol Police outfit, had little stars, semi-plain clothes, kind of looked like Congressional SS, and they had guns out… there was tear gas, did not seem to affect me …at that point **I talked to a police officer who said there were shots fired and you need to get out of here now as things are going to escalate, I went to Eastern entrance**, I had come in from the western side, DC riot police coming in, no violence and maybe like a push **and I am not doing anything** … sitting on a bench….

I had no idea that there were people in the Chamber, I had no idea how they got in there, as far as I understood no one got in there, there were people with guns keeping them out….

I started to go up around 2:15, I think it started about 10 minutes before that because by the time I got there, there were already people climbing up the stuff… **it seemed like the police wanted us to go in**, there was no breaking and entering… we were not fighting the police to go in, **the police were telling us to come in… go ahead, take a right** ….

(bold added).

It appears from the discovery provided to date that there is no evidence Mr. Stedman intended to commit or committed any violent act, encouraged any violent act, or entered or remained in the Capitol Building with the intent of doing so. It further appears that other than through lawful First Amendment expression, Mr. Stedman did not have the intent to "obstruct, influence, and impede … Congress's certification of the Electoral College vote …." (Indictment Count One), or "intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct." (DDE 14, Indictment Count Three). Also, the evidence does not support that he acted with any intent to "corruptly obstruct, influence, and impede … Congress's certification of the Electoral College vote… ." (DDE 14, Indictment Count One).

Discovery reveals that Mr. Stedman perceived not only that Capitol Police were not precluding the admission of himself and others into the Capitol, but indeed affirmatively were waving him and others in and providing directions and other signals within the Capitol. Indeed, when a Capitol Police Officer advised Mr. Stedman it would be prudent to leave the Capitol, as noted above, Mr. Stedman did so. Mr. Stedman therefore acted without the requisite intent to "knowingly enter and remain in a restricted building and grounds… without lawful authority to do so." (Indictment Count Two). For the same reasons, Mr. Stedman also did not commit the crimes charged in Counts Four and Five of the Indictment.

## LEGAL ANALYSIS AND ARGUMENT

### I.      Count One Charging Violation of 18 U.S.C. § 1512 (c)(2) Must be Dismissed

Because Count One does not state an offense pursuant to 18 U.S.C. § 1512(c)(2), Count One must be dismissed. Fed. R. Crim. P. 12 provides that a pre-trial motion to dismiss is appropriate when there is a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v). "When considering a motion to dismiss for failure to state an offense, the court 'is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes.'" *U.S. v. Sunia*, 643 F.Supp.2d 51, 60 (D.D.C. 2009) (quoting *U.S. v. Sanford, Ltd.*, 859 F. Supp. 2d 102, 107 (D.D.C. 2012)).

### A.  Congress's certification proceeding was not an "official proceeding" within the meaning of 18 U.S.C. § 1512

Title 18 U.S.C. § 1512(c)(2) provides: "Whoever corruptly … otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so shall be fined … or

imprisoned…." 18 U.S.C. § 1512(c)(2). "Official proceeding" in relevant part[13] to the instant case, is defined in 18 U.S.C. § 1515(a)(1) as "(B) a proceeding before the Congress…." 18 U.S.C. § 1515 (a)(1). Because the January 6, 2021 Congressional certification proceeding was not an exercise of Congress's implied power of investigation in aid of legislation, adjudication, or any quasi-judicial function, it was not a "proceeding before the Congress" within the meaning of § 1512 and § 1515. Therefore, Count One must be dismissed.

The structure, text, and context of Chapter 73 of title 18 -- which Chapter is entitled "Obstruction of Justice" and includes 18 U.S.C. § 1512 -- supports that Congress intended to limit obstruction of Congress prosecutions to acts interfering with Congress's investigative power. In contrast to Count One charging Mr. Stedman with violating § 1512, obstruction "by threats or force … [of] the due and proper exercise of the power of inquiry under which any **inquiry or investigation** is being had by either House, or any committee of either House or any joint committee of the Congress" is made criminal by 18 U.S.C. § 1505. 18 U.S.C. § 1505 (bold added). Here, the January 6, 2021 joint session was not exercising Congress's investigatory power. Members of the House and Senate requested, but did not receive, investigatory power. 167 Cong. Rec. H79, 105-06, 108, 111 (2021); 167 Cong. Rec. S16, 25, 32 (2021). For that reason, § 1505 is inapplicable. However, the January 6, 2021 joint session also was not legislative or quasi-judicial in nature akin to the type and character of proceedings whose obstruction or interference is covered by § 1512. As Congress's January 6, 2021 session was not occurring pursuant to its power of inquiry, investigation, or legislation, it was not an "official proceeding" under § 1512.

---

[13] Subsections (A) referring to judicial proceedings, (C) referring to government agency proceedings, and (D) regarding insurance business affecting interstate commerce before agencies, are inapposite here.

Indeed, other than § 1505, the provisions of Chapter 73 criminalize only actions that in some way relate to the sanctity of judicial or administrative justice proceedings.[14] Courts have consistently ruled that § 1512(c) applies only in the context of judicial or quasi-judicial proceedings. *See e.g. U.S. v. Ermoian*, 752 F.3d 1165, 1171-7 (9th Cir. 2013)(recognizing that terms used in § 1512 "when describing an official proceeding strongly implies that some formal hearing before a tribunal is contemplated", and holding that an FBI investigation was not an "official proceeding" within § 1512(c)); *U.S. v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (informal Border Patrol internal investigation was not an "official proceeding" because the language of § 1515(a)(1)(C) - specifically the use of preposition "**before**" in connection with the term "Federal Government agency," - implies "official proceeding" involves formal convocation of agency in which parties are directed to appear, instead of informal investigation). As in *Ramos*, the term used in § 1512 that an official proceeding is one "before" Congress implies a proceeding such as a hearing, a proceeding involving witnesses, evidence, and/or some form of adjudicative function, none of which apply to the January 6, 2021 joint Congressional session, which was essentially ceremonial and predetermined given the lack of

---

[14] *See* 18 U.S.C. **§ 1501**- Assault on process server; 18 U.S.C. **§ 1502** - Resistance to extradition agent; 18 U.S.C. **§ 1503** - Influencing or injuring officer or juror generally; 18 U.S.C. **§ 1504** - Influencing juror by writing; 18 U.S.C. **§ 1505** - Obstruction of proceedings before departments, agencies, and committees; 18 U.S.C. **§ 1506** - Theft or alteration of record or process; false bail; 18 U.S.C. **§ 1507** – Picketing/parading; 18 U.S.C. **§ 1508** - Recording, listening to, or observing proceedings of grand or petit juries; 18 U.S.C. **§ 1509** - Obstruction of court orders; 18 U.S.C. **§ 1510** - Obstruction of criminal investigations; 18 U.S.C. **§ 1511** - Obstruction of State or local law enforcement; 18 U.S.C. **§ 1512** - Tampering with a witness, victim, or an informant; 18 U.S.C. **§ 1513** - Retaliating against a witness, victim, or an informant; 18 U.S.C. **§ 1514** - Civil action to restrain harassment of a victim or witness; 18 U.S.C. **§ 1514A** - Civil action to protect against retaliation in fraud cases; 18 U.S.C. **§ 1516** - Obstruction of Federal audit; 18 U.S.C. **§ 1517** - Obstructing examination of financial institution; 18 U.S.C. **§ 1518** - Obstruction of criminal investigations of health care offenses; 18 U.S.C. **§ 1519** - Destruction, alteration, or falsification of records in Federal investigations and bankruptcy; 18 U.S.C. **§ 1520** - Destruction of corporate audit records; 18 U.S.C. **§ 1521** - Retaliating against a Federal judge or Federal law enforcement officer.

discretion in certifying the electoral vote.

