**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-383 (BAH)** |
| **PATRICK ALONZO STEDMAN,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Patrick Alonzo Stedman to 78 months' incarceration, which is the mid-point of the 70 to 87-month guideline range calculated by the Probation Office and the government, three years of supervised release, $2,000 in restitution, and the mandatory special assessment for each count of conviction, totaling $170.

## I.    INTRODUCTION

The defendant, Patrick Alonzo Stedman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Stedman, a dating and relationship coach for men and social medial influencer, used his significant online presence to encourage and organize other men to come to Washington D.C. on January 6, telling his followers the night before, "Now we FIGHT!" Along with two of these men, Stedman illegally entered the U.S. Capitol building to prevent Congress from certifying the results of the 2020 Presidential election. While inside the Capitol for over 40 minutes, Stedman was part of a disorderly mob that overran police lines in the Crypt and entered the offices of the Speaker of the House, where he took photos and videos of himself and the mob outside. Stedman yelled "Let us in!" and "Break it down!" outside the main door to the House Chamber, as other rioters banged on the door, the window of which had already been broken. When Stedman learned that another rioter had been shot by police, Stedman shouted threats at officers of the U.S. Capitol Police, including "You killed one of us? You're done!" After exiting the Capitol building, Stedman recorded a video for his followers, explaining that he had "taken action" to prevent Congress from certifying the results of the presidential election and that the "rats" – as he referred to members of Congress – had "scurried into the tunnels" to escape.

The government recommends that the Court sentence Stedman to 78 months' incarceration, a sentence which is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. 3553(a), including deterrence and properly accounting for the seriousness of the offense.

---

Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Affidavit accompanying the Complaint filed in this case, ECF 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Stedman's Role in the January 6, 2021 Attack on the Capitol

Stedman's crimes are documented through numerous videos and photos he took inside the Capitol, videos from body-worn cameras from Metropolitan Police Department officers, open-source video, surveillance footage from inside of the Capitol, and texts and messages he posted to social media.

#### *Activity Prior to January 6: "The Approaching Storm"*

Stedman was a social media influencer who had tens of thousands of followers.[2] In addition to providing dating and relationship advice and mentoring to men as a part of his business, Stedman frequently discussed political subjects with his social media followers during the days leading up to and after January 6, 2021. In the weeks prior to January 6, 2021, Stedman was active on Twitter, encouraging his followers to go to the U.S. Capitol on January 6.   On December 6, 2020, Stedman tweeted "HIGHLY recommend all patriots come to DC on the 6th.   This will be a turning point in our nation.   Will eventually be a national holiday akin to the 4th of July." (Gov. Ex. 614.)[3]   In a second tweet on the same day, he wrote "If you are coming DM [direct message]

---

[2]  At the time Stedman committed the offenses of conviction, he had approximately 25,600 followers on Twitter. As of July 26, 2023, Stedman had over 40,000 followers on Twitter.
[3]  All exhibits refer to the government's trial exhibits.

me. Assembling a TEAM." *Id.*

On the night before the attack on the Capitol, after arriving in D.C., Stedman tweeted "This is the Second American Revolution. I love you all for being here with me. NOW WE FIGHT!" (Gov. Ex. 601.)

### *January 6: "Storming the Capitol"*

On January 6, 2021, Stedman went to the "Stop the Steal" rally, where he took a group photograph, standing in the middle of 11 people, dressed in a red Make America Great Again hat and a sweater with a picture of former President Trump and the words "Make X-mas Great Again." (Gov. Ex. 619.)



*Figure 1: Group picture from "Stop the Steal" rally. Stedman is circled in red. (Gov. Ex. 619)*

At trial, Stedman testified that these were "clients" who he had organized to meet up with in Washington on January 6. Stedman testified that he had told a U.S. Congress member that he

was a "nexus point for other people connected to Stop the Steal" on January 6. (6/7/23 Trial Transcript ("Tr."), p. 222.) He testified that he had coordinated with other people by phone, text, and direct message.

