# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**     :
                                                          :
      **-v-**                                   : **Criminal No. 21-383-001 (BAH)**
                                                          :
**PATRICK STEDMAN**              :

---

## Defendant Patrick Stedman's Sentencing Memorandum

---

**On the Memorandum:**

***Rocco C. Cipparone, Jr., Esquire***
**157 Bridgeton Pike, Suite 200-320**
**Mullica Hill NJ 08062**
**(856) 547-2100**
**www.Cipparonelaw.com**
**Attorney for Defendant**

## I.      APPLICABLE LEGAL FRAMEWORK FOR SENTENCING

The advisory sentencing guidelines are now just one of the several factors which the Court must consider at sentencing pursuant to the guiding principles in *U.S. v. Booker*, 534 U.S. 220 (2005) and 18 U.S.C. § 3553. As is well established, the Court should impose a sentence that is reasonable and "*sufficient but not greater than necessary*" to achieve the purposes of sentencing, even if such is lower than the **advisory** sentencing guideline range. 18 U.S.C. § 3553(a). The Supreme Court has made clear that if a sentencing court reasonably determines (and explains its basis) that a sentence even significantly different from the advisory guideline range is appropriate, the disparity from the guideline range is of no moment: the discretion to impose such a sentence will not be disturbed on appeal unless such was an abuse of discretion by the District Court. *Gall v. United States*, 552 U.S. 38 (2007):

> We now hold that, while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard. …
>
> As a result of our decision, the Guidelines are now advisory, and appellate review of sentencing decisions is limited to determining whether they are "reasonable." Our explanation of "reasonableness" review in the Booker opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions.

*Gall*, 552 U.S. at 41, 46 (2007). Indeed, "[a] sentencing court 'may not presume that the Guidelines range is reasonable.' … Rather, the court 'must make an individualized assessment based on the facts presented.'" *U.S. v. Abukhatallah*, 41 F.4th 608, 644 (D.C. Cir. 2022) (citing *Gall*). Courts should not adopt a reflexive or presumptive acceptance of the guideline range.

The U.S. Court of Appeals for the D.C. Circuit has described the required procedural steps at sentencing. First, the Court must calculate the defendant's Guideline range, then give the respective parties the opportunity to argue for what each party deems to be the appropriate

1

sentence, after which the court considers the 18 U.S.C. § 3553(a) factors in determining the sentence regardless of whether it varies from the Guideline advisory range. The Court must articulate its reasons for a departure or variance if one is imposed. *U.S. v. Akhigbe*, 642 F.3d 1078, 1084 (D.C. Cir. 2011).

Courts should not adopt a reflexive or presumptive acceptance of the guideline range. "[A] within-guidelines sentence is not necessarily reasonable *per se*. Otherwise. . . we would come close to restoring the mandatory nature of the guidelines excised in *Booker." U.S. v. Cooper, 437 F.3d 324, 331 (3d Cir. 2006)*.

The factors which the sentencing court must consider pursuant to 18 U.S.C. § 3553(a) are:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ... issued by the Sentencing Commission[;]

(5)    any pertinent policy statement ... issued by the Sentencing Commission[;]

(6)    the need to avoid unwanted sentencing disparity among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The appellate standard of review for sentencing decisions now is "reasonableness." *Booker*, 543 U.S. at 261-62; *U.S. v. Dorcely*, 454 F.3d 366, 374 (D.C. Cir. 2006) ("Accordingly, we now review any sentence, whether within the Guidelines range or not, 'to ensure that it is reasonable in light of the sentencing factors that Congress specified in 18 U.S.C. § 3553(a).'"). Considering *Booker* and its progeny, a sentencing court also may engage in a variance from the advisory sentencing guideline range based on factors that would not otherwise be a sufficient or even a permissible basis for departure under the advisory guidelines. *U.S. v. Bigley*, 786 F.3d 11, 15 (D.C. Cir. 2015) ("sentencing courts, post-Booker, can issue a variance from the advisory guidelines range without the need for a pre-Booker departure, and can issue a variance on the same grounds that were previously forbidden for departures."). *See also U.S. v. Severino*, 454 F.3d 206, 211 (3d Cir. 2006).

## II. UNRESOLVED NON-GUIDELINES REVISIONS AND OTHER UPDATES TO THE PSR

Certain requests for clarification and revision are indicated in the Addendum to the Final PSR as "noted", which are interpreted to mean that the Probation Office concurs with such. As they are adequately summarized in the Addendum, those are not recounted here.

