# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 21-383 (BAH) |
| PATRICK ALONZO STEDMAN, | Judge Beryl A. Howell |
| Defendant. | |

## MEMORANDUM OPINION

As a result of his criminal conduct at the United States Capitol on January 6, 2021, defendant Patrick Stedman was convicted, on June 9, 2023, following a five-day jury trial, of one felony obstruction offense, under 18 U.S.C. §§ 1512(c)(2) and 2, two Class A misdemeanor offenses, and two Class B misdemeanor offenses. *See* Verdict Form, ECF No. 73. Defendant was thereafter sentenced to concurrent terms of 48 months' imprisonment on his felony conviction, and the statutory maxima of 12 months' imprisonment on his two Class A misdemeanor convictions, and of 6 months' imprisonment on his two Class B misdemeanor convictions. *See* Judgment at 3, ECF No. 86. Defendant appealed his felony obstruction conviction and sentence on September 25, 2023, which appeal was held in abeyance pending the Supreme Court's resolution of *Fischer v. United States*, 603 U.S. —, 144 S. Ct. 2176 (2024), a challenge to the application of the obstruction statute to offense conduct at the U.S. Capitol on January 6, 2021. Defendant timely self-surrendered, on October 27, 2023, to the custody of the U.S. Bureau of Prisons ("BOP") to serve his sentence, and has remained incarcerated since that time.

Now pending before the Court is defendant's Motion for Release from Custody Pending Appeal ("Def.'s Mot."), ECF No. 97; Def.'s Mem. Supp. Mot. for Release ("Def.'s Mem."), ECF

1

No. 97-1, which the government opposes, *see* Gov't's Opp'n Def.'s Mot. for Release Pending Appeal ("Gov't's Opp'n"), ECF No. 98.  For the reasons stated below, defendant's motion is GRANTED, but only prospectively, upon the expiration of defendant's one-year term of incarceration on his two convictions for Class A misdemeanors, on October 27, 2024.

## I.    BACKGROUND

Following a five-day jury trial, from June 5 to June 9, 2023, defendant was convicted of a single felony offense of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One), and four misdemeanor offenses: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  *See* Verdict Form; *see also* Indictment, ECF No. 14.

These convictions are based on the offense conduct briefly summarized as follows:  In the weeks prior to January 6, 2021, defendant used his status as a social media influencer to encourage others to travel to Washington, D.C., including the night before January 6, 2021, when defendant tweeted, "This is the Second American Revolution.  I love you all for being here with me.  NOW WE FIGHT!"  *See* Trial Tr. at 157:11–17, 175:14–18 (June 6, 2023), ECF No. 93; Trial Tr. at 215:13–22, 218:4–222:21, 227:6–229:4 (June 7, 2023), ECF No. 94.  On January 6, defendant attended the former President's "Stop the Steal" rally and posed for a photo with a group of men whom defendant described as "clients," whom he had "invit[ed]" to join him in Washington, D.C., Trial Tr. at 229:4–232:8, 235:23–236:20 (June 7, 2023), including two individuals who "traveled

with [defendant] to the Capitol" and at multiple points are shown on videotape "near [defendant] walking through" the Capitol, Trial Tr. at 196:8–10 (June 6, 2023); *see also* Trial Tr. at 236:21–23, 253:12–22 (June 7, 2023). As defendant advanced toward the Capitol, he saw "smoke," heard "shouting," and was informed by other rioters that the police had "discharg[ed] tear gas," but pressed on, shouting, "Storming the Capitol!" Trial Tr. at 238:21–239:7, 244:10 (June 7, 2023); Trial Tr. at 35:8–10 (June 8, 2023), ECF No. 95. Upon entering the Capitol building through the Senate Wing doors at 2:23 p.m.—approximately 10 minutes following the initial breach of the Capitol, and minutes before the House of Representatives stood in recess and halted work to certify the presidential election results—defendant was able to hear an alarm sounding and saw broken glass and police in riot gear. Trial Tr. at 8:9–9:5, 58:18–59:10 (June 6, 2023); Trial Tr. at 27:19–28:3, 52:11–53:19, 86:22–24 (June 8, 2023). In defendant's words, captured in a video recorded by defendant that day, he was part of the "first wave" to enter the Capitol. Trial Tr. at 82:24–83:8, 86:18–25 (June 8, 2023).

Once inside the Capitol, where defendant "knew that the Speaker of the House was involved in Congress's work to certify the presidential election results that day," Trial Tr. at 62:3–6 (June 8, 2023) (defendant testifying affirmatively to this knowledge), defendant proceeded first to the Crypt, where, as part of a mob, he recorded a video of himself shouting, "It's our fucking house!" Trial Tr. at 45:22–24, 58:10–59:4 (June 8, 2023). Defendant then advanced to the chambers of House Speaker Nancy Pelosi, saying "Hi, Nancy" as he entered and thereafter replying to a message on WhatsApp that "Pelosi was removed from the hearing," with, "I know. I am in her office. LOL." Trial Tr. at 105:1–16, 254:7–16 (June 7, 2023).

He went next to the main door of the House Chamber, where members of Congress who had not yet been evacuated from the House Chamber were taking shelter and Capitol Police

officers had barricaded the door from the inside.  Trial Tr. at 117:11–118:7, 119:9–120:19 (June 6, 2023).  As a crowd of rioters banged on the door to the House Chamber, defendant cheered them on, shouting, "Break it Down."  Trial Tr. at 67:12–15, 68:18–23 (June 8, 2023).  Later, after learning that another rioter had been shot, defendant shouted at police officers, "You are going to shoot — shoot your own people, you F'ing scum," and threatened, "You killed one of us.  You're done."  Trial Tr. at 265:22–266:14 (June 7, 2023).

Defendant then proceeded to the Rotunda and remained in the Capitol building until, in his words, as captured in a video recorded after his exit, he was "kicked out" by the police, having spent a total of approximately 44 minutes inside.  Trial Tr. at 29:8–10, 80:10–24, 85:24–86:8 (June 8, 2023).  Upon exiting the Capitol, defendant recorded a video of himself defending his actions, describing members of Congress as "[f]ucking rats [who] scurried under the tunnels" and had "declared a recess," and threatening, "If they go ahead, and they certify this bullshit, it's fucking treason" and "[i]f Trump doesn't take action, we're taking action."  Trial Tr. at 244:17–245:5 (June 7, 2023); Trial Tr. at 65:2–17, 88:24–89:6, 90:24–91:6 (June 8, 2023).

During his trial testimony, in June 2023, defendant testified that he believed he had permission to "come in and demonstrate" in the Capitol, Trial Tr. at 44:17–20 (June 8, 2023), and that his intent in entering "was to peacefully protest," not to obstruct Congress's certification of the election results, Trial Tr. at 235:17–19, 278:14–20 (June 7, 2023).  Given the evidence of his words expressing his intent before, during and after he entered the Capitol building, and his actions that day, the jury plainly did not find this sworn testimony credible and found him guilty of felony obstruction of an official proceeding, namely, the Joint Session of Congress to certify the results of the 2020 presidential election, as well as all other misdemeanor charges against him.

