UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| -v- | : **Criminal No. 21-383-001 (BAH)** |
| | : |
| **PATRICK STEDMAN** | : |

**Defendant Patrick Stedman's Sentencing Memorandum – Remand Sentencing**

**On the Memorandum:**

*Rocco C. Cipparone, Jr., Esquire*
**157 Bridgeton Pike, Suite 200-320
Mullica Hill NJ 08062
(856) 547-2100
www.Cipparonelaw.com
Attorney for Defendant**

## I. GUIDELINE CALCULATIONS

On September 9, 2024, the United States Court of Appeals for the District of Columbia Circuit vacated Count One and remanded the case for further proceedings in Case# 23-3163. USCA Case #23-3163 Document #2073905. At the direction of the District Court, on December 12, 2024 (docket document 108), the U.S Probation Office filed a document termed "Revised Recommendation of Final Presentence Investigation Report", which document contained revised guideline calculations for the limited resentencing regarding Counts Two through Five of the indictment of which Mr. Stedman was convicted.

The sentencing guidelines do not apply to Counts Four and Five.[1] The applicable guideline range determined by the Probation Office regarding Counts Two and Three[2] is 10-12 months. Although the probation office did not set forth the specific guideline calculation it used to reach that range in its recently filed document (referenced above), it appears from the defense guideline analysis that such range is appropriately determined as follows:

Count Two – U.S.S.G.§ 2B2.3

- Base Offense Level                                                              4
- Specific Offense Characteristic § 2B2.3(b)(1)(A)(vii)      +2
  (trespass at restricted building or grounds)

- U.S.S.G. § 3C1.1[3]                                                             +2

**Total Offense Level                                                              8**

---

[1] Count Four charged Disorderly Conduct in a Capitol Building in violation of 40 USC § 5104(e)(2)(D), and Count Five charged Parading, Demonstrating or Picketing in a Capitol Building in violation of 40 USC § 5104(e)(2)(G).

[2] Count Two charged Entering and Remaining in a Restricted Building or Grounds in violation of 18 USC § 1752(a)(1), and Count Three charged Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 USC § 1752(a)(2).

[3] Mr. Stedman objected to the U.S.S.G. § 3C1.1 enhancement in connection with his original sentencing orally and in his sentencing memorandum in connection therewith. Docket Document 81 at 8-9. Those arguments are incorporated herein by reference regarding the guideline calculation for Counts Two and Three for purposes of appellate preservation, but the defendant notes that no different grounds for objection to such exist. The defendant is aware of course of the Court's prior ruling at his original sentencing overruling that objection.

Count Three – U.S.S.G. § 2A2.4

- Base Offense Level        10
- U.S.S.G. § 3C1.1          +2[4]

**Total Offense Level        12**

Grouping

- Counts Two and Three are grouped together pursuant to U.S.S.G. § 3D1.2 as they involve the same victim and substantially the same harm

- Pursuant to U.S.S.G.§ 3D1.3, the guideline level is that applicable to Count Three (which has the highest offense level of the counts in the Group), therefore

**Total Offense Level = 12**

**Criminal History Category I**

**Guideline Range** = **10-12 months** (per U.S.S.G. § 5G1.1, the range of 10-16 months is capped by the statutory maximum 12 months)

## II. SENTENCING FACTORS UNDER 18 U.S.C. § 3553

As is recommended by the Probation Office in its Revised Recommendation of Final Presentence Investigation Report, Mr. Stedman requests that the Court sentence him to a sentence of 12 months/time served on each of Counts Two and Three, and 6 months/time served on each of Counts Four and Five, all to run concurrent to each other; a $20,000 fine; $500.00 restitution; 1 year of supervised release on Counts Two and Three to run concurrent to each other; and the mandatory special assessments.. Mr. Stedman served over a year (368 days) until release by the Court on bail pending appeal on October 27, 2024.[5]  In Mr.

---

[4] At the prior sentencing proceeding, Mr. Stedman objected to the application of this enhancement under U.S.S.G. 3C1.1. The same objections orally made and in Mr. Stedman's prior sentencing memorandum filed at Docket Document 81 is incorporated herein by reference for appellate preservation purposes, but Mr. Stedman is mindful of the Court's prior ruling on this same issue and no additional or different arguments are being presented.