In *U.S. v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994), the D.C. Circuit addressed whether an investigation by the Office of the Inspector General of the Agency for International Development was a "proceeding" for purposes of 18 U.S.C. § 1505. *Kelley*, 36 F.3d at 1127. In holding that the investigation was such a proceeding, the Court noted that other courts similarly holding that agency investigative[15] activities are proceedings within the scope of § 1505 did so when "the investigations typically have involved agencies with some adjudicative power, or with the power to enhance their investigations through the issuance of subpoenas or warrants." *Kelley*, 36 F.3d at 1127. In *Kelly*, the defendant also was charged with violating § 1512, and on appeal the government agreed that the term "proceeding" has the same meaning in each of § 1505 and § 1512. *Kelley*, 36 F.3d at 1128. The Court concluded that the investigation was a "proceeding" within the meaning of those statutes because the

> Inspector General's office of AID is charged with the duty of supervising investigations relating to the proper operation of the agency. See 5 U.S.C.App. 3 § 2. In addition, the Inspector General is empowered to issue subpoenas and to compel sworn testimony in conjunction with an investigation of agency activities.

*Kelley*, 36 F.3d at 1127. In contrast to the matter at hand in *Kelley* and the other cases referenced above, the January 6, 2021 joint session of Congress involved none of the requisite earmarks of an official proceeding proscribed by 18 U.S.C. § 1512. Indeed, the Department of Justice's own interpretation of § 1512(c) is consistent with Mr. Stedman's proffered interpretation:

> Section 1512 of Title 18 constitutes a broad prohibition against tampering with a witness, victim or informant. *It proscribes conduct intended to illegitimately affect the presentation of evidence in Federal proceedings or the communication of information to Federal law enforcement officers.*

---

[15] As noted *supra*, Congress's January 6, 2021 session was denied investigative designation. Members of the House and Senate requested, but did not receive, investigatory power. 167 Cong. Rec. H79, 105-06, 108, 111 (2021); 167 Cong. Rec. S16, 25, 32 (2021).

DOJ Criminal Resource Manual, CRM 1729, Department of Justice (emphasis added).[16]

Because Congress's certification proceeding was not an "official proceeding" within the meaning of § 1512, Count One must be dismissed.

### B. Count One must be dismissed because it fails to allege Mr. Stedman took some action with respect to a document, record, or other object as required to Violate 18 U.S.C. § 1512(c)(2)

Title 18 U.S.C. § 1512(c)(2) requires (among other things) that a defendant acted with respect to a document, record, or other object. Mr. Stedman did not. Count One alleges only that Mr. Stedman "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18." DDE 14 (Indictment, Count One).

Nothing in Count One, or anywhere else in the Indictment, alleges or implies that Mr. Stedman took (or aided and abetted) any action regarding any document, record, or other object with the alleged improper purpose. Absent such allegation, Count One fails to state an offense in violation of 18 U.S.C. § 1512 (c)(2). That § 1512(c)(2) requires a defendant have acted regarding a document, record, or other object is determined in the well-founded and supported Memorandum Opinion by District Judge Carl Nichols (D.D.C.) in *U.S. v. Miller*, Criminal Action No. 1:21-cr-00119 (CJN), DDE 72 (Memorandum Opinion attached hereto as **Exhibit 1**). Rather than re-invent the wheel for this Court and repeat verbatim the thorough analysis and reasoning set forth by Judge Nichols (with which I am sure by now this Court is familiar), Mr. Stedman incorporates by reference as his

---

[16] Available at https://www.justice.gov/archives/jm/criminal-resource-manual-1729-protection-government-processes-tampering-victims-witnesses-or

argument the analysis and rationale set forth in Judge Nichols' Memorandum Opinion at pages 10-29 as if fully set forth here.[17]

Because Count One fails to state an offense under 18 U.S.C. § 1512(c)(2) as it fails to allege any action by Mr. Stedman regarding any document, record, or other object with intent to corruptly obstruct, impede or influence Congress's certification of the electoral vote, Count One must be dismissed.

### C.  If 18 U.S.C. § 1512(C)(2) is Construed to Apply to the Congressional Session on January 6th as an "Official Proceeding", it is Unconstitutional as Applied to Mr. Stedman

#### 1.   Due Process violation - Lack of Fair Notice

"The Fifth Amendment provides that '[n]o person shall ... be deprived of life, liberty, or property, without due process of law.'… [T]he Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. U.S.*, 576 U.S. 591, 595 (2015). *See also U.S. v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. U.S.*, 576 U.S. 591, 595 (2015)). "The void-for-vagueness doctrine… guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *U.S. v. Lanier*, 520 U.S. 259, 67 (1997). In addition, if the law at issue "interferes with the

---

[17] Mr. Stedman acknowledges that Judge Nichols' opinion is not binding on the Court in this matter. However, Defendant Stedman adopts and incorporates the reasoning and basis for Judge Nichol's conclusion regarding this issue in support of defendant Stedman's argument that because § 1512(c)(2) requires that a defendant have acted regarding a document, record, or other object, Count One of the Indictment fails to state an offense in violation of 18 § U.S.C. 1512(c)(2).

right of free speech or of association, a more stringent vagueness test should apply." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 500 (1982). The Court of Appeals for the D.C. Circuit well summed up the vagueness concern, as expressed by the Supreme Court, regarding statutes:

> "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Company,* 269 U.S. 385, 391 …(1926). In particular, a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which "policemen, prosecutors, and juries . . . pursue their personal predilections. *Kolender v. Lawson,* 461 U.S. 352, 357-58 (1983)."

*U.S. v. Poindexter*, 951 F.2d 369, 378 (D.C. Cir. 1991).

The government's attempt in Count One to apply 18 U.S.C. § 1512(c)(2) to the instant case is unconstitutionally vague. Section 1512(c)(2) had not, prior to January 6, 2021, been used to prosecute the alleged obstruction of an "official proceeding" based on conduct not obstructive of the administration of justice. *See also* Section I.C.2 *infra* (noting other situations not prosecuted by the DOJ under § 1512(c)(2)). As discussed *supra* Section I.A, § 1512(c)(2) was used only when the proceeding involved hearing evidence, making factual findings, witness testimony or similar benchmarks of a judicial or quasi-judicial proceeding. Neither § 1512(c)(2) or any other statute in Chapter 73 provided fair notice to Mr. Stedman or the public prior to January 6, 2021 that obstructing[18] a proceeding that did not involve witnesses, evidence, and/or some form of adjudicative function, would violate § 1512(c)(2). Furthermore, Mr. Stedman was in the exercise of his First Amendment rights on January 6, 2021, and therefore the Court must be more stringent in its

---

[18] This statement is not an admission that Mr. Stedman had any intent to obstruct any proceeding regardless of its nature.

vagueness analysis. *Hoffman Estates*, 455 U.S. at 500. The government's interpretation of §
1512(c)(2) here is void-for-vagueness as applied to Mr. Stedman.