Stedman was captured in numerous videos inside the Capitol with two of these men. However, during his trial testimony, Stedman claimed he didn't know the two men with whom he traveled through the Capitol and did not even know their first names. (Tr. p. 232.)

Before entering the Capitol, as Stedman approached the building from the West Lawn, the mob already could be seen moving up the stairs. Stedman shouted, "Storming the Capitol!" and "Let's fucking go!" as he advanced forward. (Gov. Ex. 915.)



*Figure 2: Still frame of video taken by Stedman as he approached the Capitol (Gov. Ex. 915)*

As he climbed up the stairs on the West Front with the mob, Stedman stopped and looked back over the crowd behind him. He recorded a video, looking at the crowd, and said "As far as

the eye can see, it's our fucking house! It's our fucking house!"



*Figure 3: Still frame of video taken by Stedman in which he yelled "It's our fucking house!" (Gov. Ex. 915)*

Just before entering the building, Stedman sent a text message that said, "we have stormed the capitol." (Gov. Ex. 925.) In his own words, recorded on video later that day, Stedman said he was in the "first wave" that "climbed up the back part of the Capitol building" and "broke down the doors." (Gov. Ex. 922.)

Stedman entered the Capitol building at 2:23 p.m. through the Senate Wing Doors, approximately 10 minutes after the initial breach. (Gov. Ex. 303.)



*Figure 4: Still frame of video capturing Stedman entering the Capitol Building (Gov. Ex. 303)*

Within minutes of Stedman entering, Vice President Mike Pence was evacuated, and the House of Representatives was forced to declare recess and cease working to certify the election results. (Gov. Ex. 101, 203.)

Stedman proceeded directly to the Crypt, where a group of Capitol Police officers formed a line from East to West to prevent rioters from advancing further from the Senate side to the House side of the building. Evidence at trial showed that this mob shouted at police officers and violently pushed past them. Stedman, who was in the middle of the crowd, recorded a video of himself moving forward with the mob while shouting "It's our fucking house!" (Gov. Ex. 602.)



*Figure 5: Still frame of video taken by Stedman as he advanced with the mob in the Crypt after the police line was overrun (Gov. Ex. 602)*

Stedman proceeded to the chambers of House Speaker Nancy Pelosi and was part of a mob that roamed the halls and offices in the Speaker's Suite.



*Figure 6: Still frame of video taken by Stedman as he entered the Speaker's Suite. (Gov. Ex. 974) In the video, Stedman can be heard saying "Hey Nancy" as he entered the Suite.*

From the Speaker's Suite, he took pictures and videos of the riot outside on the West Front,

in which a huge chaotic crowd, police, and smoke can be seen, and shouting can be heard.



*Figure 7: Still frame of video taken by Stedman from the Speaker's Suite (Gov. Ex. 971)*

He also took selfie photos of himself on the Speaker's Balcony.



*Figure 8: Picture of Stedman on the Speaker's Balcony (Gov. Ex. 970)*

When an unknown individual sent him a message on WhatsApp at 2:35 p.m. that said, "Pelosi was removed from the hearing," Stedman responded, "I know, I'm in her office lol." (Gov. Ex. 933.) Stedman next went through the Rotunda and Statuary Hall to the Main Door of the House Chamber. A crowd had gathered outside the door. Glass windows of the door already had been

broken. As rioters banged on the outside of the door, Stedman recorded himself shouting "Break it down!" multiple times. In one video, Stedman can be heard chanting "Break it down" with the mob. (Gov. Ex. 977.) In a second video, Stedman can be heard yelling independently, "Let us in!" and "Break it down!" (Gov. Ex. 976.)



*Figure 9: Still frames of videos shot by Stedman at the House Main Doors as other rioters pounded on the doors (Gov. Ex. 977 and 976)*

Evidence at trial showed that on the other side of the door—inside the House Chamber—members of Congress who had not yet been evacuated stood huddled on the balcony, while Capitol Police officers pointed guns at the inside of the door (Gov. Ex. 812), and that another rioter was killed while attempting to crawl through a broken window into the House Chamber, (6/6/23 Tr. 121).