The following requests for revisions to the draft Presentence Report ("PSR") were referenced in the addendum to the Final PSR, but not adopted by the Probation Office. It is requested that the Court order that these additions/revisions be incorporated into the PSR. The below references are to the paragraphs as numbered in the Final PSR:

¶ **12.** For correctness and completeness, the following should be added to this paragraph. "Mr. Stedman was toward the rear of the crowd in the Crypt, and from his vantage point he could not see the front of the line and interaction with the police by others in the Crypt. Mr. Stedman also did not push, shove or have inappropriate physical contact with anyone – including any law enforcement – in

the Crypt or in any other location within or about the Capitol Building or grounds on January 6, 2021.

**¶ 20.** The third sentence of this paragraph needs to be corrected or clarified as follows: (a) Mr. Stedman did not testify that he was "part of a mob", and that characterization of his testimony should be removed. Mr. Stedman did of course acknowledge that there was a crowd of people also entering the building, and testified about his observations of course, but not that he was "part of a mob", and (b) that same sentence states that Mr. Stedman testified he "heard alarms" while he was in the building, but the testimony about hearing alarms was not that Mr. Stedman heard them contemporaneously while in the Capitol, but while watching the videos thereafter (for e.g. at trial) he acknowledged that he heard alarms in the video evidence. In substance, the point is that Mr. Stedman was oblivious to the alarms on 01-06-21 (they did not register to him) but acknowledged during his testimony that alarms were going off based on his review of the video evidence.

Also, after the sentence in ¶ 20 stating that "Defendant Stedman testified that he believed police officers let him in … no officers at the door through which he entered.", a sentence should be added stating "However, Mr. Stedman did testify, and trial exhibit D-1707 showed, that Mr. Stedman did observe police officers standing around not far from the area where he entered the Capitol Building."

**¶ 76 and ¶80**. The dollar figures are incorrect/confused. Mr. Stedman raised a total of $95,000 in donations: $45,134 from givesendgo, and $50,000 from additional sources, for a total of just over $95,000, not $140,000. See A.002 (Patrick Stedman letter). It also should be noted that the $95,000 in donations constitutes less than half of the legal fees incurred by Mr. Stedman to date.

¶80. See above. Also, it is not likely that without Mr. Stedman's income if he is incarcerated that Mrs. Stedman's income "will be more than sufficient to provide for the household." Removing Mr. Stedman's income will make supporting herself and two children difficult. Childcare expenses would remain and potentially increase. Further, for the past few years due to Covid and these charges facing Mr. Stedman, his family have been living with his parents and paying only a very modest rent of $880.00 per month. If those living circumstances change (they were always intended to only be temporary) then the expenses will increase. The statement that Mrs. Stedman's income is more than sufficient to provide for the household does not pertain and should be revised based on the above.

## III.  OBJECTIONS TO GUIDELINE CALCULATIONS IN THE PRESENTENCE INVESTIGATION REPORT

Mr. Stedman objects to the Final Presentence Report ("PSR") guideline calculations as follows:

- **¶ 35.** Mr. Stedman objects to the application of an eight (8) level offense level enhancement under U.S.S.G. §2J1.2(b)(1)(B). There was no evidence at trial that Mr. Stedman used, encouraged, or saw the use by others of pepper spray, flagpoles or any other object, or that Mr. Stedman personally caused any property damage. Mr. Stedman wore no body armor or other protective gear; did not hide his identity; and importantly possessed no weapons, pepper spray, restraints, or other dangerous objects and did not use or possess any make-shift dangerous objects throughout the entire day.

  Although Mr. Stedman, as video evidence showed, at one brief point yelled "break it down" behind a crowd near the House Chambers doors, any property damage had already been done by the time Mr. Stedman did so. Indeed, the government has acknowledged in its sentencing

memorandum that such was the situation regarding the Chamber doors: "Stedman yelled "Let us in!" and "Break it down!" outside the main door to the House Chamber, as other rioters banged on the door, **the window of which had already been broken**." GT Sentencing Memorandum ("SM") at 2 (bold added).

Furthermore, video evidence clearly shows that Mr. Stedman did not damage any property to enter the Capitol building: he walked through doors that were open and he did not counsel or cause[1] any damage to the entryway either. Mr. Stedman complied with any direct communications to him from law enforcement officers. Notwithstanding the video recorded by Mr. Stedman (and referenced by the government in its sentencing memorandum) in which Mr. Stedman stated that he was in the "first wave" of persons who entered the Capitol Building and "climbed up the back part of the Capitol Building" and "broke down the doors" (GT SM at 6), the Capitol video surveillance evidence demonstrated that those statements did not reflect the reality that Mr. Stedman was not in the "first wave" of people, did not participate in the break down the entrance doors or breaking of any glass, and that he entered by walking through the open doors about 2:24 PM, about 14 minutes after the breech by others. *See* GT Exh. 303; GT SM at 10.