At the sentencing hearing on September 8, 2023, defendant's applicable advisory guidelines sentencing range was determined to be 70 to 87 months' imprisonment, based on a finding that defendant was in Criminal History Category I and had an adjusted total offense level of 27. Sentencing Tr. at 52:20–53:2 (Sept. 8, 2023), ECF No. 91. Specifically, as to Count One, U.S.S.G. § 2J1.2 applied with a base offense level of 14, which was increased by: (a) 8 offense levels, pursuant to U.S.S.G. § 2J1.2(b)(1)(B), "because the offense involved causing or threatening physical injury to a person or property damage in order to obstruct the administration of justice," *id.* at 52:9–15; (b) 3 offense levels, pursuant to U.S.S.G. § 2J1.2(b)(2), "because the offense resulted in the substantial interference with the administration of justice, specifically, the proceedings of Congress to certify the 2020 presidential election," *id.* at 52:15–20; and (c) 2 offense levels, pursuant to U.S.S.G. § 3C1.1, for defendant's willful obstruction of justice by providing, during trial, "misleading testimony on at least two topics about being permitted inside the Capitol and [having] had no intent to disrupt the congressional certification process," *id.* at 30:17–35:15, resulting in a total offense level of 27, *id.* at 52:20–23. Defendant's objections to application of the specific offense characteristics and enhancements, under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2), and 3C1.1, were overruled, *id.* at 30:17–35:15, 39:4–42:16, and his requests for a 3-level downward adjustment under U.S.S.G. § 2X1.1, and for a 2-point reduction under the then-proposed amendment to U.S.S.G. § 4C1.1, denied, *id.* at 23:17–24, 41:9–15, 48:15–21.[1]

---

[1]    Approximately six months after defendant was sentenced, the D.C. Circuit decided that the three-level administration of justice enhancement in § 2J1.2(b)(2) "does not apply to interference with the legislative process of certifying electoral votes," *United States v. Brock*, 94 F.4th 39, 42 (D.C. Cir. 2024), concluding that "administration of justice" only applies to "judicial, quasi-judicial, and adjunct investigative proceedings." *Id.* at 51. While not explicitly addressing the eight-level enhancement in § 2J1.2(b)(1)(B), the same logic expressed in *Brock* applies to this specific offense characteristic, as this enhancement applies to "causing or threatening to cause physical injury to a person, or property damage, *in order to obstruct the administration of justice.*" U.S.S.G. § 2J1.2(b)(1)(B) (emphasis supplied). Had defendant been sentenced without the two enhancements found to be inapplicable in *Brock*, his total

5

As to Count Two, U.S.S.G. § 2B2.3 applied a base offense level of 4, which was increased by 2 offense levels, pursuant to U.S.S.G. § 2B2.3(b)(1)(A)(vii), "because the trespass occurred at a restricted building or grounds." *Id.* at 51:8–15. The cross reference, at U.S.S.G. § 2B2.3(c)(1), applied "because the offense was committed with the intent to commit a felony offense," namely, the felony charged in Count One, resulting in an offense level of 25. *Id.* at 51:16–19. Two offense levels were then added pursuant to U.S.S.G. § 3C1.1, "because the defendant willfully obstructed the administration of justice with respect to the prosecution of the instant offense," resulting in a total offense level of 27, the same offense level as Count One. *Id.* at 52:20–23.

Finally, as to Count Three, U.S.S.G. § 2A2.4(a) provided a base offense level of 10, which was increased by 2 offense levels, pursuant to U.S.S.G. § 3C1.1, "because the defendant willfully obstructed the administration of justice," for a total offense level of 12. *Id.* at 52:1–8.

Counts One, Two, and Three were grouped together, pursuant to U.S.S.G. § 3D1.2(b), for purposes of calculating the relevant offense level, with the offense level of 27 associated with Counts One and Two the highest offense level and thus applicable to the whole group. *Id.* at 51:2–7, 52:20–23. This offense level, combined with a criminal history score of I, produced an advisory guidelines range of 70 to 87 months' imprisonment. *Id.* at 52:20–53:2. This sentencing range, however, exceeded the statutory maximum of 12 months for the Class A misdemeanors charged in Counts Two and Three, such that the guidelines range for these two counts was 12 months' incarceration. *Id.* at 51:23–25, 53:3–5; *see* U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline range.").[2]

---

offense level would have been 16, which in combination with a Criminal History Category I, would have produced an advisory guidelines range for defendant of 21 to 27 months' incarceration.

[2] The sentencing guidelines are inapplicable to Counts Four and Five, which are Class B misdemeanors, each carrying a maximum sentence of six months' imprisonment. *See* U.S.S.G. § 1B1.9; 40 U.S.C. § 5109(b); *see also*

A downward variance was granted "to address the disparity in sentencing severity arising from the cumulation of increases in offense levels for specific offense characteristics, under U.S.S.G. §§ 2J1.2(b)(l)(B) and 2J1.2(b)(2), and for defendant's dissembling about material matters in his trial testimony, under U.S.S.G. § 3C1.1," which, "though appropriately applied . . . drove the sentence to be more severe than other defendants, whose offense conduct on January 6, 2021 was more serious," where "the record evidence does not show that this defendant personally engaged directly in aggressive or violent confrontations with law enforcement, brought weapons, or irreparably damaged or stole property while outside or inside the U.S. Capitol Building." Statement of Reasons at 5, ECF No. 87; *see also* Sentencing Tr. at 102:25–7, 104:1.

Defendant was sentenced to concurrent terms of 48 months' imprisonment on Count One, and the statutory maxima of 12 months' imprisonment on Counts Two and Three, and 6 months' imprisonment on Counts Four and Five, to be followed by concurrent terms of 36 months' supervised release as to Count One and 12 months' supervised release as to Counts Two and Three. *See* Judgment at 3–4; *see also* Sentencing Tr. at 104:9–16.

Defendant, who had complied with his pretrial release conditions from the time of his arrest, on January 21, 2021, through trial and sentencing, was permitted, with the government's consent, to self-surrender to BOP custody on October 27, 2023. *See* Revised Presentence Investigation Rep. ("PSR") ¶¶ 5–6, ECF No. 88; Min. Entry (June 9, 2023) (ordering that "defendant will remain released on his own personal recognizance pending sentencing"); Sentencing Tr. at 108:15–20 (Court "allow[ing] [defendant] to stay out of jail pending surrender," where government counsel stated it "does not oppose self-report"). Defendant timely self-

---

Sentencing Tr. at 53:6–8 (Court stating that "[f]or Counts 4 and 5, the Class B petty offense misdemeanors, the maximum sentence that may be imposed is six months for each count").

surrendered, without incident, to FCI Fort Dix in New Jersey, on October 27, 2023.  *See* Def.'s Mem. at 4.