[5] *See* Revised Recommendation of Final Presentence Investigation Report, docket document

Stedman's situation, weighing the relevant sentencing criteria, the requested sentence is sufficient but not greater than necessary to meet the attendant purposes of sentencing.

The salient sentencing factors are:

> **Nature and circumstances of the offense and the history and characteristics of the defendant**

Although the nature and circumstances of the offense are of course serious, Mr. Stedman's conduct was aberrational and inconsistent with his well-established solid good character, the latter of which warrants significant sentence mitigation.

> **History and Characteristics of the Defendant**

a. **New Information**

Mr. Stedman began service of his sentence at FCI Fort Dix, NJ on October 27, 2023, where he remained until this Court ordered his release pending appeal effective October 27, 2024. During his time at Fort Dix, Mr. Stedman was industrious, pursued courses, and was a model inmate with no infractions.

Mr. Stedman completed an 85-hour CORE vocational program at FCI Fort Dix run by the National Center for Construction Education and Research. A.018 (NCCER Diploma dated 08-19-2024). In addition, Mr. Stedman took various classes throughout his incarceration at FCI Fort Dix including:

- Fundamentals of Construction
- Shakespeare Made Simple 2
- Physics I
- Business Math
- Ace – general Science
- Accounting I

---

108 at 2n.1, noting that "Mr. Stedman was in custody on January 21, 2021, and then from October 27, 2023, until October 27, 2024."

- 7 Habits
- Tutor Training

A.053 (BOP Inmate Education Data sheet). Mr. Stedman also served as a tutor to other inmates, putting his tutor training to actual and positive use.

Telling also is another view of Mr. Stedman related to a reporter by a then former inmate, Joseph Morelli, who had met Mr. Stedman while both men both were incarcerated at FCI Fort Dix, NJ. Morelli encountered Mr. Stedman when Morelli was serving a three-month sentence for engaging in a series of threats toward Republican Senator Marjorie Taylor Greene. Morelli's story was the focus of an April 27, 2024 Washington Post Article. A.019 (article). The article in one section recounts that the two men – Morelli and Stedman – were on opposite ends of the "political"/ideological spectrum. Morelli while at FCI Fort Dix soon developed an impression of Mr. Stedman that was not what he anticipated for someone convicted in connection with the events of January 6, 2021:

> Morelli said okay, but as they introduced themselves to one another, here was the embodiment of all the people he'd seen on TV who had made him angry. But Stedman wasn't on the TV. He was standing across from him, face to face. Morelli expected him to sound the way he imagined all Trump supporters — as a radical, "hating everybody." And yet, the more they talked, the more Morelli liked him. He didn't seem hateful at all. He seemed smart. He had a business and a young family at home. He said he planned to spend his time in prison reading and detoxing from the news, and Morelli thought that was a good impulse, to get away from the anger that had surrounded them both. "I got caught up in the moment," Morelli remembers Stedman saying, and he understood how that felt.

A.044-45 (Washington Post article at 26-27). Of course, that recitation by Morelli, who by the time he was interviewed had served his sentence and was released from FCI Fort Dix, provided a candid look at how Mr. Stedman comported himself while incarcerated, in particular in terms of his interaction with someone who had different ideological leanings. Mr. Morelli recounted that Mr. Stedman wanted to detox from the news, read, and move away from anger. Mr. Stedman recounted that he got caught up in the moment on January 6th: it is not his genuine nature to behave in that way. That unsolicited insight provided by Morelli to the Washington

4

Post about Mr. Stedman supports that Mr. Stedman is a good person who made bad decisions on January 6th.

### b. Still Relevant Information From Prior Sentencing Memo (with some modifications)

Mr. Stedman is 36 years old and has no prior criminal history. He is a college graduate, a hard-working, financially stable, contributing member of society who is full-time self-employed, and most importantly a father of two, husband and son who made a mistake in his life based on poor judgment and the frenzy of the day involved. While the nature of the offense is serious, the conduct must be weighed against (and here mitigated by) the personal characteristics of Mr. Stedman, among the other factors addressed in this memorandum as well.