Because Count One alleges that Mr. Stedman obstructed a type of "official proceeding" not
previously identified or applied under § 1512(c)(2), and application of § 1512(c)(2) here interferes
with Mr. Stedman's exercise of his free speech rights, it must be dismissed under the Due Process
Clause of the Fifth Amendment as void for vagueness.

### 2.   Due Process and Equal Protection violation – Arbitrary Application

The void-for-vagueness doctrine also "guards against arbitrary or discriminatory law
enforcement by insisting that a statute provide standards to govern the actions of police officers,
prosecutors, juries and judges." *Dimaya*, 138 S. Ct. at 1212. *See also Poindexter*, 951 F.2d at 378.
As of March 3, 2023, the government has charged about 1000 people with federal crimes related to
the January 6 protests. Most of those defendants allegedly entered the Capitol Building. The majority
(and at least many) of those charged were not charged with violation of § 1512(c)(2), despite that the
government contends that all defendants had the objective to stop the Electoral College vote count.[19]

In addition, of course Mr. Stedman was aware on January 6, 2021 because of the media
attention these situations had received, that prior events involving conduct which strained or
exceeded the limits of First Amendment expression – in comparison to the First Amendment
protected activity in which Mr. Stedman personally engaged – had not been the subject of

---

[19] *See* **Exhibit 2** hereto (also available at  https://www.justice.gov/usao-dc/26-months-jan-6-attack-
capitol#:~:text=Approximately%2011%20individuals%20have%20been,restricted%20federal%2
0building%20or%20grounds (U.S. Attorney's Office District of Columbia 26 month update).

prosecution pursuant to § 1512, but merely disorderly persons type offenses resulting in fines of $30-$50:

> "This is a mockery and a travesty of justice," yelled one protester this week. "Kavanaugh can't be trusted," shouted another. Some protesters wore shirts that read things like "I am what's at stake."… At least 227 demonstrators were arrested between the start of the nomination hearings on Tuesday and the end of testimony on Friday, according to the U.S. Capitol Police. Most of those charged this week with disorderly conduct, crowding or obstructing paid fines of $35 or $50. … **"Disrupting the hearings** was a way for us to go directly into the homes of the American people to say, 'We will not be silenced and you need to be as outraged as we are,' "said Linda Sarsour, a co-chair of the Women's March and one of the organizers of this week's protests. Planned Parenthood and its political arm, Planned Parenthood Action Fund, also organized members from across the country, Dana Singiser, vice president for public policy and government affairs at Planned Parenthood, told CNN. Their efforts included sitting in the hearing room, participating in a nightly vigil on Capitol Hill, writing letters to senators, and setting up meetings between lawmakers and constituents.
>
> The disruptions throughout the hearing rankled senators on the Judiciary Committee.

NPR, The Resistance at The Kavanaugh Hearings: More Than 200 Arrests (Jason Breslow, September 8, 2018)(bold added).[20] Ms. Sarsour, for example admitted that her intent was to obstruct Congressional hearings.

At the Kavanaugh hearings on Capitol Hill, barricades were broken through by protesters: "Protesters broke through Capitol Police barricades and rushed up the steps to the Capitol Rotunda Saturday afternoon amid large demonstrations ahead of a Senate vote on Supreme Court nominee Brett Kavanaugh. The metal barricades were erected Thursday to keep demonstrators on specific areas of the Capitol grounds." Rollcall.com, Kavanaugh Protesters Ignore Capitol Barricades Ahead of Saturday Vote (Katherine Tully-McManus 10/6/2018).[21] Video of disruptive protestors who

---

[20] Available at https://www.npr.org/2018/09/08/645497667/the-resistance-at-the-kavanaugh-hearings-more-than-200-arrests

[21] Available at https://rollcall.com/2018/10/06/kavanaugh-protesters-ignore-capitol-barricades-ahead-of-saturday-vote/

entered or blocked offices of Senators on Capitol Hill to delay voting on Justice Kavanaugh's nomination is available at https://www.cnn.com/2018/09/20/politics/congress-protests-brett-kavanaugh/index.html (posted on CNN.com). Video of disruption of the final vote on Justice Kavanaugh's confirmation, presided over by VP Pence, is available at https://www.youtube.com/watch?v=YI4FYpQmEkY (posted by CBS News). Video of protestors pounding on the doors of the U.S. Supreme Court when Justice Cavanaugh was being sworn in is available at https://www.youtube.com/watch?v=aenQtPGgYlQ (posted by MSNBC).[22]

The DOJ also has failed to prosecute -- despite acknowledging that it is a federal crime -- persons who picketed U.S. Supreme Court Justices' homes in the wake of the leak of the draft opinion in a case. *See* National Review.com, AG Garland Dodges on Failure to Crack Down on Protests outside Justices' Homes, (Jeff Zymeri March 1, 2023).[23] Indeed, in a letter to Attorney General Merrick Garland, several U.S. Senators lamented:

> We continue to be baffled over the lack of prosecutions under Title 18, Section 1507 of the U.S. Code. We understand it is the policy of the Justice Department not to discuss any pending or potential investigations, but this is an urgent matter of national importance. As you know, Section 1507 is an act of Congress that criminalizes parading or picketing in front of the homes of judges with the intent to influence pending litigation.

Letter Dated June 15, 2022 to Attorney General Garland.[24]

---

[22] Similar video also is available at https://www.cnn.com/videos/politics/2018/10/06/supreme-court-protests-kavanaugh-confirmation-nr-vpx.cnn (posted by CNN).

[23] Available at https://www.nationalreview.com/news/ag-garland-dodges-on-failure-to-prosecute-protesters-outside-justices-homes/

[24] The letter is available at https://www.grassley.senate.gov/imo/media/doc/mcconnell_grassley_etaltodojeffortstoinfluencethecourts.pdf

The Indictment here demonstrates no basis for why Mr. Steadman is charged under § 1512(c)(2) as compared to others not so charged whose conduct was similar or even more egregious to his. There is no allegation -- and Mr. Stedman did not -- incite or engage in any violent conduct; did not threaten any violent conduct; and did not interact with any member of Congress in a disruptive way such as entering Congress's chamber where it was meeting and sitting in or interfering. This disparate treatment of Mr. Stedman is arbitrary and violates Mr. Stedman's rights to due process and equal protection under the Fifth Amendment to due process and equal protection[25]. *U.S. v. Hairston*, 495 F.2d 1046, 1051-52 (D.C. Cir. 1974) ("treatment of similarly situated persons in a different fashion is fraught with equal protection overtones."); *U.S. v. Bell*, 506 F.2d 207, 222 (D.C. Cir. 1974) (" 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation,' but only so when 'the selection [is] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' ").

Because the application of § 1512(c)(2) to Mr. Stedman is arbitrary and violates his due process and equal protection constitutional rights, Count One must be dismissed for that reason as well.