*Figure 10: Still frame of CCTV footage showing officers pointing guns at the inside of the door, at the location where Stedman yelled "break it down" from the other side (Gov. Ex. 812)*

Stedman proceeded to ascend the stairs to the House Gallery and walk the halls from East to West. When he descended the stairs on the West side, he saw tear gas in the halls. He learned that someone (later identified as Ashli Babitt) had been shot nearby.

Stedman then went back to the Main Door of the House Chamber where Capitol Police officers were still posted, and other rioters were gathered. He recorded a video in which he yelled, apparently at the police, "You're going to shoot your own people, you fucking scum!" (Gov. Ex. 997) Continuing on, he yelled "You killed one of us? You're done!" *Id.*

Stedman and his two associates then proceeded to the Rotunda, where they remained for another 11 minutes. During this time, Stedman took photos and videos, sat on a bench, talked on the phone, and observed and recorded other rioters who were involved in an extended verbal and physical confrontation with the police.



*Figure 11: Still frame of video recorded by Stedman showing other rioters physically confronting police in the Rotunda (Gov. Ex. 987)*

After witnessing this confrontation, Stedman still did not leave the Capitol building and remained for seven more minutes.   As he explained on video immediately after exiting, he did not leave the building until he was "kicked out" by the police. (Gov. Ex. 992)

Stedman and his associates exited the Rotunda Door to the East Front of the Capitol at 3:07 p.m., having been inside a total of approximately 44 minutes.

### *"The Storm is Here": Stedman's Statements after Exiting*

Upon exiting the Capitol building, Stedman continued to take additional phots and videos. Standing at the top of the steps on the East Front, just after exiting the building, Stedman took a photo of the mob scene surrounding the Capitol.



*Figure 12: Photo taken by Stedman of mob on East Side of Capitol (Gov. Ex. 994)*

Stedman proceeded to descend the stairs through the mob to the East Front Plaza. Moments later, Stedman recorded a video of himself.   (Gov. Ex. 992.)



*Figure 13: Still frame from selfie video recorded by Stedman on East Front (Gov. Ex. 922)*

14

In that video, he explained what he had done and why he did it. According to Stedman, he was "in the first wave" of rioters who "broke down the doors" and "got all the way into the chambers." Referring to members of Congress, Stedman explained that "fucking rats scurried under the tunnels because they were freaking out. They declared a recess."   In the same video, Stedman made clear his reasons for storming the Capitol: "People are ready to take action. They're ready to take action. They're already taking action. And we're at the point now where Congress does the right thing… we're not asking for much, here. We're asking them to let the states do what they wanted to do which is recertify the votes, okay? This is fucking criminal behavior, it's fucking criminal behavior. It's criminal behavior from the vice president, it's criminal behavior from three quarters of Congress…If they go ahead, and they certify this bullshit, it's fucking treason. It's fucking treason, and if Trump doesn't take action, we're taking action." (Gov. Ex. 992.)

Approximately two hours later, at 5:07 p.m., Stedman tweeted "Patriots took the hard drives from the capitol. Trump mobilizing DC national guard Pelosi trying to send in VA national guard to counter What did we tell you these last few months? The Storm Is Here." (Gov. Ex. 607.)

### Stedman's Testimony at Trial

During his trial testimony, Stedman admitted he entered the Capitol building. However, he claimed that at the time, he believed he had permission to enter and remain inside in order to "peacefully protest." (6/7/23 Tr. 278; 6/8/23 Tr. 44-45.)

Stedman testified that as he approached the Capitol, he saw smoke, heard people shouting, and was told by other rioters that the police had discharged teargas. (6/8/23 Tr. 42-44.) He further admitted that as he entered, he saw police in riot gear and also saw broken glass, and that an alarm was sounding. (*Id*. 52-53.) He knew other rioters had broken in the door through which he entered.