Indeed, at one point Mr. Stedman attempted to and did dissuade another individual from continuing to harass a Capitol Police Officer in a hallway, as he testified at trial and as is corroborated by the video

---

[1]  FBI case agent Romanowski further confirmed such during his cross-examination testimony. 06-07-2023 Tr. at 28-29.

surveillance. GT Exh. 315.

The Final PSR in the addendum also references, in support of its application of the enhancement, that Mr. Stedman yelled "you're going to shoot your own people, you fucking scum!" Continuing on, he yelled "you killed one of us? You're done!". PSR at 25 (Addendum). Those statements were not a reference to or threats of physical harm. As Mr. Stedman testified, he intended those as a reference to job loss and prosecution for the behavior regarding the shooting of the person now known to be Ashli Babbitt.

- **¶ 36.** Mr. Stedman objects to the application of a three (3) level offense level enhancement under U.S.S.G. §2J1.2(b)(2) "[b]ecause the offense resulted in substantial interference with the administration of justice." Mr. Stedman was charged with and convicted of the attempt to obstruct an official proceeding (note: there is no basis to conclude that the conviction was for other than attempt, as there was no special verdict form in that regard concerning Count One).[2] Also, Mr. Stedman complied with any direct communications to him from law enforcement officers. Any interference with Congress' actions had already occurred as Congress had already discontinued its session before Mr. Stedman even arrived at the House Chamber doors.

Furthermore, as Mr. Stedman testified and as was corroborated by other trial exhibits, Mr. Stedman was aware by the time he reached the House Chamber doors that Congress already had evacuated the Chamber.

---

[2] Indeed, Jury Note 1 Docket Entry 71 makes it clear that the jury was contemplating attempt as a basis for its verdict.

06-07-2023 Tr. at 260-61.

As a corollary, as referenced in the context of a request for a specific verdict form (in a defense trial brief filed 06/05/2023, Docket Entry 65), Mr. Stedman also contends that a downward adjustment of an additional three levels is warranted pursuant to **U.S.S.G. § 2X1.1**, which section provides for such a decrease in the case of an attempt unless "unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense". For the reasons stated above that Mr. Stedman was aware by the time he reached the Chamber doors and yelled "break it down" that Congress had already evacuated the Chamber, Mr. Stedman did not believe his acts caused the stoppage so of necessity he did not complete all the acts he believed necessary to complete the substantive offense. Furthermore, Mr. Stedman did not want to have Congress' action stopped that day: as he testified he was upset that a recess had been declared and wanted Congress to remain in session. 06-08-2023 Tr. at 65 ll. 9-12; 91 l.22-92 l.2.

- **¶ 39**. Mr. Stedman objects to the application of a two (2) level offense level enhancement under U.S.S.G. §3C1.1. Mr. Stedman's trial testimony was as to his state of mind and perceptions, and although the jury convicted, Mr. Stedman's testimony was as to his own internal state of mind and perceptions. The jury's rejection of such does not mean that he was testifying falsely or to mislead, but to tell his own truthfully held recollection of his then state of mind and his mental perceptions. *See U.S. v. Safavian*, 461 F. Supp. 2d 76, 88 (D.D.C. 2006) ("[T]he Court did not find that the lack of credibility of Mr. Safavian's testimony was sufficient to warrant the upward adjustment for obstruction under a clear and

convincing evidence standard. Mr. Safavian's testimony, and particularly those parts that the government alleges were untrue, were not based on objective, verifiable facts directly contradicted by documentary evidence or other witnesses. Rather, they centered on his state of mind, his intent, and his willfulness. While the jury obviously found the willfulness and specific intent required to convict Mr. Safavian of these charges, the Court was reluctant to enhance Mr. Safavian's offense level under the clear and convincing standard in such subjective areas (as opposed to an objective fact, such as where a defendant gives a plainly false alibi in his testimony or attempts to place the blame for the crime on another person who could not possibly have committed the crime) and his lack of credibility.").