Prior to his self-surrender, defendant filed, on September 25, 2023, a notice of appeal of his felony obstruction conviction on Count One, *see* Not. of Appeal, *United States v. Stedman*, No. 23-3163 (D.C. Cir. Sept. 25, 2023).  On defendant's motion, his appeal was ordered held in abeyance pending the Supreme Court's disposition of *Fischer*, 144 S. Ct. 2176, with the parties "directed to file motions to govern future proceedings . . . within 30 days" of such ruling, *see* Order at 1, *United States v. Stedman*, No. 23-3163 (D.C. Cir. Mar. 12, 2024); *see also* Def.'s Mot. Suspend Appeal at 1, *United States v. Stedman*, No. 23-3163 (Feb. 29, 2024) ("mov[ing] to suspend the further briefing schedule in this matter and any decision in this appeal pending the United States Supreme Court's disposition in *Fischer*").[3]

On June 28, 2024, the Supreme Court issued its decision in *Fischer*, holding that "[t]o prove a violation of Section 1512(c)(2), the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding, or attempted to do so," *Fischer*, 144 S. Ct. at 2190 (citation omitted), vacating the judgment of the D.C. Circuit that "the word 'otherwise' in Section 1512(c)(2) mean[t] that the provision unambiguously cover[ed] 'all forms of corrupt obstruction of an official proceeding, other than the conduct that [was] already covered by § 1512(c)(1),'" *id.* (quoting *United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir.), *cert. granted*, 144 S. Ct. 537 (2023), *and vacated and remanded*, 144 S. Ct. 2176 (2024), *and cert. granted, judgment vacated sub nom. Miller v. United States*, No. 23-94, 2024 WL 3259658 (U.S. July 2, 2024), *and cert.*

---

[3]     Defendant's pretrial motion to dismiss Counts One, Two, and Three, *see* Def.'s Mot. to Dismiss, ECF No. 46, was denied, Mem. Op. & Order, dated May 8, 2023, ECF No. 57.

*granted, judgment vacated sub nom. Lang v. United States*, No. 23-32, 2024 WL 3259659 (U.S. July 2, 2024)).

On August 14, 2024, over defendant's objection, the D.C. Circuit ordered that his appeal "remain in abeyance pending further order of the court" and directed the filing of "motions to govern further proceedings by August 28, 2024." Order, *Stedman*, No. 23-3163 (D.C. Cir. Aug. 14, 2024); *see* Def.'s Resp. Gov't's Mot. Continue Case in Abeyance, *Stedman*, No. 23-3163 (D.C. Cir. July 26, 2024). The Circuit noted that defendant "may seek to mitigate any prejudice from abeyance through his pending motion in [the] district court seeking release pending appeal pursuant to 18 U.S.C. § 3143(b)." Order, *Stedman*, No. 23-3163. Hence, on July 28, 2024, defendant filed the instant motion seeking "immediate conditional release pending appeal, or in the alternative for conditional release on October 26, 2024. Def.'s Mot. at 1. For the reasons set forth below, defendant's motion is GRANTED.

## II. DISCUSSION

Courts are authorized to "order the release" of an individual pending appeal upon finding, "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released," 18 U.S.C. § 3143(b)(1), and also, in pertinent part, "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—(i) reversal . . . or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process," *id*. § 3143(b)(1)(B); *see also* Charles Alan Wright et al., 3B FED. PRAC. & PROC. CRIM. § 770 (4th ed.). Defendant bears the burden of showing that both statutory prongs are met. *See United States v. Perholtz*, 836 F.2d 554, 555–56 (D.C. Cir. 1987) (per curiam) (noting "the required showing on the part of the defendant" as to "whether [an] appeal 'raises a substantial question of law or fact

likely to result in reversal'" (quoting 18 U.S.C. § 3143(b))); *United States v. Carpenter*, No. 23-3235, 2024 WL 1340206, at *1 (D.C. Cir. Mar. 28, 2024) (per curiam) (finding defendant "has not shown that the Supreme Court's resolution of" the scope of § 1512(c)(2) "in her favor would likely result" in "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process" (citing 18 U.S.C. § 3143(b)(1)(B), and *Perholtz*, 836 F.2d at 555)); *see also United States v. Zimny*, 857 F.3d 97, 101 (1st Cir. 2017) ("[Defendant] has met his burden to show entitlement to release from custody pending appeal under § 3143(b)(1)."); *United States v. Libby*, 498 F. Supp. 2d 1, 3 (D.D.C. 2007) ("In enacting § 3143(b), Congress placed the burden as to all elements bearing on whether to grant bail pending appeal on the defendant." (quotation marks, brackets, and citation omitted)). These standards are met in the instant case.

## A. Defendant Does Not Pose a Flight Risk or Danger to the Community

As to the first prong—whether defendant has shown by clear and convincing evidence that he is "not likely to flee or pose a danger to the safety of any other person or the community if released," 18 U.S.C. § 3143(b)(1)—the government contends defendant "has not met his burden to show . . . that his release would not pose a danger to society." Gov't's Opp'n at 6. This Court disagrees.

In the more than two-and-a-half years between defendant's arrest on January 21, 2021, and his self-surrender on October 27, 2023, defendant complied with the conditions of his release. *See* PSR ¶ 6 (recognizing defendant's compliance, as of August 22, 2023, with "all Court ordered conditions of release").[4] Indeed, the government did not seek pretrial detention. *See* Min. Entry

---

[4] Although on a few occasions, defendant "failed to report by telephone" as directed, Pretrial Compliance Rep. (Sept. 7, 2023), ECF No. 85, the Probation Department did not cite these infractions when concluding that defendant had fully complied with his conditions of release, *see* PSR ¶ 6, nor did the government note them at the sentencing hearing when stating its position that it "[did] not oppose self-report," Sentencing Tr. at 108:15–16. This Court

(Jan. 27, 2021). Following his conviction at the jury trial, the government objected to defendant remaining on release pending sentencing, arguing that he "represent[ed] a flight risk," Trial Tr. at 14:13–16:5 (June 9, 2023), ECF No. 96, but this objection was overruled. The Court explained in granting defendant's release pending sentencing, he had "appeared in court . . . as required" and, as the government had conceded, "ha[d] been fully compliant with his pretrial release conditions now for some time." *Id.* at 18:6–20; *see also id.* at 16:2–4 (government counsel stating "[w]e recognize he has been in compliance with his conditions of release, and that the government has his passport"). Meanwhile, the government raised no objection to defendant self-surrendering following his sentencing, *see* Sentencing Tr. at 108:15–16 (government counsel stating it "does not oppose self-report"), and defendant has been serving his sentence "with no infractions at FCI Fort Dix," Def.'s Mem. at 4. Defendant's "stable and loving family," Sentencing Tr. at 94:24–25, including a wife and two young children, PSR ¶ 54, and his co-ownership, with his wife, of a "dating and relationship coaching service," *id.* ¶ 69, are additional factors reinforcing the conclusion based on his actual compliant conduct that defendant is unlikely to flee or reoffend pending resolution of his appeal.

The government "acknowledges that, in allowing Stedman the right to self-surrender, the Court implicitly found . . . that he did not at that point pose a danger to the community," Gov't's Opp'n at 4–5 (citing Min. Entry (Sept. 8, 2023)), but nonetheless argues that defendant now poses such a danger because, as "the country approaches the final months of another fiercely contested

---

likewise accords these infractions minimal weight, particularly given defendant's otherwise full compliance with his conditions of release. *See* Pretrial Compliance Rep. (Sept. 7, 2023) (reporting that defendant once "failed to report by telephone" but "[o]ther than the aforementioned infraction . . . has reported to Pretrial Services as ordered by the Court"); Pretrial Compliance Rep. at 2 (June 4, 2021), ECF No. 16 (reporting that defendant once "failed to report by telephone as ordered by the Court"); *but see* Pretrial Compliance Rep. (June 1, 2023), ECF No. 63 (reporting no noncompliance with conditions of release); Pretrial Compliance Rep. (May 23, 2023), ECF No. 61 (same); Pretrial Compliance Rep. (Mar. 14, 2023), ECF No. 40 (same); Pretrial Compliance Rep. (Oct. 20, 2022), ECF No. 37 (same); Pretrial Compliance Rep. (Oct. 12, 2022), ECF No. 34 (same); Pretrial Compliance Rep. (July 28, 2022), ECF No. 33 (same).

presidential election," defendant, if released, "would potentially return to the same volatile political climate and unrest that led him to commit his crimes in the first place," which "prospect distinguishes the current circumstances from the circumstances of last September," *id.* at 5. This concern is both sufficiently legitimate and serious to provide reason to pause.