Mr. Stedman, apart from the instant offenses of conviction, has conducted a community and family supportive life. As David Stedman, Pat's father wrote[6] (A.009-010), Pat has been an attentive and caring son who assists financially, physically, and emotionally in their now joint living situation; he is a positive hands-on committed father to his two young children; and a loving partner to his wife Kate. Margaret Stedman, Mr. Stedman's mother, also expressed to the Court her perceptions of her son, his positive-attributes and family values, giving examples which make clear that Pat Stedman as a strong, supportive family network, which of course bodes well for his future in not recidivating and complying with all orders of the court and the law in the future. A.011. Margaret Stedman is not blind to her son's actions on January 6th and has indeed indicated in her letter that she disagrees with his actions: she is a formidable woman, former schoolteacher, and citizen who is not blindly supporting her son's actions but is supporting her son's true positive character in expressing such to the Court.

---

[6] The referenced character letters were previously supplied to the Court with Mr. Stedman's original sentencing memo, but are attached again in the Appendix hereto for the Court's ease of reference.

Notwithstanding the instant transgressions of which he has been convicted, Mr. Stedman is a person of "high morals, ethics and sense of justice," as explained by Mr. Stedman's friend Loyzo Smolinsky in a letter to the Court. A.005. Mr. Smolinsky explains that his friendship with Mr. Stedman formed after they both sat on a grand jury together, and after his consistent observance (as Your Honor knows grand jury service is for many months) of Mr. Stedman when they served on a grand jury together. Mr. Smolinsky further explains the true work ethic, commitment to the growth of others, and unconditional family love and support which Mr. Stedman exhibits. Their friendship, started during that grand jury encounter ,further grew to the point that Mr. Smolinsky became the godfather to Mr. Stedman and his wife Kate's daughter. Notwithstanding the instant aberrational conduct by Mr. Stedman, as acknowledged by Mr. Smolinsky, his opinion of Mr. Stedman has not changed. That is not out of blind ignorance, as he states, but a true and developed understanding of Pat Stedman the individual and his character over several years.

Even more poignant is the letter to the Court from Mr. Stedman's older (by 12 years) sister Meredith Dunn. As Ms. Dunn makes clear, "politically" (as to his then state of mind around the time of the events based on which Mr. Stedman was convicted), Ms. Dunn and Mr. Stedman were diametrically opposite. However, she knows that at his core Mr. Stedman is a loyal, spiritual, determinative, and self-reflecting person capable of self-revision. Ms. Dunn reveals the impact that not just this case, but Mr. Stedman's actions, had and the wounds it created in their family that thankfully are now in the healing process. That healing also was occasioned by the mellowing of Mr. Stedman which she has witnessed, and his self-reflection, again which bodes well in mitigation of sentence and a prognostication that he will not recidivate. A.012-013.

Mr. Stedman's wife Kate in her letter to the Court recounts Pat's calm reassurance to their family and her in all trying times, including a significant post-partem health scare regarding their youngest child and its impact on Mrs. Stedman. She expresses the self-reflection and inner-flagellation Mr. Stedman has done since his arrest:

> My husband has changed as a person since his arrest. He has always been a very introspective and spiritual person, and he has analyzed his actions deeply and reflected on the image he put forth of himself that day. He realized this is not the person and the leader he wants to be; the experience humbled him deeply. He regrets putting his whole family through this and is more worried for all of us right now, than he is for himself. There's a lot of sadness in him now too, whenever I catch a glimpse of him, he seems to be lost in thought and far away. I can assure you judge [sic] Howell that Pat has received his punishment in the last 2 years, in the form of the stress, the shame and social rejection we've experienced.

A.017 (Kate Stedman letter).

Other letters submitted to the Court[7] not only also solidify the above-referenced positive attributes possessed by Mr. Stedman but provide other insight as well. They are not recounted here in detail but are contained in the Appendix hereto. See A.014-015 (William Bartlett letter). The self-reflection, loyalty, growth, and evolving nature of Mr. Stedman is addressed in detail and by specifics in the letter of his friend of about 15 years, Lorraine Weekes. A.003-004 (Lorraine Weekes letter). Ms. Weekes notes that "in the past three and a half years, … [her] friend has examined and interrogated the weaknesses and shortcomings within himself that ultimately motivated the conduct that landed him in your courtroom. More than just not making the same mistake twice, Patrick is, and will continue to be, perpetually invested in confronting and reforming himself.