### 3.  Application of § 1512(c)(2)'s "corruptly" requirement to Mr. Stedman in Count One is void for vagueness

Count One alleges Mr. Stedman "did, **corruptly** obstruct, influence, and impede … Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18". DDE 14 (Indictment Count One (bold added)). The Indictment materially fails to contend how Mr. Stedman's honestly (even assuming

---

[25] "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

*arguendo* mistakenly) held belief that certification of the election would be improper and illegal, meets the "corruptly" element of § 1512(c)(2). Any construction of § 1512(c)(2) that a protest in support of an honest even if mistaken belief is "corrupt" is void-for-vagueness: § 1512(c)(2) provides no notice of such an interpretation, which also would invite arbitrary and discriminatory law enforcement.

As the D.C. Circuit recognized when addressing the use of the term "corruptly" in 18 U.S.C. § 1505, "on its face, the word 'corruptly' is vague; that is, in the absence of some narrowing gloss, people must 'guess at its meaning and differ as to its application. … [Words like] 'corrupt, … afford 'an almost boundless area for individual assessment of the morality of another's behavior.'" *Poindexter,* 951 F.2d at 378 (quoting *Ricks v. District of Columbia*, 414 F.2d 1097, 1106 (D.C. Cir. 1968)). In *Poindexter*, the defendant's alleged obstruction under § 1505 consisted of making false/misleading statements to Congress. *Poindexter,* 951 F.2d at 377. The then relevant passage of § 1505 provided,

> "*Whoever corruptly…influences, obstructs, or impedes or endeavors to influence, obstruct or impede… the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House* or any joint committee of the Congress [s]hall be fined…or imprisoned…or both [Emphasis supplied.]"

*Poindexter,* 951 F.2d at 377. The Court held that Poindexter's misrepresentation to Congress did not violate § 1505 because the "corruptly" element was not met.

The D.C. Circuit determined that although on its face § 1505 [as does § 1512(c)(2)] favors the transitive use of the verb "corrupt" and the adverb "corruptly", in either the transitive or intransitive form the use of "corruptly" in § 1505 suffers from vagueness. P*oindexter,* 951 F.2d at 379. The court, in attempting to avoid the void-for-vagueness conclusion regarding the

term, even "[n]arrow[ed] the transitive interpretation to include only 'corrupting' another person by influencing him to violate his legal duty", but nonetheless concluded even that reading would not cover Poindexter's conduct. *Poindexter*, 951 F.2d at 379. The court then went on to consider § 1505's legislative history, and concluded that "the legislative history gives no better notice than does the statutory text that lying to or misleading a Member of the Congress (or an agency) violates § 1505." *Poindexter*, 951 F.2d at 383-84. Next, the court considered whether prior judicial interpretation of § 1505 cured the vagueness defect by giving the requisite notice to protect against prosecutors and juries pursuing personal biases. It concluded that they did not. *Poindexter*, 951 F.2d at 384-86.

The *Poindexter* court thus held that "In sum, neither the legislative history nor the prior judicial interpretation of § 1505 supplies the constitutionally required notice that the statute on its face lacks. Accordingly, we find no reason to disturb our earlier conclusion that the statute is unconstitutionally vague as applied to Poindexter's conduct." *Poindexter*, 951 F.2d at 386. The court further discussed that even if "corruptly" more narrowly was interpreted to mean that a defendant must (for § 1505 violation) act "to obtain an 'improper advantage for [himself] or someone else inconsistent with official duty and rights of others'", it still would not avoid the vagueness defect:

> [still] "someone who influences another to violate his legal duty has not acted corruptly if his purpose is, for example, to cause the enactment of legislation that would afford no particular benefit to him or anyone connected with him. … [T]here "would be some purposes that would be corrupt and some that wouldn't be . . . Suppose the [defendant acted] to protect the historical reputation of some historical figure that has been dead for 20 years and he decides that he doesn't want to mar that person's reputation."

*Poindexter*, 951 F.2d at 385-86.

Following *Poindexter*, in 1996 Congress amended § 1515 to clarify that "As used in §

1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering or destroying a document or other information." False Statements Accountability Act of 1996, Pub. L. No. 104-292, §3 (underline added)[26].  Notably, **Congress chose not to amend § 1515 to define "corruptly" <u>as used in § 1512</u>.** Therefore, the amendment did nothing to cure the unconstitutionally vague term "corruptly" as it is used in 18 U.S.C. § 1512 (c)(2), violation of which Mr. Stedman is charged in Count One.

In this case, the application of § 1512(c)'s adverb "corruptly" as charged against Mr. Stedman in Count One fails the D.C. Circuit's *Poindexter* test.  First, Count One does not allege that Mr. Stedman obstructed the January 6, 2021 Congressional session "to obtain an 'improper advantage for [himself] or someone else inconsistent with official duty and rights of others'". *Poindexter*, 951 F.2d at 385. The bald use of the term "corruptly" in both the indictment and in 18 U.S.C. § 1512(c)(2) remains unconstitutionally vague: it "invite[s] arbitrary and discriminatory enforcement by which 'policemen, prosecutors, and juries . . . pursue their personal predilections.'" *Poindexter*, 951 F.2d at 378 (citation omitted). *See also Dimaya*, 138 S. Ct. at 1212. Second, Count One alleges neither that Mr. Stedman influenced another person to obstruct the proceeding January 6th proceeding in violation of his/her legal duty, nor that Mr. Stedman himself violated any legal duty by virtue of his being merely present.

Count One must be dismissed as it rests on an unconstitutionally vague interpretation of "corruptly".

### 4. Given its ambiguity Count One should be dismissed pursuant to the Rule of Lenity

In the alternative, if the Court determines that § 1512(c)(2) is not unconstitutionally

---

[26] Available at https://www.congress.gov/104/plaws/publ292/PLAW-104publ292.htm.

vague as applied here, the rule of lenity requires nonetheless that ambiguities in the statute be resolved to  Mr. Stedman's benefit: "where text, structure, and history fail to establish that the Government's position is unambiguously correct," courts must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor." *U.S. v. Granderson*, 511 U.S. 39, 54 (1994). *See also U.S. v. Villanueva-Sotelo*, 515 F.3d 1234, 1247 (D.C. Cir. 2008). Courts must refrain from speculating regarding Congressional intent:

> When interpreting a criminal statute, we do not play the part of a mindreader. In our seminal rule-of-lenity decision, Chief Justice Marshall rejected the impulse to speculate regarding a dubious congressional intent. "[P]robability is not a guide which a court, in construing a penal statute, can safely take." ... And Justice Frankfurter, writing for the Court in another case, said the following: "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity."

*U.S. v. Santos*, 553 U.S. 507, 515 (2008)(citations omitted).

Even if the Court concludes that the government's interpretation (Count One)  of § 1512(c)(2) is correct -- (1) that "official proceedings" of Congress include those which are not held pursuant to its investigatory power or non-judicial/quasi-judicial proceedings, (2) that § 1512(c)(2) applies outside the context of document destruction, and (3) that "corruptly" includes a mistaken but honestly held purpose when a defendant did not act to obtain an improper advantage for himself or someone else inconsistent with official duty and rights of others -- it is not unambiguously so.  That fact is apparent from the lack of any case law prior to January 6, 2021 supporting the government's interpretations, from the legislative history which informs contrary to such interpretations, and from the text and structure not just of § 1512(c) but all sections of Chapter 73.