15

(*Id*. 87.) He admitted that inside the Capitol building police pointed their guns at him, he saw tear gas in the halls, and he learned that another rioter had been shot by police. (*Id*. 76-78.) Despite all this, he claimed that he believed the Capitol building was open to the public that day and that the thousands of rioters who stormed the building had permission to be inside. (*Id*. 78.)

When asked why he referred to his actions that day as "storming the Capitol," he claimed this phrase was just a "euphemism for demonstrating" peacefully. (*Id*. 36.)

Stedman further testified that his only intention was to "peacefully protest," not to obstruct the certification of the election results. (6/7/23 Tr. 235, 239, 278.) He admitted that he knew Congress was working on certifying the election but insisted that he did not realize his actions as part of an invading mob might interfere with Congress's work. (*Id*. 26, 27, 30-33.)

He claimed that when he told his followers to "fight" in a "second American revolution," he was actually talking about a "political revolution" similar to the Civil Rights Movement. (*Id*. 37.)

When asked about numerous inflammatory statements he made that were captured on video, he claimed he didn't really mean what he said. He testified it was "bravado for the cameras" and that he was trying to "act tough" for his social media audience. (6/7/23 *Tr*. 245.) For example, when asked why he yelled "break it down" outside the House Chamber door, he responded that he did it to "look tough for the camera" and to create a moment of "good television." (*Id*. 257.) On cross-examination, he admitted that as he yelled this, he could see other rioters, who were within earshot of him, banging on the House Chamber door, but he insisted that, despite repeatedly yelling the contrary, he did not wish them to actually break down the door. (*Id.* 69.)

### III.     THE CHARGES

On June 2, 2021, a federal grand jury returned an indictment charging Stedman with five counts, including, Obstruction of an Official Proceeding and Aiding and Abetting (18 U.S.C. § 1512(c)(2) and 2), Entering and Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)), Disorderly and Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2)), Disorderly Conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)), and Parading, Demonstrating, or Picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)). On June 9, 2023, Stedman was convicted of all of those offenses following a jury trial.

### IV.     STATUTORY PENALTIES

Stedman now faces sentencing on each of those charges.

As noted by the Draft Presentence Report issued by the U.S. Probation Office, Stedman faces the following penalties:

- Count One (Obstruction of an Official Proceeding): up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

- Count Two (Entering and Remaining on a Restricted Building or Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Three (Disorderly and Disruptive Conduct in a Restricted Building or Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Four (Disorderly Conduct in a Capitol Building): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

- Count Five (Parading, Demonstrating, or Picketing in a Capitol Building): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government concurs with the U.S. Probation Office that the Sentencing Guidelines offense level is 27. (PSR ¶¶ 34-43).

**Count One: 18 U.S.C. §§ 1512(c)(2) and 2 - Obstruction of an Official Proceeding Before Congress, and Aiding and Abetting**

| Base offense level: | 14 | U.S.S.G. §2J1.2 (a) |
| --- | --- | --- |
| Special Offense Characteristic | +8 | U.S.S.G. §2J1.2 (b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."[4] |
| Special Offense Characteristic] | +3 | U.S.S.G. §2J1.2 (b)(2): "the offense resulted in substantial interference with the administration of justice."[5] |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the |

[4] Application of this offense characteristic is supported by, *inter alia*, the fact that Stedman threatened police officers, participated in a mob that overran police lines, and encouraged other rioters to break down doors.

[5] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. The evidence presented at trial shows that Stedman went to Washington, D.C. and joined in the riot to stop the certification of the Electoral College vote count. Further, the riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses.

| | | |
|---|---|---|
| | | administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense"[6] |
| Total | 27 | |

**Count Two: 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds**

| Base Offense Level | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1) |
| Base Offense Level (adjusted) | 25 (from Count One) | U.S.S.G. § 2X1.1(a): "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |
| Total | 27 | |

---

[6] The U.S. Probation Office and the government agree that a two-point adjustment is appropriate pursuant to U.S.S.G. § 3C1.1 based on Stedman's false testimony at trial. Significantly, Stedman's testimony contained multiple materially false statements that were directly contradicted by other evidence, including evidence Stedman himself created (e.g., cellphone videos, social media posts).