Also, the fact that the jury credited and inferred from other evidence that Mr. Stedman was guilty does not mean that Mr. Stedman's testimony was intended to willfully obstruct or impede. *See U.S. v. Reeves,* 586 F.3d 20, 23 (D.C. Cir. 2009) ("An enhancement under § 3C1.1 'is only appropriate where the defendant acts with the intent to obstruct justice.' *United States v. Henry*, 557 F.3d 642, 646 (D.C. Cir. 2009)."). He testified regarding his own state of mind and perceptions as he recalled them at the time of his testimony.

- **¶ 40**. Based on the foregoing, the adjusted offense level should be level 11, not 27.

- **¶ 43**. Based on the foregoing, the total offense level should be level 11, not 27.

- **¶ 86**. Based on the above guideline calculation objections, the total offense level should be 11 (not 27), and the guideline range should be 8-14 months (not 70-87 months).

- **¶ 117**. The guideline fine range for Count One, based on level 11 (see above) should be $4,000 to $40,000 per U.S.S.G. §5E1.2(c)(3).

- **¶ 118**. For the same reasons regarding ¶ 117 above, the fine range regarding Counts Two and Three should be $4,000 to $40,000 per U.S.S.G. §5E1.2(c)(3).

## IV.   THE COURT SHOULD GRANT A VARIANCE FROM THE ADVISORY GUIDELINE RANGE MINIMUM IN ORDER TO IMPOSE A SENTENCE THAT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO MEET THE PURPOSES OF SENTENCING UNDER 18 U.S.C. § 3553

In Mr. Stedman's situation, weighing the relevant sentencing criteria favors a sentence below the guideline range. Considering the foregoing objections, it is unclear what guideline range the Court ultimately will determine. However, in either determination (whether the range in the PSR of 70-87 months or the defense urged range of 8-14 months), a downward variance at sentencing is warranted. Of course, if the range determined is 70-87 months, a more substantial downward variance is warranted to ensure a sentence sufficient but not greater than necessary in the circumstances of this defendant and the case in context as well.

The lasting stigma and collateral consequences of the federal felony and misdemeanor convictions sustained by Mr. Stedman, along with a substantial downward variance form the sentencing guideline range, will nonetheless provide more than sufficient general and specific deterrence in the attendant circumstances.  A within guideline sentence -- especially if the range is 70-87 months, but at either range discussed herein -- would be greater than necessary to meet the purposes of sentencing.

The salient sentencing factors are:

> ➢   <u>**Nature and circumstances of the offense and the history and characteristics of the defendant**</u>

Although the nature and circumstances of the offense are of course serious, Mr. Stedman's conduct was aberrational and inconsistent with his well-established solid good character, the latter of which warrants significant sentence mitigation.

10

➢ **History and Characteristics of the Defendant**

Patrick Stedman is 35 years old and has no prior criminal history (discussed more fully *infra*). He is a college graduate, a hard-working financially stable contributing member of society who is full-time self-employed, and most importantly a father (of two), husband and son who made a mistake in his life based on poor judgment and the frenzy of the day involved. While the nature of the offense is serious, of course as the above-referenced caselaw makes clear, the conduct must be weighed against (and here mitigated by) the personal characteristics of Mr. Stedman, among the other factors addressed in this memorandum as well.

Mr. Stedman, apart from the instant offenses of conviction, has led a well-led community and family supportive life. As David Stedman, Pat's father writes (A.009-010), Pat has been an attentive and caring son who assists financially, physically, and emotionally in their now joint living situation; he is a positive hands-on committed father to his two young children; and a loving partner to his wife Kate. Margaret Stedman, Mr. Stedman's mother, also expresses to the Court her perceptions of her son, his positive-attributes and family values, giving examples which make clear that Pat Stedman as a strong, supportive family network, which of course bodes well for his future in not recidivating and complying with all orders of the court and the law in the future. A.011. Margaret Stedman is not blind to her son's actions on January 6th and has indeed indicated in her letter that she disagrees with his actions: she is a formidable woman, former schoolteacher, and citizen who is not blindly supporting her son's actions but is supporting her son's true positive character in expressing such to the Court.

Notwithstanding the instant transgressions of which he has been convicted, Mr. Stedman is a person of "high morals, ethics and sense of justice," as explained by Mr. Stedman's friend Loyzo Smolinsky in a letter to the Court. A.005. Mr. Smolinsky explains that his friendship with Mr. Stedman formed after they both sat on a grand jury together, and after his consistent observance (as Your Honor knows grand jury service is for many months) of Mr. Stedman when they served on a grand jury together. Mr. Smolinsky further explains the true work ethic, commitment to the growth of others, and unconditional family love and support which Mr. Stedman exhibits. Their friendship started during that grand jury encounter further

11

grew to the point at what Mr. Smolinsky is the God Father to Mr. Stedman and his wife Kate's daughter. Notwithstanding the instant aberrational conduct by Mr. Stedman, as acknowledged by Mr. Smolinsky, his opinion of Mr. Stedman has not changed. That is not out of blind ignorance, as he states, but a true and developed understanding of Pat Stedman the individual and his character over several years.