On January 6, 2021, defendant (1) used his significant social media presence to "encourage people to come to Washington, D.C., including on the night before the Capitol attack[,]" "to bring the fight to the Capitol Building," Sentencing Tr. at 88:13–25, and "to defend the Capitol attack . . . after what [he] had seen," *id.* at 87:2–11; (2) was part of the "first wave" to "breach [] the Capitol Building itself," *id.* at 36:23–25, entering the Capitol through the Senate wing door, at approximately 2:23 PM, *id.* at 36:16–19, and not leaving until "forced out by the police" approximately 44 minutes later, at 3:07 p.m., *id.* at 88:6–10, 93:19–21; (3) used his influence to "lead two other people into the Capitol with [him]," *id.* at 87:12–13; and (4) while inside the Capitol, "exploited the opportunity of total anarchy inside the Capitol Building," *id.* at 90:13–14, by entering "the private office of the U.S. Speaker of the House" and "yell[ing] . . . 'Hi, Nancy,'" *id.* at 90:12–22; "stood right outside the doors to the House Chamber where police were barricaded inside still trying to evacuate members and encouraged that those doors be breached and threatening the people inside the House Chamber," *id.* at 88:1–5, repeatedly shouting, "Break it down," *id.* at 92:14–17; and, after learning that another rioter had been shot, yelled obscenities at law enforcement, calling them "fucking scum," and threatening, "You killed one of us. You are done," *id.* at 92:23–93:4. In addition, defendant (5) "provide[d] materially false testimony during his trial," testifying that "he believed he had permission to enter the Capitol Building on January 6, 2021, and that he did not intend to interfere with Congress's work." *Id.* at 30:17–21.

As the government points out, defendant has "continued to disseminate disinformation and contribute to unnecessary division, while incarcerated," as reflected in an article published on defendant's business website on January 6, 2024. Gov't Opp'n at 5 (citing Patrick Stedman, *The American Soul* (Jan. 6, 2024) ("Stedman 2024 Article"), https://www.patstedman.com/2024/01/06/the-american-soul/). In this article, defendant repeated the false misinformation that the "2020 [presidential election] was stolen," and referenced January 6, 2021, as the date when "[s]ome paid the ultimate price and hundreds more have since suffered behind bars." Stedman 2024 Article. Defendant may spew this nonsense to retain, attract and grow his online following to make money and increase his popularity, or this may reflect his actual beliefs. No matter whether defendant is a charlatan or gravely misguided, this commentary confirms a distorted view of reality that dangerously fueled his and others' offense conduct at the U.S. Capitol on January 6, 2021, and ignores the severity of the disruption to the peaceful transition of power in our democracy that occurred by suggesting this offense conduct was only a peaceful, political protest. At a minimum, defendant's continued engagement with and propagation of disinformation while incarcerated certainly shows his continued lack of remorse for his egregious criminal conduct.

At the same time, however, defendant's writing does not, as the government concedes, "overtly advocat[e] violence, Gov't Opp'n at 6, and expressly rejects "any sort of violent action," Stedman 2024 Article. Most importantly, defendant fully complied with the conditions of release pending trial, sentencing, and self-surrender to BOP, and upon release, will again be placed under supervision. Although in agreement that defendant's writing indicates a "lack of remorse or understanding of the nature of the crime in question," Gov't Opp'n at 8 n.5, the contents of this article fall short of indicating his intent to re-offend. In these circumstances, and on this record,

the Court finds that he "is not likely to flee or pose a danger to the safety of any other person or the community." 18 U.S.C. § 3143(b)(1)(A); *see, e.g.*, Order at 4, *United States v. Kelly*, No. 21-cr-708 (RCL), ECF No. 151 (D.D.C. Aug. 1, 2024) (finding defendant poses no flight risk or danger to the community "under the particular circumstances of this case," even though "the looming election gives reason for pause"); *United States v. Seefried*, No. 21-cr-287 (TNM), --F. Supp. 3d--, 2024 WL 1299371, at *2 (D.D.C. Mar. 26, 2024) (making same finding, noting that "if the Government points to facts suggesting [defendant] is likely to reoffend, he cannot be released . . . [b]ut the Government must actually point to 'evidence' supporting that assertion").

**B. The Appeal Is Not For the Purpose of Delay and Raises a Substantial Question**

Next, as to the second prong, the government does not dispute that defendant's appeal "is not for the purpose of delay" and "raises a substantial question of law or fact." 18 U.S.C. § 3143(b)(1)(B); *see generally* Gov't's Opp'n. Indeed, defendant challenges his conviction on Count One, asserting, among other arguments, that his motion to dismiss Count One, which "fail[ed] to allege [defendant] acted with respect to a document, record, or other object," should have been granted rather than denied by this Court. Appellant's Br. on Appeal at 12–15, *United States v. Stedman*, No. 23-3163 (D.C. Cir. Feb. 20, 2024).

"[A] substantial question" means "a close question or one that very well could be decided the other way." *Perholtz*, 836 F.2d at 555–56 (quotation marks and citations omitted). This is a "demanding standard . . . to accord with the expressed congressional intent to increase the required showing on the part of the defendant." *Id*. The question on appeal of whether the conduct for which defendant was convicted in Count One falls within Section 1512(c)(2)'s ambit plainly satisfies this standard, as consistently found by the undersigned and other Judges on this Court when considering the release pending the Supreme Court's resolution of the *Fischer* appeal of a

defendant convicted of a single felony Section 1512(c)(2) charge, and any other convictions for only misdemeanor charges, when the defendant had already served close to or more than twelve months in prison. *See United States v. Herrera*, No. 21-cr-619, 2024 WL 1655204, at *4–5 (D.D.C. Apr. 17, 2024); *United States v. Roche*, No. 22-cr-86 (BAH), 2024 WL 1328459, at *3–4 (D.D.C. Mar. 28, 2024); *Seefried*, 2024 WL 1299371, at *3; *United States v. Bender*, 21-cr-508 (BAH), 2024 WL 960999, at *4 (D.D.C. Mar. 6, 2024); *United States v. Bledsoe*, 21-cr-204 (BAH), 2024 WL 341159, at *4 (D.D.C. Jan. 30, 2024); *United States v. Sheppard*, No. 21-cr-203 (JDB), 2024 WL 127016, at *2–3 (D.D.C. Jan. 11, 2024); *United States v. Adams*, No. 21-cr-354 (APM), 2024 WL 111802, at *2 (D.D.C. Jan. 10, 2024).