As Kelly Smith outlines in a letter to the Court, he first perceived Mr. Stedman as arrogant and self-absorbed, but came to learn over time that such was a defense mechanism: "As our friendship grew, I came to realize that the Pat I had initially perceived was not an accurate representation of his true self. Our one-on-one conversations helped me see he was not only intelligent but also compassionate and warm-hearted. It became evident that his confidence in group settings was a defense mechanism, an armor which he used to conceal his vulnerabilities." A.007 (Kelly Smith letter).

---

[7] For privacy of the letter writers, any email addresses and telephone numbers have been redacted from the public filing.

Those who wrote letters know Mr. Stedman three-dimensionally in myriad contexts, which respectfully should be give substantial consideration in mitigation of Mr. Stedman's sentence. As Ms. Weekes aptly notes, "Patrick is a lot more than his mistakes".

> **Acceptance of Responsibility**

Mr. Stedman is not seeking a guideline downward adjustment for acceptance of responsibility as the term is used in U.S.S.G. § 3E1.1. However, he did and does recognize the unintended effects that his actions had on persons at the Capitol Building on January 6, 2021. As Mr. Stedman testified at trial, he understands now with a hindsight birds-eye view of other things he subsequently learned went on that day, how officers and those who worked in/at the Capitol Building on January 6, 2021 were unnerved/fearful, even though his personal intention and conduct was not intended to create fear in others for their personal safety. Indeed, at one point, as Mr. Stedman testified (and corroborated by the video Government Exhibit 315) that he placed his hand on the shoulder of another person (whose identity was not known to him) who was giving an individual police officer a hard time and (to paraphrase) told the individual to leave the officer alone. While that does not establish "acceptance of responsibility" as that term of art is used in the sentencing guidelines, it is an indication to the Court that Mr. Stedman is neither devoid of concern for others, nor ignoring the impact on others of his conduct. He continues to of course evaluate the import of his conduct that day and self-evaluate in that regard.

Mr. Stedman further addresses substantial self-reflection and evolution -- also referenced in the letters of others[8] -- which he has done since January 6, 2021, in his attached letter to the Court, including:

> I am sure you have heard scores of apologies at this point from J6ers. Normally, I would imagine they offer regrets about their actions. For me, however, this topic is more complicated. I do not condone my conduct, and I take responsibility for the pain it's caused not simply to my friends and family, but to the national consciousness. I love my country, yet somehow I contributed to

---

[8] On example is Kelly Smith who wrote: "Since his arrest, I have witnessed Pat grow as a man. I have watched him humble himself, be more caring towards others (more than he ever had before), and have watched him grow as a friend, son, brother, husband, and father to two beautiful children." A.007.

> division and hate within it — not simply on January 6th itself, but in the months prior. Yet it is for this reason I am actually grateful for the experience of being indicted and even convicted. Because it is only through this process of suffering and humiliation that I've been able to truly look at myself and examine *why*.
>
> …
>
> If I was then who I am now, I would not have gone to Washington D.C., and I certainly would have gone nowhere near the Capitol. But in January 2021, that is not the man I was. That man did not know the unconditional love of a child, and felt like he needed to be relevant to strangers, or he wouldn't matter at all. It seems inevitable in hindsight that finding myself in that unexpected situation, I would have followed the crowd into the Capitol. This was a perfect opportunity for me to look brave on Twitter. I was not thinking about the legal implications of my desire to showcase myself on social media, or how my cocky videos might be construed. I was a fool, and like all fools I have suffered the consequences of my myopia.

A.001 (Patrick Stedman letter).

The government, as it did in its opposition to Mr. Stedman's motion for bail pending appeal, which motion Your Honor graciously granted, in its sentencing submission again references an article entitled "American Soul" (https://www.patstedman.com/2024/01/06/the-american-soul/) by Mr. Stedman published on January 6, 2024. As the Court already has noted in its memorandum in support of its order granting bail pending appeal, Mr. Stedman in that article did not overtly advocate any violence and indeed expressly rejected violent action of any sort. August 28, 2024 Memorandum Opinion at 13. As the Court determined in that Memorandum, "the contents of this article fall short of indicating his intent to re-offend. In these circumstances, and on this record, the Court finds that he 'is not likely to flee or pose a danger to the safety of any other person or the community.'" *Id.* The government also cited other writings by Mr. Stedman in its sentencing memorandum, again none of which writings in any way advocate violence by anyone; none of which contain any statements from which it can reasonably be inferred that Mr. Stedman will re-offend; and none of which comments constitute criminal activity or any activity othern that First Amendment protected activity.