Because the government's interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in Mr. Stedman's favor by dismissing Count One.

*Granderson*, 511 U.S. at 54; *Santos*, 553 U.S. at 515.

### 5. Count One's novel construction of 18 U.S.C. § 1512(c)(2) operates as an *ex post facto* law and thus its application to Mr. Stedman violates the Due Process Clause

As discussed *supra*, no court prior to January 6, 2021 construed § 1512(c)(2) as the government seeks in Count One here. Applying that novel construction to Mr. Stedman's actions would violate the Due Process Clause of the Fifth Amendment:

> [A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids. An *ex post facto* law has been defined by this Court as one "that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action," or "that aggravates a crime, or makes it greater than it was, when committed."

*Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) (citation omitted). That result is no less so when the enlargement is done by a Court rather than the legislature. *Bouie*, 378 U.S. at 353-54 ("If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.").

*Bouie* involved  an alleged trespass in a South Carolina restaurant which would not serve black Americans.  Two black college students took seats in the restaurant, and after they entered an employee posted a no trespass sign.  Police were called, and the students were asked to leave but refused. The students were arrested and charged with trespass.  *Bouie*, 378 U.S. at 348. The students were convicted, and the State Supreme Court upheld the trespass convictions.  *Bouie*, 378 U.S. at 349. The U.S. Supreme Court reversed the convictions, based on the novel construction principle of the Due Process Clause because the State Supreme Court's construction of the trespass statute amounted to an *ex post facto* law:

> If South Carolina had applied to this case its new statute [it was amended after the defendant's arrest] prohibiting the act of remaining on the premises of another after

being asked to leave, the constitutional proscription of *ex post facto* laws would clearly invalidate the convictions. The Due Process Clause compels the same result here, where the State has sought to achieve precisely the same effect by judicial construction of the statute.

*Bouie*, 378 U.S. at 362.

In the instant case, as in *Bouie*, Mr. Stedman did not "violate the statute as it was written." *Bouie*, 378 U.S. at 355. As discussed *supra*, § 1512 prohibits obstruction of "official proceedings" which all courts prior to January 6, 2021 construed to refer only to proceedings before a tribunal that mimic a court of law, or an investigation related to a judicial or quasi-judicial proceeding. "[N]othing in the statute… indicates that it also prohibited the different act," of interfering with proceedings that do not meet those criteria. *Bouie*, 378 U.S. at 355. "The interpretation given the statute by the [government in Count One here] . . . has not the slightest support in prior [§ 1512 court] decisions." *Bouie*, 378 U.S. at 356.

Therefore, Count One must be dismissed because applying 18 U.S.C. § 1512(c)(2) to Mr. Stedman would operate as an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment.

### 6. Count One's application of § 1512(c)(2) is invalid under the First Amendment as applied to Mr. Stedman

Mr. Stedman's activities on January 6, 2021 involved political expression, assembly and petitioning the government for redress of grievances. U.S. Const. amend. I. Because the § 1512(c)(2) charge in Count One characterizes protest as obstruction of congressional proceedings per se, its application to Mr. Stedman is unconstitutional.

An as-applied challenge under the First Amendment requires only that Mr. Stedman demonstrate that § 1512(c)(2) is being unconstitutionally applied as to the protected activity for which he is charged. *Edwards v. Dist. of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). Mr. Stedman's conduct only and indubitably was expressive. *See supra* Section entitled "Procedural

History and Relevant Facts" (outlining discovery that Mr. Stedman was making statements on video and live presentations while outside and inside the Capitol, walking through only with no violent or assaultive conduct by him, and with no interaction with members of Congress or any documents or records).

In deciding if conduct is expressive (and of course speech is the paradigmatic example), the Court looks to "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [and asks]… whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Protected expression is not limited to speech: conduct -- such as protesting outside or inside the Capitol --  also can be protected expression. As in past cases in which the Supreme Court held that conduct constituted protected expression, in *Johnson* the Supreme Court addressed conduct in which "Johnson burned an American flag as part — indeed, as the culmination — of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President." *Johnson*, 491 U.S. at 406. The Supreme Court concluded that Johnson's flag-burning conduct did constitute expression implicating the First Amendment. *Johnson*, 491 U.S. at 406.

Here, indisputably Mr. Stedman's alleged conduct (as well as his speech) on January 6, 2021 was protected expression. The gravamen of the § 1512(c)(2) charge in Count One is that Mr. Stedman and others protested at the Capitol concerning the results of the 2020 presential election.  That protestation implicates the heart of the First Amendment.  *See*, *e.g.*, *Johnson*, 491 U.S. at 404-06 (flag burning expressive); *Tinker v. Des Moines Ind. Comm. School. Dist.*, 393 U.S. 503, 505 (1969) (students wearing black armbands to protest Vietnam

war was expressive); *Brown v. Louisiana*, 383 U.S. 131, 141-142 (1966) (sit-in to protest of segregation expressive); *U.S. v. Grace*, 461 U.S. 171 (1983) (picketing and leaflet distribution around courthouse is First Amendment protected expression).[27]

Next, the court assesses whether the challenged statute as applied suppresses free expression. As § 1512 is content-neutral, the intermediate scrutiny standard applies, which means that the statute is constitutionally applied only if "(1) 'it is within the constitutional power of the government'; (2) 'it furthers an important or substantial governmental interest'; (3) 'the governmental interest is unrelated to the suppression of free expression'; and (4) 'the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest…'." *Edwards*, 755 F.3d at 1002 (quoting *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968)). The application of § 1512(c)(2) urged by Count One is related to the suppression of expression, assembly and the petitioning of the government for a redress of grievances. As noted, the gravamen of the § 1512(c)(2) charge in Count One is that Mr. Stedman and others protested at the Capitol concerning the results of the 2020 presential election – *i.e.* political demonstration and protest. Importantly, Mr. Stedman is not charged with violating 18 U.S.C. § 1505 (by threats or force). The Indictment's obstruction theory encompasses the very act of protesting to express dissatisfaction with and potentially thereby to affect congressional action. Accordingly, § 1512(c)(2) as applied here is "related to the suppression of free expression."

---

[27] *See also Snyder v. Phelps*, 562 U.S. 443, 448-453 (2011) (holding that protests of a funeral for a Marine killed in Iraq with signs that read among other things "God Hates the USA/Thank God for 9/11," "America is Doomed," "Thank God for IEDs," "Thank God for Dead Soldiers," is First Amendment protected speech, and that "arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'").

In *U.S. v. Caputo*, 201 F. Supp. 3d 65 (D.D.C. 2016)(Cooper, J.), the District Court determined that "[t]he target of Caputo's purported expression is the White House—the iconic seat of the executive branch and an important subject in public discourse. The act of unlawfully entering its grounds is thus much more likely to be communicative in nature than other acts of trespassing, regardless of the content of the message being expressed by the intruder." *Caputo,* 201 F. Supp. 3d at 71. So too the Capitol Building is the "iconic seat of the … [legislative] branch and an important subject in public discourse", and the "act of [even] unlawfully entering its grounds is thus much more likely to be communicative in nature". *Caputo,* 201 F. Supp. 3d at 71.