**Count Three: 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |
| Total | 12 | |

Counts One through Three group because all involve the same victim: Congress. U.S.S.G. § 3D1.2(d). The offense level for that Group is the level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a). Since Counts One and Two have the highest offense levels for any count in the group, the offense level for the group is 27. And because there is only one group, the total adjusted offense level is the level for that group: 27.

**Counts Four and Five:   18 U.S.C. §§5014(e)(2)(G) and (e)(2)(D)**

The guidelines do not apply to these offenses.

Stedman has no criminal convictions and therefore is not assigned any criminal history points.   PSR ¶ 46.   The U.S. Probation Office calculated Stedman's criminal history as category I, which is not disputed. Accordingly, Stedman's Guidelines imprisonment range is 70 to 87 months' imprisonment.   PSR ¶ 86.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

**A.      Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Stedman's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Stedman organized others to come to Washington on January 6. At least two of those individuals illegally stormed the Capitol with him and joined the mob that overran police lines and encouraged rioters to break down the doors to the House Chamber, where members of Congress were waiting to evacuate. Stedman encouraged others to break down the doors and yelled threats at the police. Stedman stormed the Capitol to prevent Congress from certifying the results of the presidential election and was a member of the mob that succeeded in doing so for over six hours. The nature and circumstances of Stedman's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 78 months' incarceration.

**B.  The History and Characteristics of the Defendant**

Unlike many defendants who appear before this Court, Stedman was raised in a stable home environment. He graduated from the University of Pennsylvania, and his employment history includes teaching English in Argentina and working as a senior analyst for Kroll, Inc. From May 2014 until the present, he has owned The Dynamic Man, LLC, which derives its income through sales of his e-book and one-on-one coaching.[7]  Stedman has no substance abuse issues and no mental health issues. But none of this dissuaded Stedman from participating in a riot and effort to block the peaceful transition of power. In fact, Stedman apparently used his talents – and

---

[7]  Stedman is the 80% owner and his wife is the 20% owner.

expansive social media presence – to encourage many others to do the same.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Stedman's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. While Stedman has no prior criminal history, his propagation of misinformation is a cause for concern. For example, he told his tens of thousands of followers that January 6 would be a "Second American Revolution" and a "turning point for our nation." He encouraged them to come to Washington on January 6 to "fight" and told them that "three quarters of Congress" were involved in "criminal behavior" and "treason." Even after seeing first-hand the violence and destruction caused by the riot, he praised the "patriots" who he claimed had stolen "hard drives from the capitol" and triumphantly declared, "What did

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

we tell you these last few months? The Storm is Here."

These statements, which are consistent with various conspiracy theories circulating online around January 6, further highlight a need for deterrence. In a similar case – *U.S. v. Bledsoe, infra*, in which the defendant claimed that he got caught up in a "stupid rabbit hole" about the election promoted by the former President and others – this Court expressed concern that the defendant's willingness to engage in conversations in the political sphere that were riddled with misinformation posed a danger of recidivism. (*U.S. v. Bledsoe*, 21-cr-204-BAH, 10/21/22 Tr. 101, 110.) The same is true in this case.