Even more poignant is the letter to the Court from Mr. Stedman's older (by 12 years) sister Meredith Dunn. As Ms. Dunn makes clear, "politically" and (as to his then state of mind around the time of the events based on which Mr. Stedman was convicted), Ms. Dunn and Mr. Stedman were diametrically opposite. However, she knows that at his core Mr. Stedman is a loyal, spiritual, determinative, and self-reflecting person capable of self-revision. Ms. Dunn reveals the impact that not just this case, but Mr. Stedman's actions, had and the wounds it created in their family that thankfully are now in the healing process. That healing also was occasioned by the mellowing of Mr. Stedman which she has witnessed, and his self-reflection, again which bodes well in mitigation of sentence and a prognostication that he will not recidivate. A.012-013.

Mr. Stedman's wife Kate in her letter to the Court recounts Pat's calm reassurance to their family and her in all trying times, including a significant post-partem health scare regarding their youngest child and its impact on Mrs. Stedman. She expresses the self-reflection and inner-flagellation Mr. Stedman has done since his arrest:

> My husband has changed as a person since his arrest. He has always been a very introspective and spiritual person, and he has analyzed his actions deeply and reflected on the image he put forth of himself that day. He realized this is not the person and the leader he wants to be; the experience humbled him deeply. He regrets putting his whole family through this and is more worried for all of us right now, than he is for himself. There's a lot of sadness in him now too, whenever I catch a glimpse of him, he seems to be lost in thought and far away. I can assure you judge Howell that Pat has received his punishment in the last 2 years, in the form of the stress, the shame and social rejection we've experienced.

A.017 (Kate Stedman letter).

Other letters submitted to the Court[3]  not only also solidify the above-referenced positive attributes possessed by Mr. Stedman but provide other insight as well. They are not recounted here in detail but are contained in the Appendix hereto. See A.014-015 (William Bartlett letter). The self-reflection, loyalty, growth, and evolving nature of Mr. Stedman is addressed in detail and by specifics in the letter of his friend of about 15 years, Lorraine Weekes. A.003-004 (Lorraine Weekes letter). Ms. Weekes notes that "in the past three and a half years, ... [her] friend has examined and interrogated the weaknesses and shortcomings within himself that ultimately motivated the conduct that landed him in your courtroom. More than just not making the same mistake twice, Patrick is, and will continue to be, perpetually invested in confronting and reforming himself.

Of course, up to this point the Court has only known about Mr. Stedman that which it could perceive at trial through testimony and evidence (other than that he has followed the Court's pretrial release order to the tee), which of course is a narrow snapshot temporally regarding the charges and otherwise constrained by the evidence and other court rules. As Kelly Smith outlines in a letter to the Court, even initial or limited exposure to someone, particularly Mr. Stedman, is not telling. He first perceived Mr. Stedman as arrogant and self-absorbed, but came to learn over time that such was a defense mechanism: "As our friendship grew, I came to realize that the Pat I had initially perceived was not an accurate representation of his true self. Our one-on-one conversations helped me see he was not only intelligent but also compassionate and warm-hearted. It became evident that his confidence in group settings was a defense mechanism, an armor which he used to conceal his vulnerabilities." A.007 (Kelly Smith letter).

Of practicality even now it is difficult for any sentencing court to get to know an individual three-dimensionally despite the efforts of doing to through a pre-sentence investigation. Those who wrote letters know Mr. Stedman three-dimensionally in myriad

---

[3]  For privacy of the letter writes, any email addresses and telephone numbers have been redacted from the public filing.

contexts, which respectfully should be give substantial consideration in mitigation of Mr.

Stedman's sentence. As Ms. Weekes aptly notes, "Patrick is a lot more than his mistakes".

>    **Acceptance of Responsibility**

Mr. Stedman is not seeking a guideline downward adjustment for acceptance of

responsibility as the term is used in U.S.S.G. § 3E1.1. However, he did and does recognize the

unintended effects that his actions had on persons at the Capitol Building on January 6, 2021.