As in those cases, defendant here was convicted of a single § 1512(c)(2) felony, has only other misdemeanor convictions, and has served close to 12 months in prison. This description raised a sufficiently substantial question of law before *Fischer* was issued, and certainly does after *Fischer*, in which the Supreme Court "decline[d] to adopt the Government's interpretation" of the obstruction statute and narrowed the scope of statutory provision defendant was convicted of violating, *Fischer*, 144 S. Ct. at 2190 (holding that "[t]o prove a violation of Section 1512(c)(2), the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding, or attempted to do so" (citation omitted)); *see also* Order at 4, *Kelly*, 21-cr-708 (RCL), ECF No. 151, at 4 (D.D.C. Aug. 1, 2024) ("[T]his Court determined that the questions raised were substantial even before a decision was rendered in *Fischer*. . . . The actual outcome in *Fischer* only bolsters this conclusion." (citation omitted)).

This issue remains unresolved whether defendant's conviction on Count One falls within Section 1512(c)(2)'s scope as construed by *Fischer*—*i.e.*, whether defendant attempted to or did

"impair[] the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding," *Fischer*, 144 S. Ct. at 2190—but, given that defendant raised on appeal "the same challenge that the Supreme Court in *Fischer* addressed," Def.'s Mem. at 5, his appeal plainly raises a "close question" that, at a minimum, is not frivolous, *Perholtz*, 836 F.2d at 556; *see also Adams*, 2024 WL 111802, at *2 ("[T]he Supreme Court's decision to review *Fischer* means, at a minimum, that this case poses a 'close question.'").

### C. Defendant's Conviction Will Likely Result In a "Reduced Sentence" Under 18 U.S.C. § 3143(b)(1)(B)(iv)

Finally, reversal of defendant's conviction under Section 1512(c)(2) is likely to result in "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B)(iv). A favorable ruling for defendant on his appeal in light of *Fischer* would not result in "reversal" under Section 3143(b)(1)(B)(i), for while such ruling may require vacatur of defendant's Section 1512(c)(2) conviction, defendant would remain convicted on four misdemeanor counts, which he has not appealed. *See Perholtz*, 836 F.2d at 557 (stating the appeal must "raise[] a substantial question likely to result in reversal of *all* counts on which imprisonment is imposed" (emphasis supplied) (citation omitted)); *see also* Def.'s Reply Supp. Mot. for Release ("Def.'s Reply") at 2, ECF No. 100.[5] Vacatur of defendant's Section 1512(c)(2) conviction, however, would likely "result in . . . a reduced sentence" in his term of imprisonment. 18 U.S.C. § 3143(b)(1)(B).

Defendant posits that he would be subject to a substantially lower sentencing guideline range were he to succeed on his appeal, with the applicable statutory maximum capping the

---

[5]      Having initially styled his reply brief as a "letter," *see* ECF No. 99, defendant timely resubmitted this brief on August 7, 2024, to comply with the formatting requirements of D.D.C. Local Criminal Rule 49(f)(4), *see* Def.'s Reply, ECF No. 100; Min. Order (directing the submission of any reply brief by August 7, 2024), and this resubmitted, corrected version is cited herein.

applicable sentencing range at 12 months, pursuant to U.S.S.G. § 5G1.1. Def.'s Mem. at 6–7. The government responds that "this Court would have good reason to resentence Stedman to more than 12 months," including by imposing "consecutive sentences in a hypothetical resentencing." Gov't's Opp'n at 7 & n.4 (quoting Order at 5, *United States v. Kelly*, No. 21-cr-708 (RCL), ECF No. 151 (D.D.C. Aug. 1, 2024)). As support, the government cites a decision by another Judge on this Court denying release pending appeal where the defendant had failed to satisfy this prong, based on the "significant probability that the defendant would be resentenced to a term approximating his original 30-month sentence." *Id.* at 8 (brackets omitted) (quoting Order at 5, *Kelly*, No. 21-cr-708 (RCL), ECF No. 151). In that case, the Court emphasized the "strong possibility" it would "impos[e] consecutive sentences in a hypothetical resentencing if necessary," given "the severity of [defendant's] conduct on January 6th." Order at 5, *Kelly*, No. 21-cr-708 (RCL), ECF No. 151.

As the government concedes, "not every judge will impose 'consecutive sentences in a hypothetical resentencing.'" Gov't's Opp'n at 8 (quoting Order at 5, *Kelly*, No. 21-cr-708 (RCL), ECF No. 151). Imposing consecutive sentences on all four misdemeanors, while possible, would represent a departure from both default practice under federal law, *see* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively."), and from the position adopted by this Court at defendant's sentencing in the instant case, where the government did not seek consecutive terms of imprisonment on any count, *see generally* Gov't's Sentencing Mem., ECF No. 80; Gov't's Suppl. Sentencing Mem., ECF No. 83, resulting in imposition of concurrent terms of imprisonment on all counts.

The government additionally argues that defendant "has not shown that the expected duration of the appeal process would extend his time served beyond the period of a likely reduced sentence," contending that defendant's "case could proceed to resentencing prior to October 27, 2024." Gov't's Opp'n at 8. This argument does not hold, particularly given the Circuit's recent grant of the government's motion on appeal "for a 30-day extension of time even just to articulate a position of the impact of *Fischer* on [defendant's] appeal," Def.'s Reply at 3; *see* Order, *Stedman*, No. 23-3163 (D.C. Cir. Aug. 14, 2024), and that "the government has not even yet submitted its reply brief to [defendant's] opening brief on appeal," Def.'s Reply at 3. While the D.C. Circuit may "be able to promptly resolve Stedman's appeal," Gov't's Opp'n at 8 (citation omitted), it strains logic that the Circuit would be poised to resolve defendant's appeal and for this case to proceed to sentencing by the expiration of defendant's hypothetical "reduced sentence," 18 U.S.C. § 3143(b)(1), on October 27, 2024, when *briefing* on defendant's appeal may still be ongoing.

At the same time, if defendant succeeds on appeal in challenging his conviction under Section 1512(c)(2), and this case is remanded for a new sentencing on all counts, a sentencing option available on resentencing that is not mentioned by either party is the imposition of a term of incarceration on one petty offense and a term of probation on another offense. *See United States v. Little*, 78 F.4th 453, 456 (D.C. Cir. 2023) (concluding that 18 U.S.C. § 3561(a)(3) "bars a court from imposing probation and imprisonment for a single offense," but noting that "[a] court may impose both only if a defendant gets imprisonment for one petty offense and probation for a different offense"). Nonetheless, should defendant's conviction under Section 1512(c)(2) be vacated, he would face a "likely reduced sentence." 18 U.S.C. § 3143(b)(1). Moreover, having served roughly ten months' imprisonment, he may have served more than the amount of time to

which he likely would be sentenced, absent the Section 1512(c)(2) conviction in Count One, when accounting for the "expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B)(iv).

### D. Timing of Release

Defendant argues that he is entitled to "immediate conditional release," Def.'s Mem. at 7, even though his "likely reduced sentence" of 12 months has not "expir[ed]," 18 U.S.C. § 3143(b)(1) (providing that "the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence").[6] As support for his immediate release, defendant relies on good time credits ("GTCs"), authorized under 18 U.S.C. § 3624(b), and earned time credits authorized under the First Step Act of 2018 ("FSA earned time credits"), *id.* § 3632(d)(4), arguing that when accounting for the 90 days of credits he has purportedly accrued as of June 29, 2024, "his release date would be . . . July 28, 2024," Def.'s Mem. at 7; *see also id.*, Att. 1, FSA Time Credit Assessment, ECF No. 97-1; Def.'s Reply at 2–3. For the reasons explained below, this argument is rejected, and defendant's release pending resolution of his appeal is authorized on October 27, 2024, the date when he has served his concurrent sentences of 12 months of imprisonment on his two Class A misdemeanor convictions.