➢ **Mental Health History**

Mr. Stedman has no history of mental health issues. PSR ¶ 62.

➢ **Substance Abuse**

Mr. Stedman has no history of substance abuse.

➢ **Education**

Mr. Stedman earned a Bachelor of Arts degree from the University of Pennsylvania in 2010.

➢ **Employment**

Mr. Stedman has a positive work ethic, and sustained employment history, including his self-employment. Mr. Stedman has been a hard-working, goal-oriented individual, who has contributed positively to society. His instant conduct is a clear aberration. Since 2014, Mr. Stedman has operated The Dynamic Man, LLC, in which he and his wife are the members of the LLC (Mr. Stedman 80%, Mrs. Stedman 20%). Before he converted to running that business full-time, Mr. Stedman was gainfully employed by Kroll Inc. as a senior analyst, from 2011-2014. In addition to those major aspects of his work history, Mr. Stedman also worked previously teaching English as a second language while he briefly traveled in South America after college (PSR ¶ 57), a warehouse laborer, and in the restaurant industry. PSR ¶¶ 68-71. Mr. Stedman has been and remains a positive contributing member of society.

➢ **Family Life**

Mr. Stedman has a rich family life, and he is a devoted family man. He maintains a strong and sustained relationship with his parents, and indeed he and his wife and children currently reside with them in New Jersey. Mr. Stedman moved his family in with his parents during the Covid-19 pandemic, in order to assist his parents during that time and help them avoid the isolation we all were experiencing in that difficult period, and to remove his family form New York City and the heightened risks of Covid-19 in that inner-city setting.

Mr. Stedman and his wife Kate were married in 2014 and maintain a loving and supportive relationship despite the rigors that the instant matter has placed on them. The

collateral consequences of his actions – the loss of relationships with friends and sadly even family members (including for a time the strained relationship with his sister Meredith Dunn as referenced in her letter) – even though the result of his own conduct, are punitive as well and should be factored in to the Court's sentencing calculus in litigation. Mr. Stedman has and continues to work at repairing those relationships (some are not salvageable).

The charges, the reputational harm, and the financial and other rigors of being a criminal defendant in a criminal case understandably strain not only the defendant, but of course his family. That strain is even more concerning to a family when raising two very young children, as are Pat and Kate. However, his wife and parents in particular have remained emotionally supportive throughout the process notwithstanding those stresses. *See* PSR ¶¶ 51-57.

Their family dynamic and emotional support for Mr. Stedman, and his for them, has remained unwavering through the very trying time during which Mr. Stedman was incarcerated, but they are readjusting to Mr. Stedman's post-incarcerated life, which hopefully will not be interrupted by any additional incarceration at resentencing. It would of course present substantial additional hardship to resentence Mr. Stedman to return to imprisonment after the reunion occasioned by his release on October 27, 2024.

➢ **Lack of Prior Record; Risk of Recidivism; Impact of Sentence Type on Recidivism**

Mr. Stedman has no prior criminal history, not even arrests or noted traffic infractions. PSR ¶¶ 44-50. Mr. Stedman's age (over 30 – he is 36) and his lack of any criminal history puts him in a demographic of persons substantially less likely to reoffend. The U.S. Sentencing Commission has conducted detailed studies of reliable empirical data to determine the demographic of persons less likely to reoffend. "[T]he Commission's research shows that the younger than 30 age group had the highest rearrest rate (64.8%) and the rate declined with each age group that follows to a low of 16.4 percent", also as reflected in the below reproduced

chart from the report.[9]

REMAINDER OF THIS PAGE INTENTIONALLY BLANK

**Table 1 Overview of Age and Recidivism Study Findings**
Rearrest Recidivism Measure

|  | Younger than 30 Years n=6,796 | 30 to 39 Years n=8,523 | 40 to 49 Years n=5,894 | 50 to 59 Years n=2,969 | 60 Years or Older n=1,204 |
|---|---|---|---|---|---|
| Percent | 64.8% | 53.6% | 43.2% | 26.8% | 16.4% |
| Median Time to Recidivism Event | 17 Months | 22 Months | 22 Months | 25 Months | 28 Months |
| Median Number of Recidivism Events | 3 | 2 | 2 | 1 | 1 |
| Most Serious Post-Release Event | Assault (26.6%, n=1,170) | Assault (24.1%, n=1,102) | Assault (20.3%, n=517) | Other Public Order Offense (22.5%, n=179) | Other Public Order Offense (23.7%, n=47) |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05_OFFUPDT. The Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