Under the *O'Brien* standard (repeated in *Edwards* as quoted *supra*), the application of § 1512(c)(2) to Mr. Stedman's conduct and speech is unconstitutional because (1) the government's interest *is* related to the suppression of free expression; and (2) the incidental restriction on First Amendment freedoms *is* greater than essential to the furtherance of that interest. *O'Brien*, 391 U.S. at 377; *Edwards*, 755 F.3d at 1002.

First, the § 1512(c)(2) application in this case is not limited to an attempt to influence Congress by threats or force[28]: the application covers acts that influence Congress through protest and demonstration. Nothing in the Indictment confines the alleged "obstruction" to entry into the Capitol Building. If the alleged "obstruction" encompasses protest outside the Capitol Building, not only Mr. Stedman's protected expression would be criminalized: so too would expression by every group which demonstrates outside the Capitol Building with a purpose to affect legislation.

Second, the attempted restriction is far greater than that "essential" to further the

---

[28] Mr. Stedman did not make, engage in, or encourage any such conduct.

government's interest in preventing corrupt obstruction of official proceedings of Congress. That legitimate government interest could adequately be protected, without infringement on protected expression, by using 18 U.S.C. § 1505 to preclude obstruction of Congress by "threats or force", and by preventing obstruction of Congress through unlawful entry into the building.

Therefore, the § 1512(c)(2) charge against Mr. Stedman in Count One unconstitutionally infringes on his First Amendment rights and must be dismissed.

## II.     Counts Two and Three Charging Violations of 18 U.S.C. § 1752 Must be Dismissed

Counts Two and Three allege that in violation of 18 U.S.C. § 1752 (a)(1) and § 1752(a)(2) respectively, Mr. Stedman entered the Capitol Building, which is characterized in each of those counts as a "restricted building and grounds" (which term is defined in § 1752(c)). Each of those counts fails to state an offense against Mr. Stedman. Count Three also is unconstitutionally vague as applied.

### 1.     Counts Two and Three fail to state offenses because they do not allege – nor can the government prove – that the U.S. Secret Service designated the alleged restricted areas

Nowhere in the indictment is it alleged that the U.S. Secret Service (USSS) restricted the Capitol Building on January 6, 2021. The government conceded in *U.S. v. Griffen*, 21-CR-92 (TNM), at Dkt. No. 33, that the United States Capitol Police (not the USSS) attempted to designate the Capitol Building and surrounding area as restricted on January 6, 2021.

Although the version of § 1752 in effect on January 6, 2021 (and currently) does not expressly require USSS restriction, the legislative history of that statute supports that it is only the USSS that can designate a restricted building or grounds. When § 1752 was enacted, the purpose was to designate the USSS to restrict areas for temporary visits by the President. *See* S. Rep. No. 91-1252 (1970). At the time of enactment, the USSS was part of the Treasury and §

1752 gave the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. § 1752(d)(1) (2004). Although that language later was removed from § 1752 before January 6, 2021, nothing in the statutory language or legislative history of § 1752 indicates that anyone other than the USSS has the authority to so restrict the Capitol building and the grounds around it. The language of §1752 (c)(1)(B) defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." Because the USSS protects the President or "other person," the USSS must designate the area "restricted." The legislative history bolsters this interpretation.[29]

Alternatively, if the Capitol Police were authorized to restrict the Capitol Building or its grounds, § 1752 does not apply because former VP Pence was not "temporarily visiting" the Capitol Building on January 6, 2021. The relevant portion of § 1752 which is charged in each of Counts Two and Three[30] against Mr. Stedman prohibits certain conduct in or near "any restricted building or grounds", defined (among other ways) as "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…." 18 U.S.C. § 1752(c)(1)(B).

---

[29] The USSS's duties and responsibilities are outlined in 18 U.S.C. § 3056, which provides that it "is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President". 18 U.S.C. § 3506(e)(1). There is no provision for any agency other than the USSS to designate events of national significance for security purposes, and indeed the distinct and independent nature of the USSS from any other agency is emphasized in 18 U.S.C. § 3506(g).

[30] Each of those counts alleges that the conduct occurred "where the Vice President and Vice President-elect were temporarily visiting".

"Temporary" means "lasting for a time only." Black's Law Dictionary (11th Ed. 2019). "Visiting" means "invited to join or attend an institution for a limited time." Merriam-Webster (2021). Together, the phrase "temporarily visiting" means temporary travel to a location at which the person does not normally live or work on a regular basis. VP Pence was not "temporarily visiting" the Capitol on January 6, 2021: he worked at the Capitol Building and grounds -- it was his place of employment. VP Pence had a permanent office in the Capitol Building and regularly worked there and used its grounds for ingress and egress thereto. On January 6, 2021, then VP Pence was not temporarily visiting the Capitol Building, he was performing his sworn duties as Senate President. *See* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer.").

Consequently, Counts Two and Three of the Indictment must be dismissed.

### 2. Count Three must be dismissed because 18 U.S.C. § 1752(a)(2) on its face and as applied in Count Three sets forth unconstitutionally vague boundary standards

As 18 U.S.C. § 1752(a)(2) on its face and as applied in Count Three sets forth unconstitutionally vague boundary standards. 18 U.S.C. § 1752(a)(2) provides

> "Whoever … knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, **or within such proximity to**, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions"

is guilty of a crime. 18 U.S.C. § 1752(a)(2)(bold added). Count Three alleges that Mr. Stedman did "engage in disorderly and disruptive conduct in and *within such proximity to*, a restricted building and grounds… ." DDE 14 (Indictment Count Three, emphasis added). The phrase

"within such proximity to" is vague and ambiguous, and therefore as applied violates Mr.

Stedman's Due Process Clause rights.

As the Supreme Court has stated,

> [T]he freedom to loiter for innocent purposes is part of the "liberty protected by the Due Process Clause… . We have expressly identified this "right to remove from one place to another according to inclination" as "an attribute of personal liberty" protected by the Constitution… . Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage" … or the right to move "to whatsoever place one's own inclination may direct" identified in Blackstone's commentaries.

*Chicago v. Morales*, 527 U.S. 41, 53-54 (1999) (citations omitted).  In *Morales*, the U.S.

Supreme Court addressed a city ordinance prohibiting gang members loitering with each other or

other persons in "any public place" and required them to disburse and leave when ordered by

police, or be guilty of violating the ordinance. *Morales*, 527 U.S. at 45-48. The U.S. Supreme

Court held (as had the Illinois Supreme Court) that the ordinance was unconstitutionally vague,

in violation of the Due Process Clause of the Fourteenth Amendment. *Morales*, 527 U.S. at 64.

Among other due process notice problems, the Court noted that the ordinance's requirement that

the accused remove themselves "from the area" involved ambiguities of constitutional magnitude:

> How far must they move? If each loiterer walks around the block and they meet again at the same location, are they subject to arrest or merely to being ordered to disperse again? As we do here, we have found vagueness in a criminal statute exacerbated by the use of the standards of "neighborhood" and "locality." *Connally* v. *General Constr. Co.*, 269 U.S. 385 (1926).

*Morales*, 527 U.S. 41, 59 (1999).