Moreover, Stedman's propagation of misinformation is particularly troublesome given his claim at trial that much of what he said was "bravado" and "good television" that was designed to make him "look tough" for his social medial audience. His refusal to acknowledge that the statements he made had real consequences – such as encouraging other rioters to join the riot and to actually break down the doors to the House Chamber, where shortly thereafter another rioter was killed – is concerning and further supports a need for deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[10]

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information on the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Notably, this Court has sentenced multiple defendants for violating 18 U.S.C. § 1512. In the cases discussed below, the Court found that the sentencing enhancements for causing or threatening to cause physical injury to a person, or property damage (U.S.S.G. §2J1.2 (b)(1)(B)) and for substantial interference with the administration of justice (U.S.S.G. §2J1.2 (b)(2)) applied, as they do in the present case. None of these defendants was alleged to have physically assaulted police officers. In these cases, the Court gave sentences between 48- and 60-months' incarceration. A higher sentence is warranted in the present case because Stedman propagating misinformation; he organized others who also illegally entered the Capitol by; he encouraged other rioters to break down the doors of the House Chamber; and he threatened Capitol Police officers. These facts distinguish this case from the other similarly situated defendants and justify a higher sentence.

For example, in *United States v. Williams*, No. 21-cr-377-BAH, the defendant issued a series of social media posts expressing anger that Trump lost and stating his intention to go to the Capitol on January 6 and "Hold the Line" to stop the certification of the election results. On January 6, he joined a group of rioters on the West Front where he helped them climb bicycle racks. Similar to Stedman, he recorded himself on the stairs and bragged, "[w]e just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper-sprayed, and hit everybody. Fuck that, we took this fucking building." Like Stedman, he was part of the crowd that overran the

police in the Crypt. He advanced to the Rotunda where he celebrated with other rioters and smoked marijuana. When the police tried to force him out of the Rotunda, he joined with other rioters and resisted and mocked the police. Williams later bragged on social media about his actions and expressed no remorse. Williams faced a guideline range of 57 to 71 months, and this Court sentenced him to 60 months' incarceration, a sentence within that range.

While Williams's conduct is similar to Stedman's in some ways, Stedman went beyond Williams in significant ways. As noted above, Stedman actively encouraged others to join him in Washington on January 6, including at least two other individuals who illegally entered the Capitol building. He encouraged other rioters to break down a door to access an area where members of Congress were sheltering, and he threatened police officers during a tense moment after another rioter had been shot. He also entered the Speaker's Suite, a sensitive area, insisting at trial that he and the mob had permission to be there, in contradiction to the evidence. Additionally, Williams did not receive a two-point enhancement for obstruction, and thus had a lower guideline range than Stedman. For these reasons, Stedman deserves a longer sentence than Williams.

In *United States v. Matthew Bledsoe*, 21-cr-204-BAH, the defendant scaled the wall of the Capitol building and, like Stedman, entered the Senate Wing Door. He posted on social media before, during, and after the riot, and obstructed justice by misleading the jury under oath at trial. Like Stedman, Bledsoe engaged in threatening behavior, such as sending texts and social media posts about members of Congress, and made statements like "where those pieces of shit at" when he entered the building. Like Stedman, Bledsoe's guidelines range was 70-87 months, and the government recommended the low end of the range at 70 months. The Court sentenced Bledsoe to 48 months' incarceration, noting, *inter alia*, that Bledsoe's conduct was similar to William's

conduct, except Williams was in the Capitol for a longer time and that Bledsoe didn't confront law enforcement.

As described above, Stedman's conduct was more serious than both Williams and Bledsoe. Whereas Bledsoe remained inside the Capitol for a total of 22 minutes, eventually leaving voluntarily, Stedman roamed the Capitol for 44 minutes, staying inside the Rotunda to film other rioters physically confronting the police and leaving only when he was "kicked out" by the police. Additionally, while Bledsoe simply observed other rioters attempting to gain access to the House Chamber Main Door, Stedman actively encouraged them by repeatedly yelling "break it down" as they banged on the door. Unlike other defendants, Stedman organized his followers to "fight," and at least two of them illegally entered the Capitol with him. These significant differences support a higher sentence for Stedman.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases

involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Stedman was convicted of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of

full restitution without respect to a defendant's ability to pay.[11]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Stedman to pay $2,000 in restitution for his convictions. This amount fairly reflects Stedman's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 78 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory special assessment for each count of conviction, totaling $170.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    Brian Morgan
Joseph Smith
Assistant United States Attorneys

31