As Mr. Stedman testified at trial, he understands now with a hindsight birds-eye view of other

things he subsequently learned went on that day, how officers and those who worked in/at the

Capitol Building on January 6, 2021 were unnerved/fearful, even though his personal

intention and conduct was not intended to create fear in others for their personal safety.

Indeed, at one point, as Mr. Stedman testified (and corroborated by the video Government

Exhibit 315) that he placed his hand on the shoulder of another person (whose identity was not

known to him) who was giving an individual police officer a hard time and (to paraphrase) told

the individual to leave the officer alone. While that does not establish "acceptance of

responsibility" as that term of art is used in the sentencing guidelines, it is an indication to the

Court that Mr. Stedman is neither devoid of concern for others, nor ignoring the impact on

others of his conduct. He continues to of course evaluate the import of his conduct that day and

self-evaluate in that regard.

Mr. Stedman further addresses substantial self-reflection and evolution -- also

referenced in the letters of others[4]  -- which he has done since January 6, 2021, in his attached

letter to the Court, including:

> I am sure you have heard scores of apologies at this point from
> J6ers. Normally, I would imagine they offer regrets about their
> actions. For me, however, this topic is more complicated. I do not
> condone my conduct, and I take responsibility for the pain it's
> caused not simply to my friends and family, but to the national
> consciousness. I love my country, yet somehow I contributed to
> division and hate within it — not simply on January 6th itself, but

---

[4]  On example is Kelly Smith who wrote: "Since his arrest, I have witnessed Pat grow as a man.
I have watched him humble himself, be more caring towards others (more than he ever had
before), and have watched him grow as a friend, son, brother, husband, and father to two
beautiful children." A.007.

in the months prior. Yet it is for this reason I am actually grateful for the experience of being indicted and even convicted. Because it is only through this process of suffering and humiliation that I've been able to truly look at myself and examine *why*.

...

If I was then who I am now, I would not have gone to Washington D.C., and I certainly would have gone nowhere near the Capitol. But in January 2021, that is not the man I was. That man did not know the unconditional love of a child, and felt like he needed to be relevant to strangers, or he wouldn't matter at all. It seems inevitable in hindsight that finding myself in that unexpected situation, I would have followed the crowd into the Capitol. This was a perfect opportunity for me to look brave on Twitter. I was not thinking about the legal implications of my desire to showcase myself on social media, or how my cocky videos might be construed. I was a fool, and like all fools I have suffered the consequences of my myopia.

A.001 (Patrick Stedman letter).

> ### Mental Health History

Mr. Stedman has no history of mental health issues. PSR ¶ 62.

> ### Substance Abuse

Mr. Stedman has no history of substance abuse.

> ### Education

Mr. Stedman earned a Bachelor of Arts degree from the University of Pennsylvania in 2010.

> ### Employment

Mr. Stedman has a positive work ethic, and sustained employment history, including his self-employment. Mr. Stedman has been a hard-working, goal-oriented individual, who has contributed positively to society. His instant conduct is a clear aberration. Since 2014, Mr. Stedman has operated The Dynamic Man, LLC, in which he and his wife are the members of the LLC (Mr. Stedman 80%, Mrs. Stedman 20%). Before he converted to running that business full-time, Mr. Stedman was gainfully employed by Kroll Inc. as a senior analyst, from 2011-2014. In addition to those major aspects of his work history, Mr. Stedman also worked previously teaching English as a second language while he briefly traveled in South America

after college (PSR ¶ 57), a warehouse laborer, and in the restaurant industry. PSR ¶¶ 68-71. Mr. Stedman has been and remains a positive contributing member of society.

> ### Family Life

Mr. Stedman has a rich family life, and he is a devoted family man. He maintains a strong and sustained relationship with his parents, and indeed he and his wife and children currently reside with them in New Jersey. Mr. Stedman moved his family in with his parents during the Covid-19 pandemic, in order to assist his parents during that time and help them avoid the isolation we all were experiencing in that difficult period, and to remove his family form New York City and the heightened risks of Covid-19 in that inner-city setting.

Mr. Stedman and his wife Kate were married in 2014 and maintain a loving and supportive relationship despite the rigors that the instant matter has placed on them. The collateral consequences of his actions – the loss of relationships with friends and sadly even family members (including for a time the strained relationship with his sister Meredith Dunn as referenced in her letter) – even though the result of his own conduct, are punitive as well and should be factored in to the Court's sentencing calculus in litigation. Mr. Stedman has and continues to work at repairing those relationships (some are not salvageable).