---

[6] Defendant confusingly identifies both October 24, 2024, and October 26, 2024, as the "statutory end" of his one-year term of imprisonment. *See* Def.'s Mem. at 6–7 (stating "the full statutory end of Mr. Stedman's concurrent sentences on the misdemeanors would be October 24, 2024"); Def.'s Mot. at 1 (requesting "in the alternative for conditional release on October 26, 2024"); *see also* Def.'s Mem. at 8. Defendant states that October 26, 2024, is "365 days from the date he surrendered for service of his sentence," and that October 24 takes into account the "1 day jail credit . . . for his initial day of arrest incarceration, and 1 day credit for the day of release." Def.'s Mem. at 7 n.2. Defendant cites no authority for either calculation. Consistent with the decisions of other Judges on this Court, and as set forth below, this Court orders defendant released "one year to the day after he surrendered to the custody of the Attorney General"—here, on October 27, 2024. *Seefried*, 2024 WL 1299371, at *6; *see also Roche*, 2024 WL 1328459, at *1, *5 (where defendant self-surrendered on July 5, 2023, ordering defendant released on July 6, 2024); *Bender*, 2024 WL 960999, at *2, *6 (where defendants self-surrendered on July 6, 2023, and November 1, 2023, ordering defendants released on July 7, 2024, and November 2, 2024, respectively).

### 1. Good Time Credits

In the event defendant's felony obstruction conviction is vacated, leaving only his 12-month sentences on his Class A misdemeanors as his "likely reduced sentence," as defendant urges, he would not be eligible to have applied any accrued GTCs, since such eligibility requires an imposed imprisonment term of over 12 months, under 18 U.S.C. § 3624(b)(1).

Under 18 U.S.C. § 3624(b), the statutory provision governing the award of GTCs, federal prisoners "serving a term of imprisonment of *more than 1 year*" but less than life "may receive credit toward the service of the prisoner's sentence of up to 54 days for each year of the prisoner's sentence imposed by the court," provided BOP determines that "the prisoner has displayed exemplary compliance with institutional disciplinary regulations." 18 U.S.C. § 3624(b)(1) (emphasis supplied). The Supreme Court previously determined that "[t]he words 'term of imprisonment' in this phrase almost certainly refer to the sentence imposed, not to the time actually served," *Barber v. Thomas*, 560 U.S. 474, 483 (2010) (quoting 18 U.S.C. § 3624(b)(1), in effect Apr. 9, 2008 to Dec. 20, 2018), whereas the same phrase used later in the statute, "[w]hen modified by the phrases 'at the end of each year' and 'during that year,'" was held to "refer[] to prison time actually served rather than the sentence imposed by the judge,'" *Izzo v. Wiley*, 620 F.3d 1257, 1260 (10th Cir. 2010) (quotation marks omitted) (quoting *Barber*, 560 U.S. at 483–86 (upholding BOP's method of awarding good time credits based on the "prison time actually served rather than the sentence imposed," as basis for prorating credit available during a prisoner's last year of imprisonment or portion thereof)).

To be sure, the First Step Act of 2018 in effect abrogated *Barber*'s holding that the latter use of the phrase "term of imprisonment" "refer[red] to prison time actually served rather than the sentence imposed by the judge," *Barber*, 560 U.S. at 484–85, by amending the GTC provision "to

ensure that defendants receive the maximum of 54 days of good conduct time for each year of the sentence imposed, rather than, as had been BOP's practice, for each year of the sentence served," *United States v. Sarachandran*, No. 06-cr-615 (RJD), 2019 WL 2568712, at *1 (E.D.N.Y. June 20, 2019) (emphasis and citations omitted); *see also Powers v. Warden Allenwood USP*, 824 F. App'x 95, 95 (3d Cir. 2020) (per curiam) (explaining that "[u]ntil recently, although § 3624(b)(1) provided that prisoners could earn up to 54 days each year for exemplary compliance, the BOP used a calculation that allowed a maximum of only 47 days," whereas "the First Step Act . . . amended § 3624(b) to require the BOP to permit up to 54 days per year" (brackets and quotation marks omitted) (quoting *Bottinelli v. Salazar*, 929 F.3d 1196, 1197 (9th Cir. 2019))).

Yet, the FSA made no change to the threshold eligibility clause of the statute, as interpreted by *Barber*, that limits entitlement to the accrual of GTCs to prisoners who have "serv[ed] a term of imprisonment of more than 1 year," 18 U.S.C. § 3624(b)(1), with "term of imprisonment" in this context meaning—consistent with the *Barber* Court's interpretation—"the sentence imposed, not [] the time actually served," *Barber*, 560 U.S. at 483.

In this case, even if his felony obstruction conviction were vacated, defendant will still be required to serve his concurrent 12-month terms of incarceration on his Class A misdemeanor convictions, and thus his sentence would fall one day short of the statutory threshold for eligibility to accrue GTCs. S*ee, e.g.*, *United States v. Weitzel*, No. 23-3100, 2024 WL 2290309, at *1 (8th Cir. May 21, 2024) (per curiam) (rejecting challenge to "adequacy of the district court's explanation" of the one-year prison sentence imposed, concluding the district court "did not need to specifically address [defendant's] request for one day more, even if a slightly longer sentence would have given him an opportunity to earn good-time credits" (citations omitted)); *Andrews v. Dobbs*, 848 F. App'x 568, 569 (4th Cir. 2021) (per curiam) (concluding defendant "is not entitled

to good-time credits on his revocation sentence because the district court sentenced him to 12 months' imprisonment" and "[u]nder § 3624(b)(1), a prisoner is only entitled to good-time credit if he is 'serving a term of imprisonment of more than 1 year'" (quoting 18 U.S.C. § 3624(b)(1)); *United States v. Caldwell*, 802 F. App'x 81, 83–84 (3d Cir. 2020) (rejecting challenge to substantive reasonableness of sentence, finding "a sentence of 12 months is [not] unreasonable in comparison to a sentence of 10 months, which [defendant] effectively would have served, assuming good behavior, had he been sentenced to 12 months and a day"). In other words, in defendant's "best case scenario," his 12-month sentence on his Class A misdemeanors would not be eligible for a reduction for GTCs, and simply because he seeks release pending appeal does not warrant crediting him for GTCs for which he would be ineligible if he prevails on appeal.