Also, the below data further supports the unlikelihood of recidivism by Mr. Stedman, especially if the Court were to consider a less than incarceration only sentence: "[o]ffenders who received a prison only sentence had a higher rearrest rate than offenders who received a different form of sentence (Figure 23)", which Figure 23 is reproduced here:

REMAINDER OF THIS PAGE INTENTIONALLY BLANK

---

[9] The Effects of Aging on Recidivism Among Federal Offenders at 22, United States Sentencing Commission (December 2017). The full report can be accessed and downloaded at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.



Fig. 23 Rearrest Rate of Recidivism Study Offenders by Type of Federal Sentence Imposed and Age at Release

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05_OFFUPDT. The Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

Finally, persons with zero (0) criminal history points such as Mr. Stedman have the lowest recidivism rate compared to those with any criminal history points (even substantially lower than Category I offenders with just 1 criminal history point).[10]

The Federal Bureau of Prisons Recidivism Risk Assessment for Mr. Stedman also favors a conclusion that Mr. Stedman poses no likely risk of recidivism. A.052.

For those reasons, and considering the information contained in this Memorandum, the PSR, and to be gleaned from the materials in the Defendant's Appendix, Mr. Stedman certainly is not likely to reoffend.

Mr. Stedman is not a person who is likely to recidivate, for all the foregoing reasons. Further, his ability to adhere to the terms of any sentence, and to not violate the law, is supported by the fact that he has not had any bail infraction since his release on conditions on January 21, 2021; during the period when he remained on release pending his voluntary

---

[10] "Overall, an offender's total criminal history score is a strong predictor of recidivism. Rearrest rates range from a low of 30.2 percent of offenders with zero criminal history points to a high of 85.7 percent for offenders with 15 or more criminal history points. Each additional criminal history point is generally associated with a greater likelihood of recidivism. …[T]here is a 22.1 percentage point difference in rearrest rates between offenders with no criminal history and one-point offenders."  The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders at 14, United States Sentencing Commission (March 2017). The full report can be accessed and downloaded at https://www.ussc.gov/research/research-reports/criminal-history-and-recidivism-federal-offenders.

surrender; and again since his bail pending appeal release from incarceration on October 27, 2024. Mr. Stedman has demonstrated in the almost four years since his errant conduct that he will not reoffend.

Finally, the deterrent effect that this process and his conviction have had and will naturally have on him, as discuss *infra* more fully, also ensure that he will not recidivate (although even without those it seems clear that he will not commit any other crime).

➤ **Deterrence and Punishment**

### a. Specific Deterrence

The need – or more importantly lack of need - for specific deterrence of Mr. Stedman is addressed by reference to the preceding sections of this Memorandum. Mr. Stedman has been deterred by the over one year he has spent incarcerated, away from his wife, two children, parents, siblings and friends, as well as his business, and the $20,000 fine he paid. The family finances naturally have diminished during that time as well. The collateral consequences of his actions – over a year loss of freedoms through incarceration; social isolation; the loss of relationships; financial impact; social stigma; and restrictions of freedoms during release on bail – all have served to deter him and ensure that he will not reoffend.

### b. General Deterrence

General deterrence must be viewed in context. Here, Mr. Stedman's personal history, and the picture of him that emerges overall, makes clear that general deterrence still could and would be served by a time served sentence for his misdemeanor offenses, along with a fine (substantial as previously imposed) and restitution. As to general deterrence, for persons similarly situated to Mr. Stedman – not affiliated with any radical groups, a father of two, devoted son and husband, and well-employed productive society member – such a sentence will send an adequate deterrent message. Mr. Stedman has no prior criminal history. The direct and collateral societal consequences of his actions, his prosecution, and his self-reflection are sufficient to deter others as well.