In *Connally v. General Constr. Co.*, 269 U.S. 385 (1926), the Supreme Court addressed

the vagueness of an Oklahoma statute requiring that "not less than the current rate of per diem

wages in the locality where the work is performed shall be paid to laborers… ." *Connally*, 269

U.S. at 388. The Court found unconstitutional vagueness in statutes that rested on the vague

boundary standards set forth using the words "locality" and "neighborhood". The Court noted

that "both terms are elastic and, dependent upon the circumstances, may be equally satisfied by

areas measured by rods or by miles." *Connally*, 269 U.S. at 395. The Court thus found the

statute unconstitutionally vague.  The Court also noted the vagueness problem with terms such

as "near the place" (another way of saying "proximity"):

> Certainly, the expression "near the place" leaves much to be desired in the way of
> a delimitation of boundaries; for it at once provokes the inquiry, "how near?" . . .
> The result is that the application of the law depends not upon a word of fixed
> meaning in itself, or one made definite by statutory or judicial definition, or by the
> context or other legitimate aid to its construction, but upon the probably varying
> impressions of juries as to whether given areas are or are not to be included within
> particular localities. The constitutional guaranty of due process cannot be allowed
> to rest upon a support so equivocal.

*Connally*, 269 U.S. at 395.

What does "*within such proximity to*" the Capitol building and its grounds mean here

as applied to Mr. Stedman? The indictment does not so state and thus it is left to the individual

conjecture of police, prosecutors, a judge or jury. Proximity means "the state of being near in

space or time": in other words "near the place", which as stated above the Supreme Court said

is unconstitutionally vague. *See* https://dictionary.cambridge.org/dictionary/english/proximity.

Here, the vagueness in the § 1752(a)(2) violation charged in Count Three is even more

egregious than the statutes at issue in *Morales* and *Connally* because here First Amendment

protected activity is involved: the attempted criminalized activity includes pure political

speech, assembly, and Mr. Stedman's right to petition the government. *Hoffman Estates*, 455

U.S. at 500.  "The constitutional guaranty" of due process rights "cannot be allowed to rest

upon a support so equivocal" as the vague boundary phrase "within such proximity to" in 18

U.S.C. § 1752(a)(2), and as applied in Count Three. *Connally*, 269 U.S. at 395.

Considering the above, Count Three of the Indictment must be dismissed.

### III.   The Government Should be Precluded from Presenting Evidence regarding any Events of January 6, 2021 for which it cannot Demonstrate Mr. Stedman was Present and Observed

Unless the government shows that, at the relevant time Mr. Stedman personally observed or otherwise was aware of particular conduct by other persons present on the Capitol Building grounds or in the Capitol Building on January 6, 2021, any evidence (video, audio, documents or testimony) of such is irrelevant to any issue which must be decided by the trier of fact, and therefore is inadmissible. For example, and video or other footage or testimony about the conduct of other persons present on the Capitol Building grounds or in the Capitol Building, including physical assault on any other person, property destruction, movement of barricades or other barriers, verbal threats to other persons, non-verbal threats to other persons, or other such words or actions that were not observed by Mr. Stedman are irrelevant to his state of mind and actions on January 6, 2021.

Any action and words of which Mr. Stedman was not personally aware could not possibly have impacted his state of mind, and thus are irrelevant and inadmissible. Federal Rule of Evidence 401 provides that evidence is relevant if it "has any tendency to make a fact more or less probable … and the fact is of consequence in determining the action." FED. R. EVID. 401. Here, if Mr. Stedman was not aware of conduct and words such as the examples provided above at or near the time of his entry onto restricted grounds or into the Capitol Building (*i.e.* at the time he allegedly committed the offenses charged in the Indictment), any such evidence (video, audio, testimony or other form of evidence) would have no "tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the

evidence… .". FED. R. EVID. 401. Therefore, any such evidence must be excluded, as irrelevant evidence is not admissible. FED. R. EVID. 402.

Furthermore, the unfair prejudicial impact of any evidence of the nature as that referenced above, would substantially outweigh any minimal probative value to be obtained from that evidence. FED. R. EVID. 403. Also, the admission of any such evidence would result in undue delay, wasting time, and misleading the jury that Mr. Stedman somehow is responsible legally for the conduct or words of others when such was not known to Mr. Stedman.

While Count One of the Indictment does charge Mr. Stedman with aiding and abetting in violation of 18 U.S.C. § 2, a person cannot aid and abet that of which he is unaware. "Aiding and abetting requires the government to prove: '(1) the specific intent to facilitate the commission of a crime by another; (2) guilty knowledge (3) that the other was committing an offense; and (4) assisting or participating in the commission of the offense.'" *U.S. v. Wilson*, 160 F.3d 732, 738 (D.C. Cir. 1998)(citation omitted). Indeed, "[t]o prove aiding and abetting the government must show that [the defendant] … shared some intent with … [those he is alleged to have aided and abetted] … and took some affirmative action to assist **them** in carrying out **their** plan… . " *Wilson*, 160 F.3d at 738 (bold added).

### IV.   Mr. Stedman Requests Expanded Voir Dire and Additional Peremptory Challenges

Mr. Stedman requests the Court to permit expanded examination of prospective jurors before and during formal voir dire, and additional peremptory challenges, to ensure that he receives his right to a fair and impartial jury as guaranteed by the Sixth Amendment. There has been overwhelming and sustained media coverage, public and publicized Congressional hearings, social media coverage, and an unfettered presence of reports regarding the events that form the

subject matter of the charges against Mr. Stedman, most of it negatively directed at those who were present at or in the Capitol Building and grounds on January 6, 2021. Because that coverage has overwhelmingly assigned group fault to those present at the Capitol Building and grounds on January 6, 2021 -- especially those who went inside as did Mr. Stedman -- the potential prejudicial effects of such coverage are atypically widespread. At a one-year anniversary observance,

> [Vice President Kamala] Harris compared the Jan. 6 insurrection to two other dates when the United States came under attack: Dec. 7, 1941, when the Japanese bombed Pearl Harbor, and Sept. 11, 2001, when terrorists turned commercial airplanes into missiles and attacked the World Trade Center and the Pentagon.
>
> "Certain dates echo throughout history, including dates that instantly remind all who have lived through them where they were and what they were doing when our democracy came under assault," Harris said. "Dates that occupy not only a place on our calendars but a place in our collective memory."

The Washington Times carried the quote.[31] The Vice President was hardly the first to draw such a parallel.[32]

The impact on D.C. residents from the January 6th events was substantial and widespread. The City's mayor ordered a citywide curfew, declared a state of emergency for more than two

---

[31] Annie Linskey, *Biden goes after Trump for lies and self-aggrandizement in Jan. 6 insurrection anniversary speech*, WashingtonPost.com (Jan. 6, 2022) https://www.washingtonpost.com/politics/biden-goes-after-trump-for-lies-and-self-aggrandizement-in-jan-6-insurrection-anniversary-speech/2022/01/06/fdb39c14-6eff-11ec-aaa8-35d1865a6977_story.html).