The charges, the reputational harm, and the financial and other rigors of being a criminal defendant in a criminal case understandably strain not only the defendant, but of course his family. That strain is of course even more concerning to a family when raising two very young children, as are Pat and Kate. However, his wife and parents in particular have remained emotionally supportive throughout the process notwithstanding those stresses. *See* PSR ¶¶ 51-57.

> ### Lack of Prior Record; Risk of Recidivism; Impact of Sentence Type on Recidivism

Mr. Stedman has no prior criminal history, not even arrests nor noted traffic infractions. PSR ¶¶ 44-50. Mr. Stedman's age (over 30 – he is 35) and his lack of any criminal history puts him in a demographic of persons substantially less likely to reoffend. The U.S. Sentencing Commission has conducted detailed studies of reliable empirical data to determine

the demographic of persons less likely to reoffend. "[T]he Commission's research shows that the younger than 30 age group had the highest rearrest rate (64.8%) and the rate declined with each age group that follows to a low of 16.4 percent", also as reflected in the below reproduced chart from the report.[5]

**Table 1** Overview of Age and Recidivism Study Findings
Rearrest Recidivism Measure

| | Younger than 30 Years n=6,796 | 30 to 39 Years n=8,523 | 40 to 49 Years n=5,894 | 50 to 59 Years n=2,969 | 60 Years or Older n=1,204 |
|---|---|---|---|---|---|
| Percent | 64.8% | 53.6% | 43.2% | 26.8% | 16.4% |
| Median Time to Recidivism Event | 17 Months | 22 Months | 22 Months | 25 Months | 28 Months |
| Median Number of Recidivism Events | 3 | 2 | 2 | 1 | 1 |
| Most Serious Post-Release Event | Assault (26.6%, n=1,170) | Assault (24.1%, n=1,102) | Assault (20.3%, n=517) | Other Public Order Offense (22.5%, n=179) | Other Public Order Offense (23.7%, n=47) |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05_OFFUPDT. The Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

Also, the below data further supports the unlikelihood of recidivism by Mr. Stedman, especially if the Court were to consider a less than incarceration only sentence: "[o]ffenders who received a prison only sentence had a higher rearrest rate than offenders who received a different form of sentence (Figure 23)", which Figure 23 is reproduced here:

REMAINDER OF THIS PAGE INTENTIONALLY BLANK

---

[5] The Effects of Aging on Recidivism Among Federal Offenders at 22, United States Sentencing Commission (December 2017). The full report can be accessed and downloaded at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.



*Fig. 23* Rearrest Rate of Recidivism Study Offenders by Type of Federal Sentence Imposed and Age at Release

Finally, persons like Mr. Stedman with zero (0) criminal history points such as Mr. Stedman have the lowest recidivism rate compared to those with any criminal history points (even substantially lower than Category I offenders with just 1 criminal history point).[6]

For those reasons, and considering the information contained in this Memorandum, the PSR, and to be gleaned from the materials in the Defendant's Appendix, the defendant certainly is not likely to reoffend.

Mr. Stedman is not a person who is likely to recidivate, for all of the foregoing reasons. Further, his ability to adhere to the terms of any sentence, and to not violate the law, is supported by the fact that he has not had any bail infraction since his release on conditions on January 21, 2021, just short of 3 years ago. Finally, the deterrent effect that this process and his conviction have had and will naturally have on him, as discuss *infra* more fully, also ensure that he will not recidivate (although even without those it seems clear that he will not commit

---

[6] "Overall, an offender's total criminal history score is a strong predictor of recidivism. Rearrest rates range from a low of 30.2 percent of offenders with zero criminal history points to a high of 85.7 percent for offenders with 15 or more criminal history points. Each additional criminal history point is generally associated with a greater likelihood of recidivism. ...[T]here is a 22.1 percentage point difference in rearrest rates between offenders with no criminal history and one-point offenders."    The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders at 14, United States Sentencing Commission (March 2017). The full report can be accessed and downloaded at https://www.ussc.gov/research/research-reports/criminal-history-and-recidivism-federal-offenders.

any other crime).

➢ **Deterrence and Punishment**

### a. Specific Deterrence

The need – or more importantly lack of need - for specific deterrence of Mr. Stedman is addressed by reference to the immediately preceding section of this Memorandum. Mr. Stedman will be sufficiently deterred by any sentence, including one involving a substantial downward variance, imposed by the Court. He has dutifully complied with the terms of his pretrial release, which demonstrates his desire and willingness not to reoffend. The collateral consequences of his actions – social isolation, the loss of relationships, financial impact, social stigma, and restrictions of freedoms even through the pretrial release terms – all have served to deter him and ensure that he will not reoffend. His transgressions, although very serious, did not involve him engaging in actual physical harm to anyone, and indeed he was well intentioned when he went to Washington D.C. that day. As he indicated he got swept up mentally, and that situation will not recur.