This result is consistent with the decisions in other cases issued by the undersigned and other Judges on this Court, ordering the release, under 18 U.S.C. § 3143(b)(1), of defendants challenging their felony obstruction convictions under § 1512(c) only upon completion of their "likely reduced sentence," imposed for misdemeanor convictions of twelve months. *See, e.g.*, *Roche*, 2024 WL 1328459, at *1, *5 (authorizing the release of a defendant convicted of one felony and five misdemeanors "at the expiration of a term of incarceration on his two convictions for Class A misdemeanors"); *Seefried*, 2024 WL 1299371, at *1, *6 (noting defendant was "convicted of a felony and four misdemeanors" and ordering his release "one year to the day after he surrendered to the custody of the Attorney General" (citation omitted)); *Bender*, 2024 WL 960999, at *1, *6 (ordering the release of two defendants convicted of one felony and five misdemeanors each "when they have served twelve months in prison); *Bledsoe*, 2024 WL 341159, at *1–2, *6 (granting the release of a defendant convicted of one felony and four misdemeanors who had already served 14 months' incarceration—more than the statutory maximum authorized for his

Class A misdemeanor convictions); *cf.* Min. Order, *Clark*, No. 21-cr-538 (DLF) (D.D.C. July 26, 2024) (denying release in part since "even if the Court were to take into account the defendant's earned release credits of approximately 75 days, those credits still would not justify his immediate release" and noting that "18 U.S.C. § 3143(b)(1)(B)(iv) does not reference anticipated decisions by the Bureau of Prisons . . . Nor does the statute take into account good time or early release credits"). In short, defendant's request to be released pending appeal with credit for GTCs is denied.

### 2. FSA Earned Time Credits

Defendant also seeks immediate release in reliance on his FSA earned time credits, which BOP is authorized to apply toward early transfer into prerelease custody or supervised release, under 18 U.S.C. §§ 3632(d)(4) and 3624(g). This reliance is misplaced for at least two reasons: first, this statutory provision vests the administrative determination to assess defendant's eligibility to accrue FSA earned time credits and to apply any such credits toward early transfer to prerelease custody or supervised release exclusively with BOP, and, second, even if this Court assumed authority to make such an eligibility determination and an estimate of such FSA earned time credits, defendant has not demonstrated satisfaction of § 3624(g)'s statutory requirements for such FSA credits. Consequently, FSA earned time credits will not be considered in estimating defendant's "likely reduced sentence," which is the measure of when he should be released pending appeal, under 18 U.S.C. § 3143(b)(1)(B)(iv).

Generally, FSA credits may be earned by eligible federal prisoners to qualify for early release from incarceration in the amount of "10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(i). Such FSA credits may be increased by prisoners, who are "determined

by the Bureau of Prisons to be at a minimum or low risk for recidivating," and who can "earn an additional 5 days of time credits for every 30 days of successful participation" in such programming or activities. *Id.* § 3632(d)(4)(A)(ii); *see also Guerriero v. Miami RRM*, No. 24-10337, 2024 WL 2017730, at *1 (11th Cir. May 7, 2024) (per curiam). Prisoners are ineligible to earn FSA credits if they are "serving a sentence for a conviction" under one of nearly seventy statutory provisions listed in 18 U.S.C. § 3632(d)(4)(D), and are ineligible to have them applied toward prerelease custody or supervised release if they are subject to removal under immigration laws, *id.* § 3632(d)(4)(E); *see also Johnson v. Warden Allenwood FCI*, No. 23-2893, 2024 WL 1596676, at *1 n.2 (3d Cir. Apr. 12, 2024) (per curiam) (noting "Section 3632(d)(4)(D) comprises 68 subsections that identify offenses that render a prisoner ineligible to earn time credits under § 3632" (citing 18 U.S.C. § 3632(d)(4)(D)(i)–(lxviii))).[7] For any accrued credits to "be applied toward time in prerelease custody or supervised release," the prisoner must first be found *by BOP* to be eligible "under section 3624(g)." *Id.* § 3632(d)(4)(C) ("The Director of the Bureau of Prisons shall transfer *eligible prisoners, as determined under section 3624(g),* into prerelease custody or supervised release." (emphasis supplied)).

Several requirements are set out "under section 3624(g)" for FSA earned time credits to be applied for early transfer by BOP of a prisoner into prerelease custody or supervised release. *First*, the prisoner must show that he "has earned time credits . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." 18 U.S.C. § 3624(g)(1)(A). *Second*, he must have shown, through BOP's recidivism risk assessment system established by § 18 U.S.C. § 3632(a), "a demonstrated recidivism risk reduction or [that he] has maintained a minimum or

---

[7]     Defendant is not disqualified due to these provisions, as the FSA Time Credit Assessment attached to defendant's motion indicates. *See* Def.'s Mem., Att. 1, FSA Time Credit Assessment; *see also* 18 U.S.C. § 3632(d)(4)(D), (E).

low recidivism risk, during the prisoner's term of imprisonment." *Id.* § 3624(g)(1)(B). *Third*, he must have "had the remainder of [his] imposed term of imprisonment computed under applicable law." *Id.* § (g)(1)(C). *Finally*, in the case of transfer to prerelease custody, he must have "been determined under the [risk assessment system] to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of [him]," *id.* § (g)(1)(D)(i)(I), or "had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison" subject to the warden's enumerated determinations, *id.* § (g)(1)(D)(i)(II), or in the case of placement in supervised release, "been determined under the [risk assessment system] to be a minimum or low risk to recidivate pursuant to the last reassessment of [him]," *id.* § (g)(1)(D)(ii).

If these enumerated requirements are met, then the "[BOP Director] shall transfer eligible prisoners . . . into prerelease custody or supervised release," *id.* § 3632(d)(4)(C), provided, among other elements, the BOP Director has "ensure[d] there is sufficient prerelease custody capacity to accommodate all eligible prisoners," *id.* § 3624(g)(11), or, as to supervised release, that "the sentencing court included as a part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment," *id.* § 3624(g)(3) (authorizing the BOP Director to "transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632").

As these provisions reflect, the FSA conditions a prisoner's eligibility to earn credits under § 3632(d)(4) and to have such credits applied for early transfer to prerelease custody or supervised release, on *BOP*'s determinations that a prisoner has satisfied the criteria set forth in §§ 3632(d)(4) and 3624(g). *See, e.g.*, *Brown v. Penders*, 101 F.4th 944, 945 (1st Cir. 2024) (noting that "*BOP* calculated that [defendant] had earned fifteen FSA credits, which it applied to accelerate her release date" (emphasis supplied)); *Guerriero*, 2024 WL 2017730, at *1 (observing "Section

3632(d)(4)(C) provides that the *BOP* can apply [] FSA time credits to either lengthen an eligible prisoner's prerelease custody, such as home confinement or half-way house placement, or to advance transfer to supervised release" (emphasis supplied) (citing 18 U.S.C. § 3632(d)(4)(C)); *Poff v. Carr*, No. 22-10623, 2023 WL 2240463, at *1 (5th Cir. Feb. 27, 2023) (per curiam) (noting the "FSA requires the *BOP* to evaluate each prisoner and determine the type and amount of [recidivism reduction] programing appropriate for each prisoner to reduce their risk of recidivism" (emphasis supplied) (citing 18 U.S.C. § 3632(a)(3)); *White v. Rule*, No. 24-cv-49 (JPH) (MG), 2024 WL 2060982, at *1 (S.D. Ind. Apr. 19, 2024) (noting "[i]t is the *BOP* and not the Court that determines Petitioner's recidivism risk score" (emphasis supplied)); *McLean v. Rivers*, No. 23-cv-1750 (G) (BK), 2024 WL 665858, at *2 (N.D. Tex. Jan. 26, 2024), *report and recommendation adopted*, No. 23-cv-1750 (G) (BK), 2024 WL 666070 (N.D. Tex. Feb. 15, 2024) (recognizing "[t]he First Step Act grants discretion to the *BOP* to determine the placement of inmates who have earned enough time credits to receive a sentence reduction" (emphasis supplied) (citing 18 U.S.C. § 3632(d)(4)(C)); *Brodie v. Pliler*, No. 22-cv-3821 (LGS), 2022 WL 16751908, at *4 (S.D.N.Y. Nov. 7, 2022) (observing that "*BOP* retains discretion over whether to apply FSA Time Credits to 'prerelease custody *or* supervised release'" (first emphasis supplied) (citation omitted)); *Russell v. Bureau of Prisons*, No. 20-cv-1082 (KGB) (JTR), 2021 WL 7208910, at *3 (E.D. Ark. Sept. 27, 2021), *report and recommendation adopted as modified*, No. 20-cv-1082 (KGB), 2022 WL 604814 (E.D. Ark. Feb. 28, 2022) (observing that "the duty to implement, calculate, and grant prisoner's access to the FSA's Earned Time Credit has [] been delegated to the *BOP*" (emphasis supplied)).