The many factors that support this conclusion are presented in detail *supra* and in the Defendant's Appendix, but to reiterate the most salient they include:

14

- ➢ the aberrational nature of Mr. Stedman's conduct
- ➢ the lack of even any arrests or notable traffic violations in the past
- ➢ the strong continued family support network which Mr. Stedman has
- ➢ Mr. Stedman's history of service to others as reflected in the various letters contained in the Appendix hereto and summarized above
- ➢ The very low likelihood of recidivism by Mr. Stedman
- ➢ The self-reflection Mr. Stedman has done regarding his conduct and his remorse

The combination of those factors (and the others cited throughout) make Mr. Stedman's situation unique enough to warrant the sentence requested herein and recommended by the Probation Office. A sentence of the stigma and limitations resulting from the convictions he has sustained, along with the other attendant even if collateral consequences thereof, would do no harm to the concept of general deterrence. It would provide such in context. *See U.S. v. Howe*, 543 F.3d 128, 140 (3d Cir. 2008).

### c. Punishment

The need for punishment still would be met by the requested sentence. Serving twelve months incarceration, and a $20,000 fine has a substantially deleterious impact on anyone's life. It is not a situation Mr. Stedman ever intends to put himself in again. Other punitive – even if collateral -- effects upon Mr. Stedman include the following:

- A lasting stigma not only from his conviction, but the alienation from one-time friends and even family members because of the subject matter of his actions and the conviction

- The financial impact of legal fees, and the stresses and uncertainty of his "fate" over the three years since his arrest, including how such has and will continue to impact his family. Although it often is said that those "stresses" and "impacts" come from nothing other than choices a defendant made, they are nonetheless real stresses and impacts which at least feel punitive to a defendant, especially one like Patrick Stedman, who otherwise has led a perfectly community positive and law-abiding life

- Restrictions of his freedoms, including potentially being on a no-fly list as have many persons charged based on conduct in the events of January 6, 2021

Those things – although perhaps not intentionally punitive – nonetheless qualify as punishment and consequences suffered by Mr. Stedman, and respectfully should be considered in mitigation of the advisory guideline sentence recommended.

➢ **The kinds of sentences available**

The urged sentence is within the range of those available to the Court in this case.

➢ **The kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines**

The sentencing guidelines are discussed *supra*.

➢ **Pertinent policy statement issued by the Sentencing Commission**

There do not appear to be any particularly pertinent policy statements.

➢ **The need to avoid unwanted sentencing disparity among defendants with similar records who have been found guilty of similar conduct**

Considering the foregoing factors and facts, the sentence requested by Mr. Stedman would not create any <u>unwarranted</u> sentencing disparity from others convicted of similar offenses. The requested sentence would be in line – indeed more harsh – that the average sentence imposed on persons convicted of offenses subject to the same guideline as Mr. Stedman, as the Probation Office noted:

> During the last five fiscal years (FY2019-2023), there were 22 defendants whose primary guideline was §2A2.4, with a Final Offense Level of 12 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 19 defendants (86%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 9 month(s) and the median length of imprisonment imposed was 10 month(s). For all 22 defendants in the cell, the average sentence imposed was 8 month(s) and the median sentence imposed was 9 month(s).

December 12, 2024 Revised Recommendation of Final Presentence Investigation Report at 2 (docket document 108).

The government in its memorandum discusses several cases that are not on par with that of Mr. Stedman. See Government memorandum at 14-17 (Docket Document 109). Without going into the details of each case, for example, many of the cases which the

16

government cites[11] as support for its urged sentence involved sentences for a felony conviction (either in addition to or different that a felony under 18 U.S.C. § 1512, such as violation of 18 U.S.C. § 231 and/or 18 U.S.C. § 111, assault). Mr. Stedman is now to be sentenced on four (4) misdemeanor convictions, not any felony. Other cited cases involved upward departures of a modest nature, such as a <u>two-month total sentence of imprisonment</u> imposed upon Jolene Eicher, 22-38 (BAH), that involved conduct by a defendant convicted of the same four misdemeanors as Mr. Stedman, but whose conduct was worse and distinguishable from that of Mr. Stedman in that Ms. Eicher. According to the government's sentencing memorandum, Eicher

> was consistently at the forefront of the violent mob on the West side of the Capitol, often directly across from officers while they were fighting off other rioters; [and] actively assisted other rioters with climbing onto the Lower West Terrace"… .
>
> Distinct from other defendants who might have been present in another area or at a later time, Eicher was clearly at the front of mob during some of the most violent moments of the attack on Capitol and police. Eicher maintained her position against officers within mere feet of them—just an arms' length away. She, at a minimum, saw first-hand, the officers' desperate struggle. …
>
> [T]he government recommends that this Court sentence Defendant to 9 months of incarceration… .