[32] See, e.g., David Mastio, *After ousting Liz Cheney, Republicans prove they're a bigger threat than 9/11 hijackers*, USA Today (May 13, 2021)("As surely as the terrorists of 9/11 wanted to tear down American democracy in 2001, the terrorists of Jan. 6 want to tear down our democracy as well, even as they pose as its defenders…. Yes, 9/11 cost many more lives than Jan. 6 has so far, but comparing the two attacks is reasonable because the Big Lie is more dangerous to our way of life than the 2001 terrorists' medieval ideology ever was.")(https://www.usatoday.com/story/opinion/voices/2021/05/13/jan-6th-insurrection-greater-danger-democracy-than-9-11-column/5057119001/).

weeks after January 6, 2021, and discouraged out-of-towners from attending the Presidential

Inauguration on January 20th because of road closures and heightened security.[33] Increased

security in D.C. was put in place regarding the anniversary of the events of January 6, 2021.[34]

Although ubiquitous and undeniably broad coverage of course is undeniable, further a

survey commissioned by the Federal Public Defender[35] demonstrates the impact that media

coverage has had on D.C. residents. For example, 63 percent of national respondents said they

would describe the actions of "people who forced their way into the U.S. Capitol on January 6,

2021," with the phrase "Trying to overturn the election and keep Donald Trump in Power." In

contrast, substantially more D.C. residents -- 85 percent -- said the same. That disparity also

characterized the phrase "trying to overthrow the US government," which 72 percent of D.C.

respondents found applicable (as compared to 54 percent of national respondents). **Exhibit 3** at 4-

5.

The majority of D.C. residents surveyed have prejudged the guilt of defendants who have

---

[33] Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today, DC.gov (Jan. 6, 2021)(https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today); Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days, DC.gov (Jan 6, 2021)(https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1#:~:text=Mayor%20Bowser%20Issues%20Mayor%27s%20Order%20Extending%20Today%27s%20Public%20Emergency%20for%2015%20Days,-Wednesday%2C%20January%206&text=(Washington%2C%20DC)%20%E2%80%93%20Today,engaged%20in%20violence%20and%20destruction); Jane Recker, DC Mayor Says Americans Should Not Come to Washington for the Inauguration, Washingtonian (Jan. 11, 2021)(https://www.washingtonian.com/2021/01/11/dc-mayor-says-americans-should-not-come-to-washington-for-the-inauguration/) .

[34] https://www.bloomberg.com/news/articles/2022-01-03/jan-6-anniversary-will-bring-heightened-security-to-capitol#xj4y7vzkg ("Capitol Police, federal and local agencies are beefing up security at the U.S. Capitol complex ahead of this week's anniversary of the Jan. 6 insurrection," and "added police power will be significant and visible").

[35] *See* **Exhibit 3** hereto..

been criminally charged regarding the events of January 6th. Residents of the District of Columbia and the Northern District of Georgia were asked for their "Opinion of whether people arrested for Jan 6 activities are guilty or not guilty of the charges brought against them." Fifty-four percent (54%) of Georgia respondents answered "Guilty," 10 percent said "Not guilty," and the remaining 36 percent responded either "Depends" or "Don't know/refused." Respondents in the District of Columbia, however, were much more convinced of defendants' guilt and much less ambivalent: 71 percent said "Guilty"; just 3 percent said "Not guilty"; 16 percent volunteered a response recorded as "Depends"; and 10 percent volunteered a "Don't know/refused" response. **Exhibit 3** at 7.

Predetermined views shaped by the reporting, House Select Committee hearings, documentaries, social media and other coverage are so widespread in this District's jury pool that empaneling a sufficiently impartial jury at a minimum can be accomplished only by allowing the parties a fulsome chance to explore individual prejudices. Mr. Stedman therefore asks the Court to permit: (1) a questionnaire to be sent, after review and approval by the Court, to summoned prospective jurors, (2) the right for the parties to be present during any pre-screening questioning the Court conducts before formal voir dire, (3) individual questioning during voir dire, and (4) expanded peremptory challenges -- 20 rather than the 10 otherwise permitted by Fed. R. Crim. P. 24 -- to be afforded to Mr. Stedman.[36]

Expanded examination of prospective jurors is essential for a fair trial here. *See Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976)("[I]f an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*."). *See also Skilling v. U.S.,* 561 U.S. 358, 385 (2010)(noting success of "extensive screening questionnaire and followup voir dire [in] yield[ing] jurors whose

---

[36] The defense has no objection to the government also receiving proportionately additional peremptory challenges.

links to Enron were either nonexistent or attenuated.").

In *U.S. v. Alford,* Criminal Action 21-263 (TSC)(D.D.C. April 18, 2022)(DDE46)

(**Exhibit 4**), Judge Chutkan granted a similar motion by the defendant,  who like Mr. Stedman

was charged with violations of 18 U.S.C. § 1752 and § 5104 arising out of the events on January

6, 2021, finding that

> Defendant's case is in many ways unique. Unlike most crimes that involve an identifiable victim or victims, the victims of Defendant's alleged crimes are more nebulous. The government alleges that Defendant acted knowingly and with intent to impede and disrupt a Joint Session of Congress convened to certify the results of the 2020 Presidential election. This allegation goes to the heart of the democratic process and arguably affects all Americans. And without question, there has been extensive media coverage of the January 6 events. Many District residents—and Americans throughout the country—including those who were not at the Capitol on January 6, may thus hold impressions and opinions about the day's events. Whether those impressions and opinions amount to disqualifying bias or whether prospective jurors can set aside any impressions and opinions and view the evidence against Defendant with an objective and open mind, is a question that deserves careful consideration. Accordingly, while Defendant falls short of showing that no impartial jury can be empaneled here, the court finds good reason to expand examination of prospective jurors in each of the three ways he requests.

*Alford*, 21-cr-263 (TSC), DDE 46 at 14-15. As a result, The Court in *Alford* granted the

opportunity for the defendant (jointly to the extent questions could be agreed upon, and

otherwise identifying disputes in that regard) to submit a written questionnaire for distribution to

prospective jurors. The Court also held that the parties may be present for pre-screening

questioning of prospective jurors conducted before the beginning of formal voir dire, that the

parties would be permitted to ask reasonable follow-up questions of individual jurors during voir

dire. Defendant Stedman should be afforded those same opportunities for the foregoing reasons.

In addition, for the foregoing reasons, expanded peremptory challenges are requested.

"The process of peremptory challenges is essential to an impartial trial." *U.S. v. Gordon*, 829

F.2d 119, 124 (D.C. Cir. 1987). Indeed, the Supreme Court long has recognized that peremptory

challenges are "one of the most important of the rights secured to the accused." *Pointer v. U.S.*, 151 U.S. 396, 408 (1894). "Though the peremptory challenge has never been held to be constitutionally mandated by the Supreme Court, …  the Supreme Court has often noted its significance. … [citing numerous Supreme Court cases]. Indeed, the trial's impartiality is, in part, secured by the exercise of the peremptory challenge. *Boone v. U.S.*, 483 A.2d 1135, 1138 (D.C. Cir. 1984).

While sometimes jurors can answer questions squarely that will satisfy the outward appearance that they can be fair and impartial, the unique nature and extent of public attention these cases have received makes peremptory challenges even more important so that the defendant can be satisfied that he received a trial by impartial jurors. Additional preemptory challenges are warranted here also for the foregoing reasons.

Respectfully submitted,

Law Offices of Rocco C. Cipparone, Jr.

BY:     */s/Rocco C. Cipparone Jr.*
        Rocco C. Cipparone, Jr., Esquire
        Attorney for defendant Patrick Stedman

Date: April 5, 2023