### b. General Deterrence

General deterrence must be viewed in context. Here, Mr. Stedman's personal history, and the picture of him that emerges overall, makes clear that general deterrence still could and would be served by a substantial downward variance. As to general deterrence, for persons similarly situated to Mr. Stedman – not affiliated with any radical groups, a father of two, devoted son and husband, and well-employed productive society member – a sentence lower than the advisory guidelines still will send an adequate deterrent message. Mr. Stedman has no prior criminal history. The direct and collateral societal consequences of his actions, his prosecution, and his self-reflection are sufficient to deter others as well. He will forever be a convicted federal felon denied certain civil rights; ostracized by others based on the very public nature of the circumstances surrounding the offenses of which he was convicted and the infamous events of January 6, 2021, and the never-diminishing ostracization that has and will continue to pertain.

The many factors that support this conclusion are presented in detail *supra* and in the

Defendant's Appendix, but to reiterate the most salient they include:

➢ the aberrational nature of Mr. Stedman's conduct
➢ the lack of even any arrests or notable traffic violations in the past
➢ the strong continued family support network which Mr. Stedman has
➢ Mr. Stedman's history of service to others as reflected in the various letters contained in the Appendix hereto and summarized above
➢ The very low likelihood of recidivism by Mr. Stedman
➢ The self-reflection Mr. Stedman has done regarding his conduct and his remorse

The combination of those factors (and the others cited throughout) make Mr. Stedman's situation unique enough to warrant a sentence well below the advisory guidelines range, and the downward variance would not do any harm to general deterrence. A sentence of the stigma and limitations resulting from the lifelong federal felony and misdemeanor convictions he has sustained, along with the other attendant even if collateral consequences thereof, would do no harm to the concept of general deterrence. It would provide such in context.

Those "distinguishing characteristics render the ultimate disparity from the Guidelines reasonably warranted. … [A] potential offender observing the sentencing proceedings would receive the message that prison time could be imposed absent those meaningful distinctions, which satisfies the § 3553(a) goal of general deterrence" *U.S. v. Howe*, 543 F.3d 128, 140 (3d Cir. 2008).

### c. Punishment

The need for punishment still would be met by a sentence involving a substantial downward variance, for many of the same reasons set forth *surpa* in the "Specific Deterrence" section. Also, the convictions alone are substantial punishment given the lasting stigmatic effect they will have upon Mr. Stedman. Other punitive – even if collateral -- effects upon Mr. Stedman include the following:

• A lasting stigma not only from his conviction, but the alienation from one-time friends and even family members as a result of the subject matter of his actions and the conviction

• The financial impact of legal fees, and the stresses and uncertainty of his "fate" over the three years since his arrest, including how such has and will

continue to impact his family. Although it often is said that those "stresses" and "impacts" come from nothing other than choices a defendant made, they are nonetheless real stresses and impacts which at least feel punitive to a defendant, especially one like Patrick Stedman, who otherwise has led a perfectly community positive and law-abiding life

- Restrictions of his freedoms, including potentially being on a no-fly list as have many persons charged based on conduct in the events of January 6, 2021

Those things – although perhaps not intentionally punitive – nonetheless qualify as punishment and consequences suffered by Mr. Stedman, and respectfully should be considered in mitigation of the advisory guideline sentence recommended.

> ### The kinds of sentences available

The urged sentence is within the range of those available to the Court in this case.

> ### The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines

The sentencing guidelines are discussed *supra*.

> ### Pertinent policy statement issued by the Sentencing Commission

There do not appear to be any particularly pertinent policy statements.

> ### The need to avoid unwanted sentencing disparity among defendants with similar records who have been found guilty of similar conduct

Each case and defendant still is an individual consideration, and in light of all of the foregoing factors discussed, the requested sentence would not create any unwarranted sentencing disparity from others convicted of similar offenses.

> ### The need to provide restitution to any victims of the offense

Restitution is addressed in the PSR ¶¶ 21, 121, and the amount set forth therein is appropriate to Mr. Stedman, and adequately accounts for restitution in this situation.

Respectfully submitted,

/s/Rocco C. Cipparone, Jr.
Rocco C. Cipparone, Jr., Esquire
Attorney for defendant