Here, defendant's request for immediate release on the basis of FSA earned time credits, pursuant to 18 U.S.C. § 3143(b)(1), essentially asks this Court to supplant BOP's statutorily designated authority to make these FSA earned time credit assessments—or otherwise to bypass

the plain text of the FSA and directly apply the purportedly accrued credits to reduce his period of incarceration and transfer him to prerelease custody or supervised release early, at least for the period pending resolution of his appeal. Yet, it is not at all clear the statute provides courts with this authority, *see generally id.* §§ 3624(g), 3632(d)(4), and such judicial supplanting of BOP's statutorily delegated command does not appear to have been Congress's intention regarding application of FSA earned time credits, *see, e.g.,* 164 Cong. Rec. S7745-01, 7747 (Statement of Sen. Cornyn) ("[I]f you are not a low-risk offender, as determined by the testing that is done by the Bureau of Prisons, you will not be eligible for these less confining conditions. This . . . determination . . . *is left to experienced law enforcement officers and wardens who work with these individuals on a daily basis.*" (emphasis supplied)). Under the statute's plain terms, the authority to determine a prisoner's eligibility for and application of FSA earned time credits is left to BOP. *See* 18 U.S.C. §§ 3624(g), 3632(d)(4).

This understanding is consistent with the nature and scope of authority delegated to BOP under the FSA earned time credit regime that is both longer term and more fact intensive than BOP's ministerial determination of a prisoner's eligibility for and computation of GTCs under § 3624(b). Indeed, in contrast to GTCs, "which are reflected in an inmate's projected release date, FSA Time Credits are conditional benefits contingent on numerous factors," *Smith v. Eischen*, No. 22-cv-1704 (NEB) (DJF), 2023 WL 3170436, at *5 (D. Minn. May 1, 2023), *report and recommendation adopted as modified*, No. 22-cv-1704 (NEB) (DJF), 2023 WL 4203165 (D. Minn. June 27, 2023), *aff'd*, No. 23-2620, 2024 WL 1479767 (8th Cir. Apr. 5, 2024), with *BOP* making the ongoing and fact-specific determinations of whether a prisoner's accrued credits may be applied toward prerelease custody or supervised release, including whether the prisoner "has shown . . . a demonstrated recidivism risk reduction or has maintained a minimum or low

recidivism risk," *id.* § 3624(g)(1)(B). This Court has neither access to the internal records within BOP nor the expertise to make these determinations and instead these tasks have been statutorily assigned to BOP.[8]

In any event, defendant has not shown that he has satisfied all eligibility criteria set forth in § 3624(g), including that "he has had the remainder of [his] imposed term of imprisonment computed under applicable law," *id.* § 3624(g)(1)(C). The BOP FSA Time Credit Assessment submitted as an attachment to defendant's motion appears to reflect that defendant has accrued 90 days of FSA earned time credit, *see* Def.'s Mem., Att. 1, FSA Time Credit Assessment, yet, defendant has submitted *no* information that he has satisfied the eligibility criterium under at least § 3624(g)(1)(C)—that he "has had the remainder of [his] imposed term of imprisonment computed under applicable law," § 3624(g)(1)(C), so as to permit the *application* of any such credits "toward prerelease custody or supervised release," *id.* § 3632(d)(4)(C). Any such computation would be complicated by the fact that, should defendant's felony obstruction conviction be vacated, his "likely reduced sentence," *id.* § 3143(b)(1), would be different from the 48-month term of imprisonment that defendant is currently serving.

Finally, even under any generous assumption that this Court both possesses the authority to determine and apply FSA earned time credits to reduce defendant's term of incarceration *and* that defendant has satisfied the criteria set forth in § 3624(g), defendant is ineligible to have any such credits applied toward supervised release because, as the D.C. Circuit has held, supervised

---

[8]     This reasoning is also consistent with the ruling of another Judge on this Court, who found that, for a release pending appeal under 18 U.S.C. § 3143(b)(1), the statute does not allow courts to consider "anticipated decisions by the Bureau of Prisons" regarding application of early release credits. Min. Order, *United States v. Clark*, No. 21-cr-538 (DLF) (D.D.C. July 26, 2024). Here, because the defendant has not shown that the required BOP finding exists, any decision to apply his accrued time credits would necessarily "anticipate[]" such a decision by the BOP, *id.*, and such an anticipatory ruling is not permissible under § 3624(g), as Judge Friedrich's persuasive analysis of § 3143(b)(1) held in *Clark*.

release is "release by the Bureau of Prisons to the supervision of a probation officer for a term of supervision *following expiration* of a sentence's term of imprisonment." *United States v. Davis*, 711 F.3d 174, 176 (D.C. Cir. 2013) (emphasis in original) (citing 18 U.S.C. § 3624(a), (e)). Here, although defendant has successfully argued for release pending resolution of his appeal, his 48-month sentence remains in place, at least until such resolution and the vacatur he seeks of his felony obstruction conviction. Should defendant's appeal be denied, he will be ordered remanded to BOP's custody to serve the remainder of his sentence. *See, e.g.*, *Bledsoe*, 2024 WL 341159, at *6 (holding that the defendant's release pending appeal "may be revoked" depending on the result of the *Fischer* decision); *United States v. Madeoy*, No. 86-cr-0377 (HHG), 1991 WL 148553, at *1 (D.D.C. July 15, 1991) (noting that the government had moved to revoke the defendant's release pending appeal).[9]

Therefore, defendant will be released, pending resolution of his appeal, at the expiration of his "likely reduced sentence" of 12 months' incarceration for his two Class A misdemeanor convictions, on October 27, 2024. 18 U.S.C. § 3143(b)(1).

---

[9]  The government urges that defendant's "alternative motion for release on October 24, 2024 should be denied as premature," Gov't's Opp'n at 9, but this position would serve only to kick the proverbial can down the road and necessitate another round of briefing as to the same issues, consuming both the parties' and judicial resources, time and attention unnecessarily. For this reason, the undersigned and other Judges of this Court, have granted motions for release on a prospective basis. *See, e.g.*, *Roche*, 2024 WL 1328459, at *5; *Seefried*, 2024 WL 1299371, at *6; *Bender*, 2024 WL 960999, at *6.

## III.   CONCLUSION

For the reasons set forth above, defendant's Motion for Release Pending Appeal, ECF No. 97, is GRANTED, but only prospectively, effective October 27, 2024.  An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: August 28, 2024

_____
**BERYL A. HOWELL**
United States District Judge