*United States v. Eicher*, 22-38-BAH (Government Sentencing Memorandum, Docket Document 93 at 2, 14, 24).

Mr. Stedman neither was at the forefront of the mob directly across from officers, nor did he physically assist any other persons that day to breach the Capitol Building. Even then, the government asked for 9 months incarceration, 21 months less than the 30-month sentence of imprisonment it is now seeking regarding Mr. Stedman. The Court imposed a two (2) month

---

[11] The government also cites several examples of cases in which upward departures were applied but does not reference what were the charges of conviction and cites transcripts of sentencings which it does not provide in any appendix. Not all of those transcripts are available to the defendant Stedman on such short notice from the date the government submitted its memo to the date Mr. Stedman had to file this memorandum, and not all are accessible on PACER.

sentence on Eicher. *United States v. Eicher*, 22-38-BAH, Judgment (Docket Document 99).

> ### The need to provide restitution to any victims of the offense

Considering the misdemeanor convictions for which Mr. Stedman is to be re-sentenced, a $500.00 restitution award is the appropriate award. *See* December 12, 2024 Revised Recommendation of Final Presentence Investigation Report at 1, 4 (docket document 108).

> ### Fine

The Court previously imposed a $20,000 fine upon Mr. Stedman, and Mr. Stedman does not contest the Court imposing the same fine, which he has paid in full previously.

## CONCLUSION

The government's requested 30-month sentence[12] based on a sought upward variance or departure, would be greater than necessary to accomplish the attendant purposes of sentencing in the full context here, including all the mitigating factors addressed above in detail.

The government's most recent sentencing memorandum (Docket Document 109 at 23) essentially completely ignores all the above-discussed positive history and characteristics of Mr. Stedman, including but not limited to his positive contributions and personal growth efforts while incarcerated. All that information was available to the government (it has access to BOP records upon request or subpoena of course), and much of it was known to the government from the prior sentencing process, yet it fails to address such in its memorandum. The government's memorandum ignores Mr. Stedman's family and friend support network; the additional family hardship that would be occasioned by a resentence that makes Mr. Stedman return to imprisonment; his post-conviction positive interaction with other inmates; the low recidivism score assigned to him by the Federal Bureau of Prisons; his full compliance

---

[12] The Government in its recent sentencing memo Docket Document 109 states that the upward variance/departure it seeks is 14 months, but that is incorrect. It seeks an 18-month upward departure/variance from the top of the 10-12 month guideline range. The range is not 10-16 months, it is 10-12 months.

with his bail conditions and sentence conditions for almost four (4) years since his arrest on January 21, 2021; timely voluntary surrender without incident; his model behavior with no infractions while incarcerated; and the other positive attributes discussed above. Those factors support the defense requested sentence.

Mr. Stedman's requested 12-month/time-served overall sentence for the offenses – the top of the guideline range – would reflect a significant enhancement (anywhere from at least 20%-33.33% higher approximately) than others convicted and sentenced under the same guideline. Again, as noted by the probation Office:

> For the 19 defendants (86%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 9 month(s) and the median length of imprisonment imposed was 10 month(s). For all 22 defendants in the cell, the average sentence imposed was 8 month(s) and the median sentence imposed was 9 month(s).

December 12, 2024 Revised Recommendation of Final Presentence Investigation Report at 2 (docket document 108).

Furthermore, the requested fine -- $20,000 – is no small fine also considering Mr. Stedman's financial condition as it existed on the date of the original sentencing, which of course was negatively affected by the over one-year he also was incarcerated, as well as legal fees he incurred for the appeal, and this remand resentencing. That additional penalty also promotes respect for the law, is punitive, and provides general and specific deterrence.

The Court respectfully is urged to impose a sentence of 12 months/time served on each of Counts Two and Three, and 6 months/time served on each of Counts Four and Five, all to run concurrent to each other; a $20,000 fine; $500.00 restitution; 1 year of supervised release on Counts Two and Three to run concurrent to each other; and the mandatory special assessments. That sentence would be the sufficient but not greater than necessary sentence here.

        Respectfully submitted,

         /s/Rocco C. Cipparone, Jr.
         Rocco C. Cipparone, Jr., Esquire
         Attorney for defendant Patrick Stedman